**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| HUGUES GERVAT, derivatively on behalf of ZOOM VIDEO COMMUNICATIONS, INC., | |
| Plaintiff, | C.A. No.: |
| v. | **JURY TRIAL DEMANDED** |
| ERIC S. YUAN, KELLY STECKELBERG, JONATHAN CHADWICK, CARL M. ESCHENBACH, PETER GASSNER, KIMBERLY L. HAMMONDS, DAN SCHEINMAN, SANTIAGO SUBOTOVSKY, and BART SWANSON, | |
| Defendants, | |
| and | |
| ZOOM VIDEO COMMUNICATIONS, INC., | |
| Nominal Defendant. | |

## SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Hugues Gervat ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Zoom Video Communications, Inc. ("Zoom" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Eric S. Yuan, Kelly Steckelberg, Jonathan Chadwick, Carl M. Eschenbach, Peter Gassner, Kimberly L. Hammonds, Dan Scheinman, Santiago Subotovsky, and Bart Swanson (collectively, the "Individual Defendants" and together with Zoom, the "Defendants") for breaches of their fiduciary duties as directors, officers, and/or controlling shareholder of Zoom, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's

complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Zoom, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Zoom's directors, officers, and controlling shareholder between April 18, 2019 through the present (the "Relevant Period").

2. Zoom is a popular Delaware corporation based in San Jose, California, that provides video conferencing services and a platform that purportedly "delivers happiness and fundamentally changes how people interact." The Company offers "frictionless" connection via video, phone, chat, and content sharing through its cloud-based platform. Zoom strives to "live up to the trust [its] customers place in [it] by delivering a communications solution that 'just works.'"

3. The cornerstone of the Company's platform is its "Zoom Meetings" product, which provides video meetings equipped with chat and file sharing functionalities, to hosts and participants across the United States and internationally. Participants can join Zoom Meetings through the Zoom mobile application. Zoom provides a number of other communication services and features, including Zoom Chat, Zoom Rooms, and Zoom Video Webinars. The Company's customer base encompasses numerous industries, including education, entertainment, finance,

government, healthcare, retail/consumer products, and more. Zoom also provides its services to individuals. As of January 31, 2020, Zoom had approximately 81,900 customers with more than 10 employees.

4.      The Company was founded in 2011, by former Vice President of Cisco Systems, Inc. ("Cisco"), Eric S. Yuan ("Yuan"), who served, and continues to serve as Zoom's Chief Executive Officer ("CEO").

5.      On March 22, 2019, the Company filed a registration statement on Form S-1 with the SEC, to commence its initial public offering ("IPO") and take Zoom public. The Form S-1 was declared effective on April 17, 2019, after several amendments (the "Registration Statement").

6.      The next day, on April 18, 2019, the Company filed a prospectus on a Form 424B4 with the SEC, that purported to disclose necessary information about Zoom's products, platform, prospects, and general business, including pertinent risk factors, for the investing public's consideration before participating in Zoom's IPO and purchasing the newly-public shares (the "Prospectus," and together with the Registration Statement, the "IPO Documents"). Zoom's shares began publicly trading the same day, under the ticker symbol "ZM."

7.      The Company's IPO closed on April 23, 2019, with over 9.91 million shares sold to the investing public, not including shares sold pursuant to underwriter purchase agreements, at $36.00 per share.

8.      Throughout the Relevant Period, the Individual Defendants caused the Company to tout its interactions with operating systems and third-party applications, and the reliability of its technology, infrastructure, encryption and other security controls in filings with the SEC, earnings calls with investors, on its website, and through its own privacy policy, which also purportedly disclosed how users' personal information was handled at Zoom. Among the representations made,

was that hosts could enable end-to-end encryption for Zoom's video communications as part of Zoom's security measures. These representations were made in the Company's IPO Documents, and in Company statements and SEC reports following Zoom's IPO.

9. In reality, the Company's platform and its primary application were riddled with security deficiencies that exposed its network, including users' webcams, to unauthorized intruders. Moreover, the Company was also providing unnecessary personal user data to third parties, such as Facebook, Inc. ("Facebook") without the knowledge or authorization of Zoom users. It also became known that Zoom did not in fact offer end-to-end encryption, a system designed to prevent data from being modified or read by outside parties, as it had represented (collectively, the "Data and Security Exposure").

10. Reports of Zoom's security vulnerabilities began spreading to the market as early as July 2019, when a research article was published detailing a flaw in Zoom's systems for Macintosh users ("Mac") that allowed hackers to take over Zoom user webcams. Soon after, the Electronic Privacy Information Center ("EPIC"), a public interest group, filed a complaint with the U.S. Federal Trade Commission ("FTC') alleging, *inter alia*, that the Company "intentionally designed their web conferencing service to bypass browser security settings and remotely enable a user's web camera without the consent of the user[,]" thereby exposing user webcams to unauthorized attacks. In response to these disclosures, the price per share of Company stock declined. However, it remained artificially inflated, as investors remained uninformed of the scope of the Data and Security Exposure.

11. The true extent of the vulnerabilities inflicting the Company's privacy and security, such as the illicit sharing of user information with third parties, including Facebook, remained concealed from investors until March and April 2020, when the COVID-19 pandemic dramatically

shifted lives across the globe. With city and state governments increasingly issuing orders to shelter-in place, Zoom's applications and products became the tool of choice for numerous government operations, schools, businesses, and individuals, as personal and professional lives turned fully remote. As a result, the Company's share price, and the demand for Zoom products boomed.

12.     However, beginning in late March 2020 and continuing through April 6, 2020, a series of disclosures, including the Company's own admissions, revealed Zoom's improper data collection and transfer of user information to Facebook and the continued vulnerabilities in Zoom's security, including the prevalence of "Zoombombing," where unwanted intruders utilize the Company's screen-sharing features to hijack meetings and/or otherwise interrupt seemingly secure sessions. Further, on March 31, 2020, a number of articles revealed that Zoom's video conferencing software did not support end-to-end- encryption, but "[i]nstead it offers what is usually called transport encryption," a less secure means of encryption that allowed the Company itself to access unencrypted videos and audio of Zoom meetings.

13.     Revelation of the Data and Security Exposure subjected the Company to scrutiny from the Federal Bureau of Investigation ("FBI") and several state attorneys general ("AGs"), several legal proceedings brought by consumers, recently consolidated in the United States District Court for the Northern District of California, in the case captioned *In re Zoom Video Communications, Inc. Privacy Litigation*, Master File No. 5:20-cv-02155-LHK (N.D. Cal.) (the "Consumer Action"), and the loss of business by institutions that banned the use of Zoom for remote operations.

14.     On April 1, 2020, *Reuters* reported that one of the Company's customers, Space Exploration Technologies Corp. ("SpaceX") and SpaceX's largest customer, the National Aeronautics and Space Administration ("NASA"), banned their employees from using Zoom.

15.     Upon these disclosures, the Company's shares declined by $29.77 per share, or nearly 20%, between March 27, 2020 and April 2, 2020, from closing at $151.70 on March 27, 2020, to close at $121.93 per share on April 2, 2020 and declined further as subsequent disclosures were made.

16.     Between April 3, 2020 and April 4, 2020, additional disclosures were made regarding suspicious sales of Company stock made by Defendant Yuan, another AG investigation, additional research reports exposing significant weaknesses in Zoom's encryption, Zoom's "mistaken[]" allowance of two secondary datacenters located in China to accept calls from Zoom clients, and Yuan's admission that he "really messed up as CEO[.]"

17.     On April 6, 2020, New York City's Department of Education announced that it was banning the use of Zoom in city classrooms. The same day, an article reported on *Yahoo! Finance* disclosed that a link had been posted on a popular forum on the dark web that included 352 compromised Zoom accounts for hackers to target, including a major U.S. healthcare provider.

18.     On the news of the aforementioned, the Company's stock price fell $5.26 per share, or 4.10%, from closing at $128.20 per share, to close at $122.94 per share, the following trading day, on April 6, 2020.

19.     Throughout the Relevant Period, the investing public was under a false impression of the Company's business, operations, and its cybersecurity.

20.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to engage in the Data and Security Exposure, and by personally

making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Zoom's data privacy and security controls were insufficient, as evinced by the Data and Security Exposure; (2) despite the Company's own claims, Zoom's video communications software was not equipped with end-to-end encryption; (3) consequently, Zoom users faced certain risks, including a heightened risk that their personal information would be improperly retrieved by unapproved parties, such as Facebook; (4) revelation of the Data and Security Exposure would foreseeably decrease personal and professional usage of Zoom's video communication services; and (5) the Company failed to maintain internal controls.  As a result of the foregoing, Zoom's public statements were materially false and misleading at all relevant times.

21.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while six of the Individual Defendants made lucrative insider sales, netting proceeds of over $172.9 million.

22.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

23.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, its President and CEO, and its Chief Financial Officer ("CFO") to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the Consumer Action, multiple AG investigations, the need to undertake internal investigations, losses from the waste of

corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and are costing the Company millions of dollars.

24.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

25.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the CEO's liability in the Securities Class Action, of their not being disinterested and/or independent directors, of the fact that a majority of the directors are beholden to Defendant Yuan whose combined voting power is 34.4% as a result of his beneficial stock ownership, rendering him a controlling shareholder, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

27.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

28.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

29.     Venue is proper in this District because Zoom is incorporated in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

**Plaintiff**

30.     Plaintiff is a current shareholder of Zoom. Plaintiff has continuously held Zoom common stock at all relevant times.

**Nominal Defendant Zoom**

31.     Zoom is a Delaware corporation with its principal executive offices at 55 Almaden Boulevard, 6th Floor, San Jose, California 95113. Zoom's shares trade on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "ZM."

**Defendant Yuan**

32.     Defendant Yuan is the founder of Zoom, and has served as the Company's CEO, President, and Chairman of the Board since June 2011. According to the Company's Schedule 14A filed with the SEC on May 7, 2020 (the "2020 Proxy Statement), as of March 31, 2020, Defendant Yuan beneficially owned 45,529,724 shares of the Company's Class B common stock, which represented 39.3% of the Company's outstanding Class B common stock as of that date, and 34.4% of the total voting power with respect to all shares of Class A and Class B common stock, rendering him a controlling shareholder.[1] Given that the price per share of the Company's

---

[1] Class A common stock and Class B common stock vote together as a single class on all matters, including the election of directors, subject to limited circumstances. Each share of Class A common stock is entitled to one vote per share, and each share of Class B common stock is entitled to 10 votes per share.

common stock at the close of trading on March 31, 2020 was $146.12, Defendant Yuan owned approximately $6.6 billion worth of Zoom stock.

33.    For the fiscal year ended January 31, 2020, Defendant Yuan received $320,826 in compensation from the Company. This included $300,000 in salary, and $20,826 in non-equity incentive plan compensation.

34.    During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Yuan made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| April 23, 2019 | 583,787 | $36.00 | $21,016,332.00 |
| January 14, 2020 | 70,143 | $73.92 | $5,184,970.56 |
| January 15, 2020 | 70,143 | $75.77 | $5,314,735.11 |
| February 12, 2020 | 70,143 | $88.13 | $6,181,702.59 |
| February 13, 2020 | 70,143 | $89.56 | $6,282,007.08 |
| March 16, 2020 | 70,143 | $112.18 | $7,868,641.74 |
| March 17, 2020 | 70,143 | $108.20 | $7,589,472.60 |

35.    Thus, in total, before the fraud was exposed, he sold 1,004,645 Company shares on inside information, for which he received approximately $59.4 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

36.    The 2020 Proxy Statement stated the following about Defendant Yuan:

*Eric S. Yuan.* Mr. Yuan is the founder of our company and has served as the Chairman of our board directors, President and Chief Executive Officer since June 2011. From May 2007 to June 2011, Mr. Yuan served as Corporate Vice President of Engineering at Cisco Systems, Inc., a multinational technology company. Mr. Yuan served in various roles, most recently as Vice President of Engineering, at WebEx Communications, Inc., an internet company, from August 1997 until its acquisition by Cisco Systems, Inc. in May 2007. Mr. Yuan holds a Bachelor's degree in Applied Math from Shandong University of Science & Technology and a Master's degree in engineering from China University of Mining & Technology.

Mr. Yuan was selected to serve on our board of directors because of the perspective and experience he brings as our founder, as well as his extensive experience with technology companies.

**Defendant Steckelberg**

37.     Defendant Kelly Steckelberg ("Steckelberg") has served as the Company's CFO since November 2017. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Steckelberg beneficially owned 1,084,380 shares of the Company's Class B common stock and 27,912 of Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $146.12, Defendant Steckelberg owned approximately $162.5 million worth of Zoom stock.

38.     For the fiscal year ended January 31, 2020, Defendant Steckelberg received $408,533 in compensation from the Company. This included $356,250 in salary, and $52,283 in non-equity incentive plan compensation.

39.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Steckelberg made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| October 18, 2019 | 11,067 | $65.76 | $727,765.92 |
| November 18, 2019 | 11,067 | $70.14 | $776,239.38 |
| December 18, 2019 | 11,067 | $67.01 | $741,599.67 |
| January 21, 2020 | 11,067 | $75.99 | $840,981.33 |
| February 19, 2020 | 11,067 | $103.02 | $1,140,122.34 |
| March 19, 2020 | 11,067 | $126.17 | $1,396,323.39 |

40.     Thus, in total, before the fraud was exposed, she sold 66,402 Company shares on inside information, for which she received approximately $5.6 million. Her insider sales, made

with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

41.     The 2020 Proxy Statement stated the following about Defendant Steckelberg:

*Kelly Steckelberg.* Ms. Steckelberg has served as our Chief Financial Officer since November 2017. Prior to joining us, Ms. Steckelberg served in various executive positions at Zoosk, Inc., an internet dating company, including Chief Executive Officer from December 2014 to June 2017, Chief Operating Officer from August 2012 to December 2014 and Chief Financial Officer from March 2011 to December 2014. From May 2007 to March 2011, Ms. Steckelberg worked at Cisco Systems, Inc., where her roles included Consumer Segment Finance Senior Director and divisional Chief Financial Officer for WebEx. Prior to joining Cisco Systems, Inc., Ms. Steckelberg served as Controller and Chief Accounting Officer at WebEx Communications, Inc., from May 2006 until its acquisition by Cisco Systems, Inc. in May 2007. Ms. Steckelberg holds a B.B.A. in Accounting and an MPA from the University of Texas at Austin.

### Defendant Chadwick

42.     Defendant Jonathan Chadwick ("Chadwick") has served as a Company director since September 2017. He also serves as Chair of the Company's Audit Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Chadwick beneficially owned 290,000 shares of the Company's Class B common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $146.12, Defendant Chadwick owned approximately $42.3 million worth of Zoom stock.

43.     For the fiscal year ended January 31, 2020, Defendant Chadwick received $37,500 in compensation from the Company, all in fees earned or paid in cash.

44.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Chadwick made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| February 19, 2020 | 50,000 | $101.49 | $5,074,500.00 |
| February 20, 2020 | 50,000 | $110.19 | $5,509,500.00 |

| March 16, 2020 | 10,000 | $111.67 | $1,116,700.00 |

45.     Thus, in total, before the fraud was exposed, he sold 110,000 Company shares on inside information, for which he received approximately $11.7 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

46.     The 2020 Proxy Statement stated the following about Defendant Chadwick:

*Jonathan Chadwick.* Mr. Chadwick has served as a member of our board of directors since September 2017. Since April 2016, Mr. Chadwick has been a private investor. From November 2012 to April 2016, Mr. Chadwick served as Chief Financial Officer, Chief Operating Officer and Executive Vice President of VMware, Inc., a virtualization and cloud infrastructure solutions company. From March 2011 until October 2011, he served as the Chief Financial Officer of Skype Communication S.a.r.l., a voice over IP (VoIP) service company, and as a Corporate Vice President of Microsoft Corporation, a technology company, after its acquisition of Skype Communication S.a.r.l. from October 2011 until November 2012. From June 2010 until February 2011, Mr. Chadwick served as Executive Vice President and Chief Financial Officer of McAfee, Inc., a security software company, until its acquisition by Intel Corporation. From September 1997 until June 2010, Mr. Chadwick served in various executive roles at Cisco Systems, Inc. He also worked for Coopers & Lybrand, an accounting firm (now PricewaterhouseCoopers) in various roles in the United States and United Kingdom. He currently serves on the boards of directors of Elastic N.V., a search and data analysis company, ServiceNow, Inc., a cloud computing company, and various private companies. He previously served on the board of directors of Cognizant Technology Solutions Corporation, an IT business services provider, and F5 Networks, Inc., an application networking delivery company. Mr. Chadwick is a Chartered Accountant in England and holds a B.Sc. degree in Electrical and Electronic Engineering from the University of Bath.

We believe Mr. Chadwick is qualified to serve as a member of our board of directors because of his significant financial expertise as a Chief Financial Officer and service on the boards of directors of various public companies.

**Defendant Eschenbach**

47.     Defendant Carl M. Eschenbach ("Eschenbach") has served as a Company director since November 2016. He also serves as a member of the Company's Audit Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Eschenbach beneficially owned

380,967 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $146.12, Defendant Eschenbach owned approximately $55.6 million worth of Zoom stock.

48.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Eschenbach made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| April 23, 2019 | 828,437 | $34.20 | $28,332,545.40 |
| March 6, 2020 | 130,385 | $112.89 | $14,719,162.65 |

49.     Thus, in total, before the fraud was exposed, he sold 958,822 Company shares on inside information, for which he received approximately $43 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

50.     The 2020 Proxy Statement stated the following about Defendant Eschenbach:

*Carl M. Eschenbach.* Mr. Eschenbach has served as a member of our board of directors since November 2016. Since April 2016, Mr. Eschenbach has been a general partner at Sequoia Capital Operations, LLC, a venture capital firm. Prior to joining Sequoia Capital Operations, LLC, Mr. Eschenbach spent 14 years at VMware, Inc., most recently as its President and Chief Operating Officer, a role he held from December 2012 to March 2016. He served as VMware, Inc.'s Co-President and Chief Operating Officer from April 2012 to December 2012, as Co-President, Customer Operations from January 2011 to April 2012, and as Executive Vice President of Worldwide Field Operations from May 2005 to January 2011. Prior to joining VMware, Inc. in 2002, Mr. Eschenbach held various sales management positions with Inktomi Corporation, 3Com Corporation, Lucent Technologies Inc., and Dell EMC. He currently serves on the boards of directors of Palo Alto Networks, Inc., a global cybersecurity company, and Workday, Inc., a leading provider of enterprise cloud applications. Mr. Eschenbach is also a director of several private companies. Mr. Eschenbach received an electronics technician diploma from DeVry University.

We believe Mr. Eschenbach is qualified to serve as a member of our board of directors because of his significant expertise in the technology industry and service on the boards of directors of various public companies.

**Defendant Gassner**

51.     Defendant Peter Gassner ("Gassner") has served as a Company director since October 2015. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Gassner beneficially owned 487 shares of the Company's Class A common stock, and 1,202,720 shares of the Company's Class B common stock, which represented 1% of the Company's outstanding Class B common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $146.12, Defendant Gassner owned approximately $175.8 million worth of Zoom stock.

52.     For the fiscal year ended January 31, 2020, Defendant Gassner received $118,181 in compensation from the Company. This included $22,500 in fees earned or paid in cash and $96,681 in stock awards.

53.     The 2020 Proxy Statement stated the following about Defendant Gassner:

*Peter Gassner.* Mr. Gassner has served as a member of our board of directors since October 2015. Since January 2007, Mr. Gassner has served as Chief Executive Officer and member of the board of directors of Veeva Systems Inc., a cloud computing company. Prior to that, from July 2003 to June 2005, Mr. Gassner served as Senior Vice President of Technology at salesforce.com, inc., a global leader in CRM. From January 1995 to June 2003, Mr. Gassner served as Chief Architect and General Manager of PeopleTools at PeopleSoft, Inc., a company providing human resources management systems acquired by Oracle. Mr. Gassner previously served on the board of directors of Guidewire Software, Inc., a software publisher. Mr. Gassner holds a B.S. in Computer Science from Oregon State University.

We believe Mr. Gassner is qualified to serve as a member of our board of directors because of his significant management experience in the technology industry and service on the boards of directors of various public companies.

**Defendant Hammonds**

54.     Defendant Kimberly L. Hammonds ("Hammonds") has served as a Company director since September 2018. She also serves as a member of the Company's Nominating and

Corporate Governance Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Hammonds beneficially owned 96,875 shares of the Company's Class B common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $146.12, Defendant Hammonds owned approximately $14.1 million worth of Zoom stock.

55.   For the fiscal year ended January 31, 2020, Defendant Hammonds received $25,125 in compensation from the Company, all in fees earned or paid in cash.

56.   During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Hammonds made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| October 15, 2019 | 37,500 | $70.02 | $2,625,750.00 |
| November 8, 2019 | 3,125 | $70.00 | $218,750.00 |
| November 18, 2019 | 16,797 | $70.14 | $1,178,141.58 |
| January 6, 2020 | 3,125 | $70.00 | $218,750.00 |
| January 8, 2020 | 3,125 | $71.69 | $224,031.25 |
| February 10, 2020 | 3,125 | $88.87 | $277,718.75 |
| March 9, 2020 | 3,125 | $109.14 | $341,062.50 |

57.   Thus, in total, before the fraud was exposed, she sold 69,922 Company shares on inside information, for which she received approximately $5 million. Her insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

58.   The 2020 Proxy Statement stated the following about Defendant Hammonds:

*Kimberly L. Hammonds.* Kimberly Hammonds has served as a member of our board of directors since September 2018. Ms. Hammonds served as the Group Chief Operating Officer at Deutsche Bank AG, a global financial services company and as a member of the Deutsche Bank Management Board from November 2015 to May 2018. She joined Deutsche Bank as Chief Information Officer and Global

Co-Head Technology and Operations in November 2013 from The Boeing Company, a global aerospace company. Ms. Hammonds joined The Boeing Company in 2008 and served in a number of capacities, including most recently as Chief Information Officer/Vice President, Global Infrastructure, Global Business Systems from January 2011 to November 2013. Ms. Hammonds joined The Boeing Company from Dell Incorporated, a technology company, where she led IT systems development for manufacturing operations in the Americas, and directed global IT reliability and factory systems since 2007. Ms. Hammonds currently serves on the boards of directors of Box, Inc., an enterprise cloud content and file sharing provider, and Tenable Holdings, Inc., a provider of cybersecurity solutions. Ms. Hammonds previously served on the boards of directors of Cloudera, Inc., a data management, machine learning and advance analytics platform provider, and Red Hat, a provider of open source solutions. Ms. Hammonds holds a B.S.E. from the University of Michigan at Ann Arbor and an MBA from Western Michigan University.

We believe Ms. Hammonds is qualified to serve as a member of our board of directors because of her significant market and financial expertise and service on the boards of directs of various public companies.

**Defendant Scheinman**

59.     Defendant Dan Scheinman ("Scheinman") has served as a Company director since January 2013. He also serves as Lead Independent Director, Chair of the Company's Compensation Committee and as a member of the Audit Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Scheinman beneficially owned 2,846,372 shares of the Company's Class B common stock, which represented 2.5% of the Company's outstanding Class B common stock as of that date, and 2.2% of the total voting power with respect to all shares of Class A and Class B common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $146.12, Defendant Scheinman owned approximately $415.9 million worth of Zoom stock.

60.     For the fiscal year ended January 31, 2020, Defendant Scheinman received $50,625 in compensation from the Company, all in fees earned or paid in cash.

61.     The 2020 Proxy Statement stated the following about Defendant Scheinman:

*Dan Scheinman.* Mr. Scheinman has served as a member of our board of directors since January 2013. Since April 2011, Mr. Scheinman has served as an angel investor. From January 1997 to April 2011, Mr. Scheinman served in various roles at Cisco Systems, Inc., most recently as Senior Vice President, Cisco Media Solutions Group. He currently serves on the boards of directors of Arista Networks, Inc., a cloud networking company, and several private companies. Mr. Scheinman holds a B.A. degree in Politics from Brandeis University and a J.D. from the Duke University School of Law.

We believe Mr. Scheinman is qualified to serve as a member of our board of directors because of his significant knowledge of our company and the technology industry.

**Defendant Subotovsky**

62.     Defendant Santiago Subotovsky ("Subotovsky") has served as a Company director since December 2014. He also serves as Chair of the Company's Nominating and Corporate Governance Committee and as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Subotovsky beneficially owned 143,462 shares of the Company's Class A common stock and 17,988,825 shares of the Company's Class B common stock, which represented 15.6% of the Company's outstanding Class B common stock as of that date, and 13.6% of the total voting power with respect to all shares of Class A and Class B common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $146.12, Defendant Subotovsky owned approximately $2.6 billion worth of Zoom stock.

63.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Subotovsky made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| April 23,2019 | 912,026 | $34.20 | $31,191,289.20 |
| March 10, 2020 | 73,168 | $108.97 | $7,973,116.96 |
| March 19, 2020 | 73,168 | $121.13 | $8,862,839.84 |

64.     Thus, in total, before the fraud was exposed, he sold 1,058,362 Company shares on inside information, for which he received approximately $48 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

65.     The 2020 Proxy Statement stated the following about Defendant Subotovsky:

*Santiago Subotovsky.* Mr. Subotovsky has served as a member of our board of directors since December 2014. Mr. Subotovsky is a General Partner at Emergence Capital, a venture capital firm, and has been with the firm since 2010. In 1999, Mr. Subotovsky founded AXG Tecnonexo, an e-learning vendor in Latin America. Mr. Subotovsky currently serves on the boards of directors of several private companies. He holds a B.S. in Economics from Universidad de San Andrés in Argentina and an MBA from Harvard Business School. Mr. Subotovsky is an Endeavor Entrepreneur and Kauffman Fellow.

We believe Mr. Santiago is qualified to serve on our board of directors because of his experience in the venture capital industry and market knowledge and his experience serving as a director of various private companies.

**Defendant Swanson**

66.     Defendant Bart Swanson ("Swanson") has served as a Company director since August 2013. He also serves as a member of the Company's Compensation Committee and Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Swanson beneficially owned 85,908 shares of the Company's Class B common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $146.12, Defendant Swanson owned approximately $12.5 million worth of Zoom stock.

67.     The 2020 Proxy Statement stated the following about Defendant Swanson:

*Bart Swanson.* Mr. Swanson has served as a member of our board of directors since August 2013. Since March 2013, Mr. Swanson has served as an advisor at Horizons Ventures Limited, a venture capital firm. Previously, Mr. Swanson served as Chairman and President of Summly Ltd., a mobile news app acquired by Yahoo Inc., the Chief Operating Officer of Badoo Ltd., a social discovery network, the

Managing Director and Vice President International at GSI Commerce, an e-commerce corporation acquired by eBay Inc., and a General Manager at Amazon.com, Inc., a multinational technology company. Mr. Swanson currently serves on the boards of directors of several private companies. Mr. Swanson previously served as a director of the Modern Times Group (MTG), a digital entertainment company. Mr. Swanson holds a B.A. in History and Political Science from the University of Southern California, an M.A. in International Studies from the University of Pennsylvania, and an MBA from The Wharton School of the University of Pennsylvania.

We believe Mr. Swanson is qualified to serve as a member of our board of directors because of his experience in the venture capital industry and market knowledge and his experience serving as a director of various private companies.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

68.     By reason of their positions as officers, directors, controlling shareholder, and/or fiduciaries of Zoom and because of their ability to control the business and corporate affairs of Zoom, the Individual Defendants owed Zoom and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Zoom in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Zoom and its shareholders so as to benefit all shareholders equally.

69.     Each director, officer, and controlling shareholder of the Company owes to Zoom and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

70.     The Individual Defendants, because of their positions of control and authority as directors, officers, and/or controlling shareholders of Zoom, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

71.     To discharge their duties, the officers, directors, and controlling shareholder of Zoom were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

72.     Each Individual Defendant, by virtue of his or her position as a director, officer, and/or controlling shareholder, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors, officers, and controlling shareholders of Zoom, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers, directors, and/or controlling shareholders of the Company has been ratified by the remaining Individual Defendants who collectively comprised Zoom's Board at all relevant times.

73.     As senior executive officers, directors, and/or controlling shareholder of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in

21

this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

74.     To discharge their duties, the officers and directors of Zoom were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Zoom were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Zoom's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Zoom conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Zoom and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Zoom's operations would comply with all

applicable laws and Zoom's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

75.     Each of the Individual Defendants further owed to Zoom and the shareholders the duty of loyalty requiring that each favor Zoom's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

76.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Zoom and were at all times acting within the course and scope of such agency.

77.     Because of their advisory, executive, managerial, directorial, and controlling positions with Zoom, each of the Individual Defendants had access to adverse, non-public information about the Company.

78.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Zoom.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

79.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

80.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

81.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Zoom was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

82.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or

substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

83.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Zoom, and was at all times acting within the course and scope of such agency.

## ZOOM'S CODE OF CONDUCT

84.     The Company's Code of Conduct is purportedly designed to ensure the Company is:

- Operating our business ethically and with integrity;

- Avoiding actual or apparent conflicts of interest;

- Compliance with the letter and spirit of all laws and Zoom policies, including full, fair, accurate, timely and understandable disclosure in reports and documents we filed with the U.S. Securities and Exchange Commission (the "SEC") and in our other public communications; and

- The prompt internal reporting of suspected violations of this Code.

85.     Zoom's Code of Conduct applies to, "the directors, executives, employees and independent contractors of Zoom and its subsidiaries."

86.     In a section titled, "Conflicts of Interest," the Code of Conduct provides:

We have a duty to act in the best interests of Zoom and its stockholders, employees and other constituencies and not in our individual self-interest. A conflict of interest may exist where the interests or benefits of one person or entity conflict or appear to conflict with the interests or benefits of Zoom. Your decisions and actions related to Zoom should be based on the best interests of Zoom and not based on personal relationships or benefits, either for yourself or for others. Zoom personnel must never use or attempt to use their position with Zoom to obtain improper personal benefits.

87.     In a section titled, "Compliance," the Code of Conduct states, in relevant part:

Zoom strives to comply with all applicable laws and regulations. It is your personal responsibility to adhere to the standards and restrictions imposed by those laws and

regulations, including those relating to financial and accounting matters. The same applies to policies we adopt, such as this one. Even if conduct complies with the letter of the law or our policies, we must avoid conduct that will have an adverse effect on the trust and confidence of our customers, partners or investors. Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as Zoom, to civil and/or criminal penalties.

* * *

Insider Trading. Employees who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business. All nonpublic information about Zoom or about companies with which we do business is considered confidential information. To use material nonpublic information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical, it is illegal. Employees must exercise the utmost care when handling material inside information. Please refer to our Insider Trading Policy for more detailed information.

88.     The Code of Conduct further provides, in a section titled, "Protection and Proper Use of Company Assets," that "[a]ll employees are expected to protect Zoom's assets and ensure their efficient use."

89.     In a section titled, "Confidentiality," the Code of Conduct maintains that "if you are handling information protected by any privacy policy published by us, such as our website policy, then you must handle that information in accordance with the applicable policy.

90.     The Code of Conduct further provides for "Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting; Accurate Financial and Accounting Disclosures," as follows:

Our principal Chief Executive Officer, Chief Financial Officer and people who perform similar functions are our "senior financial officers" and are responsible for ensuring that disclosures in our periodic reports and other public communications are full, fair, accurate, timely and understandable.

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed

26

accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

* * *

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the SEC. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about Zoom that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

  • no employee may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

  •all employees must cooperate fully with our finance and accounting department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete;

  • no employee, director or person acting under their direction, may coerce, manipulate, mislead or fraudulently influence our finance and accounting department, our independent public accountants or counsel, if the employee, director or other person knows or should know that the action, if successful, could result in rendering Zoom's financial statements materially misleading; and

  • no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to their manager, the Compliance Officer, the Audit Committee or one of the other compliance resources described in our Whistleblower Policy on reporting complaints regarding accounting and auditing matters.

91.     The Individual Defendants violated the Code of Conduct by engaging in or permitting the Data and Security Exposure, the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, and failing to report the same. Moreover, six of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, and comply with laws and regulations.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

92.     In April 2011, Defendant Yuan founded the teleconferencing software company, Zoom, under the name Saasbee, Inc. In February 2012, the Company changed its name to Zoom Communications, Inc., and adopted its current name in May 2012. Yuan formerly served as Cisco's vice president but found himself unhappy with the outdated video and audio services the company provided.

93.     Zoom provides a video-first communications platform that virtually connects people through "frictionless video, phone, chat and content sharing[,]" enabling thousands of people to participate in single face-to-face meetings, across devices and locations.

94.     The Company's customer base encompasses individuals as well as numerous industries, including education, entertainment, finance, government, healthcare, retail/consumer

products, and more. As of January 31, 2020, Zoom had approximately 81,900 customers with more than 10 employees.

95.     The cornerstone of the Company's platform is its "Zoom Meetings," which was publicly released in January 2013, and provides HD video, voice, chat, and content sharing across mobile devices, desktops, laptops, telephones, and conference room systems. Zoom Meetings integrate with third-party applications, including Dropbox, Google, LinkedIn, Microsoft, and Slack. The Company touts its meetings as "a flexible tool for on-the-go employees who rely on their mobile device or tablet throughout their business day."

96.     Zoom Meetings include a suite of products and features, purportedly "designed to give users an easy, reliable, and innovative video-first communications experience." Zoom Meetings are comprised of hosts and attendees, and are equipped with chat and file sharing functionalities, to hosts and participants across the United States and internationally. Participants can join Zoom Meetings through the Zoom mobile application ("app"). Zoom provides a number of other communication services and features, including Zoom Chat, Zoom Rooms, and Zoom Video Webinars.

97.     Zoom generates revenue from sales of subscriptions to its platform. Although the Company's main Zoom Meetings are offered to users, free of charge, Zoom offers upgraded paid subscription plans and products. The Company's paid offerings include Pro, Business, and Enterprise plans, which provide enhanced features and functions, including expanded attendee and time limits.

98.     The Company initiated the process for going public on March 22, 2019, with the filing of its Registration Statement, declared effective on April 17, 2019, following several amendments. The Company's IPO took place the next day, on April 18, 2019. On that day, the

Company filed its Prospectus, which purportedly disclosed the necessary information for investors to know about Zoom's products, platform, prospects, and general business, including pertinent risk factors, before participating in Zoom's IPO. Zoom's shares began publicly trading the same day, under the ticker symbol "ZM."

99.     The Company's IPO closed on April 23, 2019, with over 9.91 million shares sold to the investing public, and an additional 3,130,435 shares sold to underwriters of the IPO, at $36.00 per share. Certain selling shareholders, including Company insiders, also registered 10,958,131 shares of stock for resale during the IPO.

### *COVID-19 Pandemic and the Booming Demand of Zoom's Common Stock*

100.     In early 2020, cities, states, and countries across the globe became exposed to a new strand of the coronavirus, known as COVID-19. The virus spread across the globe, enveloping the world in a pandemic that required a dramatic shift in societies to socially distance and stay at home as much as feasible. Thus, during the first quarter of the 2020 calendar year, millions of people were placed under stay-at-home directives and/or quarantine restrictions issued by state and/or local governments. With the advent of "shelter-in-place" directives, individuals, businesses, and institutions began increasingly relying on Zoom Meetings and other communication features offered by the Company as a primary method of communicating and/or providing services to the public.  Zoom's platform met a dire need and became a popular solution for facilitating seemingly secure communications between people on a personal and professional level. The Company's touted security, reliability, and accessibility placed Zoom in an advantageous position to secure the attention of this unique market and experience skyrocketing growth, while many other companies on the market were suffering historic lows caused by the unknown impact the COVID-19 pandemic would have on the global economy.

101.    Accordingly, the Company's share price experienced explosive growth in 2020, from a starting point of approximately $68.00 per share on January 2, 2020 to a high of nearly $165.00 per share by March 23, 2020.

**Data and Security Exposure**

***Vulnerabilities in Zoom's Security and "Zoombombing"***

102.    The Individual Defendants caused the Company to significantly overstate Zoom's security measures and controls throughout the Relevant Period. Despite assuring otherwise to its users, the Company's software app and video conference platform failed to provide secure and reliable video conferencing. The Company's video communications were not equipped with end-to-end encryption, despite Zoom's contrary representations, leaving user communications vulnerable to being read or changed by unauthorized/outside parties to those communications. Insight into the significant deficiencies in Zoom's privacy and security measures began to come to light as early as July 2019, when Jonathan Leitschuh published an article discussing a vulnerability in Zoom's system for Mac users that allowed any website to forcibly join a user to a video-enabled Zoom call, without the users' permission. According to Leitschuh, although the Company eventually identified and disclosed the vulnerability, Zoom merely patched the problem with a "quick fix solution" that failed to protect against unwanted users maliciously entering into Zoom calls and meetings, potentially exposing 750,000 companies around the world.[2]

103.    The vulnerabilities in Zoom's product design and security practices resulted in EPIC filing a complaint with the FTC to investigate the Company for, *inter alia*, exposing users

---

[2]   https://medium.com/bugbountywriteup/zoom-zero-day-4-million-webcams-maybe-an-rce-just-get-them-to-visit-your-website-ac75c83f4ef5. Last visited June 10, 2020.

to the prospect of being vulnerable to unwanted remote surveillance and also provided unauthorized users with the ability to intrude on calls.

104.    Zoom's Meetings remained exposed to potential attacks throughout the Relevant Period, due in part, to further weaknesses in Zoom's encryption. As more users began utilizing Zoom Meetings for their day to day life and business after the COVID-19 pandemic began, a practice known as "Zoombombing" also became more frequent. Zoombombing occurs when unwanted intruders disrupt Zoom meetings, calls, and/or conferences, and post offensive images and/or speech. "Zoombombers," i.e., the hackers that initiate these intrusions/harassments, have disrupted online classes, business conferences, and presentations across the United States and have resulted in significant regulatory scrutiny over the Company, including by the FBI and state AGs.[3]

### *Unauthorized Transfer of Users' Personal Information*

105.    During the Relevant Period, Zoom collected and distributed consumer data analytics to Facebook without users' knowledge or authorization. The Company's privacy policy at the time stated that it may collect the profile information of Facebook users in connection with its software development kit ("SDK"), whenever users logged into Zoom's app with their Facebook accounts. However, unbeknownst to users and investors, the Company was also transmitting unnecessary data analytics to Facebook for users with and without Facebook accounts. Specifically, Zoom's app was embedded with a code that automatically provided the personal information of users to Facebook, and potentially other third parties. This information included details of a users' device, including the model, the time zone, the city the user connecting to Zoom's services from the app was located in, and the carrier utilized by the user. Such information

---

[3]  https://www.npr.org/2020/04/03/826129520/a-must-for-millions-zoom-has-a-dark-side-and-an-fbi-warning. Last visited June 10, 2020.

provided Facebook and possibly other companies with data for targeted advertisement. The code particularly impacted iOS applications, and resulted in the transfer of data analytics to Facebook each time a user opened the Zoom app. Such information was later admittedly improperly and unnecessarily provided to Facebook through Facebook's SDK.[4]

106.    On or around March 27, 2020, the Company reconfigured its Facebook SDK to remove the data sharing feature. However, the Company did not disclose any action taken about information already shared with Facebook. Moreover, in order to protect against the unauthorized data transfer, users would need to actively download the latest version of the application and those that did not, remain(ed) vulnerable.

107.    The Company's inadequate systems and communications to Zoom users resulted in the invasion of privacy for numerous consumers, including users that did not have Facebook accounts and led several consumers to file complaints and initiate lawsuits against the Company for invasion of privacy and alleged violations of pertinent state consumer protection laws. These lawsuits were recently consolidated into the Consumer Action, which remains ongoing.

**False and Misleading Statements**

*April 18, 2019 IPO Documents*

108.    On April 18, 2019, the Company began trading its shares on NASDAQ. As outlined above, the IPO Documents purported to disclose the necessary information about the Company that investors would need to determine whether or not to participate in the IPO. The IPO Documents highlighted that Zoom's "unique technology and infrastructure enable best-in-class reliability, scalability and performance." The IPO Documents further touted that the Company

---

[4]        https://blog.zoom.us/wordpress/2020/03/27/zoom-use-of-facebook-sdk-in-ios-client/.Last visited June 10, 2020.

"offer[s] robust security capabilities, including **end-to-end encryption**, secure login, administrative controls and role-based access controls." (Emphasis added).[5]

109.    The IPO Documents additionally maintained that "[o]ne of the most important features of [the Company's] platform is its broad interoperability with a range of diverse devices, operating systems and third-party applications." The IPO Documents described Zoom's platform as being "accessible from the web and from devices running Windows, Mac OS, iOS, Android and Linux[]"; and stated that the Company had "integrations with Atlassian, Dropbox, Google, LinkedIn, Microsoft, Salesforce, Slack and a variety of other productivity, collaboration, data management and security vendors." The IPO Documents also stated that Zoom "provide[s], develop[s] and create[s] applications for [its] platform partners that integrate [its] platform with [its] partners' various offerings."

110.    With respect to Zoom's purported growth strategy, the IPO Documents stated that Zoom, "enable[s] developers to embed our platform into their own offerings through open application program interfaces (APIs) and our cross-platform software development kits (SDKs)[]" like those already utilized by the Company, or  that would be used by the Company with Facebook's SDK.

111.    The IPO Documents assured that Zoom's platform was reliable, easy to use, and "just works" stating in relevant part that:

---

[5] The Company also touted its commitment to protect the security of its users' personal data in the privacy policy that had been updated, upon information and belief, a month before the IPO took place. The Company also released "Security Whitepapers" detailing Zoom's security guide, after the IPO took place, which were modified and updated throughout the Relevant Period. These documents also assured the investing public of Zoom's commitment to its privacy and security measures. The most recent versions of these documents, dated April 2020, may be retrieved on the Company's website. https://zoom.us/docs/en-us/privacy-and-security.html. Last visited June 11, 2020.

> [Zoom's] cloud-native platform delivers reliable, high-quality video that is easy to use, manage and deploy, provides an attractive return on investment, is scalable and easily integrates with physical spaces and applications. We believe that rich and reliable communications lead to interactions that build greater empathy and trust. We strive to live up to the trust our customers place in us by delivering a communications solution that 'just works.'

112.    Additionally, the IPO Documents asserted that the Company "strive[s] to comply with applicable laws, regulations, policies and other legal obligations relating to privacy, data protection and information security to the extent possible."

113.    Lastly, the IPO Documents enumerated general, boilerplate, risk provisions the Company could become subject to related to data privacy, hacking, and cybersecurity, and failed to include tailored risks that Zoom was already subjected to due to the Data and Security Exposure. The IPO Document's "catch-all" risk provisions included that Zoom's "actual or perceived failure to comply with privacy, data protection and information security laws, regulations, and obligations could harm our business." The IPO Documents also noted the following about the Company's historic issues with its security measures:

> Our security measures have, on occasion, in the past, been, and may in the future be, compromised Consequently, our products and services may be perceived as not being secure. This perception may result in customers and hosts curtailing or ceasing their use of our products, our incurring significant liabilities and our business being harmed.

### *June 7, 2019 Form 10-Q*

114.    On June 7, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended April 30, 2019 with the SEC (the "1Q20 10-Q"). The 1Q20 10-Q was signed by Defendants Yuan and Steckelberg and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Yuan and Steckelberg attesting to the accuracy of the 1Q20 10-Q.

115.     The 1Q20 10-Q contained substantively the same statements made in ¶¶109, 111-113 concerning the manner in which Zoom interacted with various operating systems and third-party applications, the reliability of its platform, its accessibility, and its capacity to foster trust with users and customers, Zoom's efforts to comply with laws, policies, and regulations pertaining to privacy, data protection, and information security, and general, boiler-plate risk provisions that failed to account for known risks Zoom was subjected to due to the Data and Security Exposure.

116.     The statements referenced in ¶¶108-115 herein were materially false and misleading because they failed to disclose, *inter alia*, that: (1) Zoom's data privacy and security controls were insufficient, as evinced by the Data and Security Exposure; (2) despite the Company's own claims, Zoom's video communications software was not equipped with end-to-end encryption; (3) consequently, Zoom users faced certain risks, including a heightened risk that their personal information would be improperly retrieved by unapproved parties, such as Facebook; (4) revelation of the Data and Security Exposure would foreseeably decrease personal and professional usage of Zoom's video communication services; and (5) the Company failed to maintain internal controls. As a result of the foregoing, Zoom's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge While False and Misleading Statements Continue**

117.     On July 8, 2019, Jonathan Leitschuh, a software engineer and security researcher, published an article, the link to which he provided in his Twitter account, titled, "Zoom Zero Day: 4+ Million Webcams & maybe an RCE? Just get them to visit your website!" The article purported to reveal a serious vulnerability in Zoom's conference call services "in the Mac Zoom Client [that] allows any malicious website to enable your camera without your permission." The article

maintained that "[t]he flaw potentially exposes up to 750,000 companies around the world that use Zoom to conduct day-to-day business."

118.    On this news, Zoom's stock price fell $1.12 per share, or 1.22%, from closing at $91.88 per share on July 5, 2019, to close at $90.76 per share the next trading day, on July 8, 2019.

119.    A few days later, on July 11, 2019, EPIC, a public interest research organization, filed its complaint with the FTC, urging the FTC to launch an investigation into Zoom's problematic security and privacy measures, or lack thereof. The EPIC complaint alleged, *inter alia*, that Zoom "placed at risk the privacy and security of the users of its services"; and that it "intentionally designed [its] web conferencing service to bypass browser security settings and remotely enable a user's web camera without the consent of the user." The EPIC complaint further alleged that "[a]s a result, Zoom exposed users to the risk of remote surveillance, unwanted videocalls, and denial-of-service attacks." Moreover, EPIC asserted that "[w]hen informed of the vulnerabilities Zoom did not act until the risks were made public, several months after the matter was brought to the company's attention," that the Company "exposed its users to a wide range of harms, many of which are ongoing," and that Zoom's "business practices amount to unfair and deceptive practices under Section 5 of the FTC Act, subject to investigation and injunction by the [FTC]."[6]

120.    On this news, Zoom's stock price fell $1.32 per share, or 1.42%, from closing at $92.72 per share on July 10, 2019, to close at $91.40 per share on July 11, 2019.

121.    Despite these revelations, the Company's shares continued to trade at artificially inflated rates, as the Individual Defendants continued to make and/or cause the Company to make

---

[6]https://www.epic.org/privacy/ftc/zoom/EPIC-FTC-Complaint-In-re-Zoom-7-19.pdf. Last visited June 10, 2020.

misrepresentations, including material omissions concerning the Data and Security Exposure and the consequent risks to which Zoom was subjected.

### September 5, 2019 Earnings Call

122.    On September 5, 2019, Zoom held an earnings call for analysts and investors concerning the Company's financial results for the second fiscal quarter ended July 31, 2019. In response to a question posed by an analyst about the Company's architecture and technology and the "secret sauce" that made Zoom's "technology and architecture unique and difficult to replicate[,]" Defendant Yuan stated, in relevant part, "I think the ***combination of technology, ease-of-use, security will win the customer trust***, right. If you look at all other solutions out there today, all of them architecture is very old, right? Not a design for modern video cloud -- video first architecture. That's why we're ahead of any of our competitors for several years." (Emphasis added).

### September 13, 2019 Form 10-Q

123.    On September 13, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended July 31, 2019 with the SEC (the "2Q20 10-Q"). The 2Q20 10-Q was signed by Defendants Yuan and Steckelberg and contained SOX certifications signed by Defendants Yuan and Steckelberg attesting to the accuracy of the 2Q20 10-Q.

124.    The 2Q20 10-Q contained substantively the same statements made in ¶¶109, 111-113, and the 1Q20 10-Q concerning the manner in which Zoom interacted with various operating systems and third-party applications, the reliability of its platform, its accessibility, and its capacity to foster trust with users and customers, Zoom's efforts to comply with laws, policies, and regulations pertaining to privacy, data protection, and information security, and general, boiler-

plate risk provisions that failed to account for known risks Zoom was subjected to due to the Data and Security Exposure.

125.    In addition, the 2Q20 10-Q failed to disclose the EPIC complaint, initiated before the FTC on July 11, 2020 regarding certain aspects of the Data and Security Exposure. Specifically, in a section titled, "Legal Proceedings" the 2Q20 10-Q maintained that "[w]e are not presently a party to any litigation the outcome of which, we believe, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, cash flows or financial condition."

### December 9, 2019 Form 10-Q

126.    On December 9, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended October 31, 2019 with the SEC (the "3Q20 10-Q"). The 3Q20 10-Q was signed by Defendants Yuan and Steckelberg and contained SOX certifications signed by Defendants Yuan and Steckelberg attesting to the accuracy of the 3Q20 10-Q.

127.    The 3Q20 10-Q contained substantively the same statements made in ¶¶109, 111-113, and the 1Q20 and 2Q20 10-Qs concerning the manner in which Zoom interacted with various operating systems and third-party applications, the reliability of its platform, its accessibility, and its capacity to foster trust with users and customers, Zoom's efforts to comply with laws, policies, and regulations pertaining to privacy, data protection, and information security, and general, boiler-plate risk provisions that failed to account for known risks Zoom was subjected to due to the Data and Security Exposure. The 3Q20 10-Q further failed to disclose the EPIC complaint and maintained the same representations as the 2Q20 10-Q that Zoom was "not presently a party to any litigation the outcome of which, we believe, if determined adversely to us, would individually

or taken together have a material adverse effect on our business, operating results, cash flows or financial condition."

### March 4, 2020 Earnings Call

128.    On March 4, 2020, Zoom held an earnings call for analysts and investors concerning the Company's financial results for the fourth fiscal quarter ended January 31, 2020. During the call, Defendant Yuan stated the following while describing an instance of Zoom's security and compliance measures:

> I also want to thank VMware for trusting Zoom. VMware has been providing all employees, globally, access to Zoom meetings and digital workspace, and will soon utilize a large deployment of Zoom Phone. The easy, single sign-on access to Zoom from any device is enabled to leverage the VMware Workspace ONE platform, ***allowing employees to access all the applications they need from their device of choice while ensuring security and compliance***.

(Emphasis added).

### March 20, 2020 Form 10-K

129.    Less than a week before the truth emerged, on March 20, 2020, the Company filed its annual report on Form 10-K for the fiscal year ended January 31, 2020 with the SEC (the "2020 10-K"). The 2020 10-K was signed by Defendants Yuan, Steckelberg, Chadwick, Eschenbach, Gassner, Hammonds, Scheinman, Subotovsky, Swanson, and non-party Roy Benhorin, and contained SOX certifications signed by Defendants Yuan and Steckelberg attesting to the accuracy of the 2020 10-K.

130.    Similar to the IPO Documents, the 2020 10-K touted that Zoom's "unique technology and infrastructure enable best-in-class reliability, scalability, and performance."

131.    The 2020 10-K further highlighted Zoom's Video Webinars function, which purportedly, "easily integrates with Facebook Live, YouTube, and other custom streaming

services, providing access to large bases of viewers." The 2020 10-K failed to disclose how/if the personal data of users, could be implicated by such integration.

132.    The 2020 10-K also contained substantively the same statements made in ¶¶109, 111-113, and the above-mentioned 10-Qs concerning the manner in which Zoom interacted with various operating systems and third-party applications, the reliability of its platform, its accessibility, and its capacity to foster trust with users and customers, Zoom's efforts to comply with laws, policies, and regulations pertaining to privacy, data protection, and information security, and general, boiler-plate risk provisions that failed to account for known risks Zoom was subjected to due to the Data and Security Exposure. Like the 2Q20 and 3Q20 10-Qs, the 2020 10-K further failed to disclose the EPIC complaint and maintained the same representations about not being party to any litigation.

133.    The statements referenced in ¶¶122-132 herein were materially false and misleading because they failed to disclose, *inter alia*, that: (1) Zoom's data privacy and security controls were insufficient, as evinced by the Data and Security Exposure; (2) despite the Company's own claims, Zoom's video communications software was not equipped with end-to-end encryption; (3) consequently, Zoom users faced certain risks, including a heightened risk that their personal information would be improperly retrieved by unapproved parties, such as Facebook; (4) revelation of the Data and Security Exposure would foreseeably decrease personal and professional usage of Zoom's video communication services; and (5) the Company failed to maintain internal controls. As a result of the foregoing, Zoom's public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

134.    On March 26, 2020, while businesses and individuals were increasingly relying on Zoom's video conferencing services amidst the COVID-19 pandemic to facilitate remote operations and adapt to new shelter-in place orders issued by local and national governments, an article was published on Vice Media Group's technology branch, *Motherboard*, detailing the Company's transfer of user data analytics to Facebook.[7] The article specifically reported that Zoom's privacy policy had not clearly communicated that "the iOS version of the Zoom app is sending some analytics data to Facebook, even if Zoom users don't have a Facebook account[,]" and asserted that "Zoom is not forthcoming with the data collection or transfer of it to Facebook." The article further alleged that Zoom's app "notifies Facebook when the user opens the app, [and transfers] details on the user's device such as the model, the time zone and the city they are connecting from, which phone carrier they are using, and a unique advertiser identifier created by the user's device which companies can use to target a user with advertisements." According to the article, *Motherboard* contacted Zoom in connection with the publication, and that "a day after the publication of this piece, Zoom confirmed the data collection in a statement to Motherhood."

135.    The next day, on March 27, 2020, Defendant Yuan issued a statement on behalf of the Company, posted to its blog, disclosing "a change that we have made regarding the use of Facebook's SDK." The change was purportedly made after the Individual Defendants were "made aware on Wednesday, March 25, 2020, that Facebook SDK was collecting device information unnecessary for us to provide our services." Defendant Yuan went on to confess that "[t]he information collected by the Facebook SDK did not include information and activities related to meetings such as attendees, names, notes, etc., but rather included information about devices such

---

[7] https://www.vice.com/en_us/article/k7e599/zoom-ios-app-sends-data-to-facebook-even-if-you-dont-have-a-facebook-account. Last visited June 10, 2020.

as the mobile OS type and version, the device time zone, device OS, device model and carrier, screen size, processor cores, and disk space," and "therefore we decided to remove the Facebook SDK in [the] iOS client and have reconfigured the feature so that users will still be able to log in with Facebook via their browser." Defendant Yuan apologized to investors and assured them of the Company's firm commitment "to the protection of our users' privacy." He further maintained that "[w]e are reviewing our process and protocols for implementing these features in the future to ensure this does not happen again."

136.    On March 30, 2020, the following trading day after the Company's statement, *The New York Times* reported that the New York State AG, Letitia James, was inquiring into Zoom's "data privacy and security practices." The article disclosed that the New York AG had sent a letter to the Company probing into Zoom's recent measures taken in connection with its security, if any, "to handle increased traffic on its network and detect hackers" given the COVID-19 pandemic. The article quoted the New York AG, who stated that the office "was concerned that Zoom's existing security practices might not be sufficient to adapt to the recent and sudden surge in both the volume and sensitivity of data being passed through its network," and "[w]hile Zoom has remediated specific reported security vulnerabilities, [the office] would like to understand whether Zoom has undertaken a broader review of its security practices." The New York AG investigation, according to *The New York Times* article, referenced Leitschuh's earlier reported findings over Zoom's webcam security vulnerabilities, the EPIC complaint, the *Motherboard* article findings, and the Company's reactionary response to the ongoing concerning issues. *The New York Times* article further expanded on additional concerns of the New York AG related to remote learning, including that, "the [Zoom] app may be circumventing state requirements protecting student data[]"; "some children's privacy experts and parents said they were particularly concerned about

how children's personal details might be used," and "[s]ome districts have prohibited educators from using Zoom as a distance-learning platform." The article touched on all aspects of the Data and Security Exposure, and reported that, "[o]ver the last few weeks, internet trolls have exploited a Zoom screen-sharing feature to hijack meetings and do things like interrupt educational sessions or post white supremacist messages to a webinar on anti-Semitism—a phenomenon called 'Zoombombing.'"

137.    Also on March 30 2020, *Bloomberg* reported that a lawsuit had been initiated against Zoom by a user of its services "who claims the popular video-conferencing service is illegally disclosing personal information." The consumer lawsuit, the first of many, concerned the recent disclosures and specifically alleged that the Company "collects information when users install or open the Zoom application and shares it, without proper notice, to third parties including Facebook Inc.," that "Zoom's privacy policy doesn't explain to users that its app contains code that discloses information to Facebook and potentially other third parties," and that Zoom's "wholly inadequate program design and security measures have resulted, and will continue to result, in unauthorized disclosure of its users' personal information."

138.    The next day, on March 31, 2020, the FBI issued a warning to schools, in particular, about Zoombombing. That same day, several news outlets, including *The Intercept* and *The Verge*, reported that the Company's communications software was not actually equipped with end-to-end encryption, despite Zoom's representations to the contrary. In actuality, the Company had been "using its own definition of the term, one that lets Zoom itself access unencrypted video and audio from meetings." According to *The Intercept* article, "despite this misleading marketing, the service actually does not support end-to-end encryption for video and audio content, at least as the term is commonly understood," and "[i]nstead it offers what is usually called transport encryption," a less

secure means of encrypting information. The article further maintained that after *The Intercept* contacted Zoom for a comment regarding the end-to-end encryption of its video meetings, a spokesperson for the Company wrote that, "[c]urrently, it is not possible to enable E2E [end-to-end] encryption for Zoom video meetings[.]" *The Intercept* article also provided further details about Zoom's actual encryption, transport encryption, "which is different from end-to-end encryption because the Zoom service itself can access the unencrypted video and audio content of Zoom meetings."

139.    After market hours on April 1, 2020, *Reuters* reported that SpaceX and NASA had both banned their employees from using Zoom's video conferencing software because of "significant privacy and security concerns,"  brought to the companies' attention after the FBI's warning regarding Zoombombing.

140.    The same day, Defendant Yuan posted a blog post titled, "A Message to Our Users" admitting that, "[the Company] recognize[s] that we have fallen short of the community's – and our own – privacy and security expectations."

141.    Upon these disclosures, the Company's shares declined by $29.77 per share, or nearly 20%, between March 27, 2020 and April 2, 2020, from closing at $151.70 on March 27, 2020, to close at $121.93 per share on April 2, 2020 and declined further as subsequent disclosures were made.

142.    On April 3, 2020, *The Street* reported on suspicious sales by Zoom insiders, including Defendant Yuan, who had "recently dumped $38 million of the company's stock ahead of an investigation into security breaches at the video conferencing company[]" and "several other senior executives sold millions of dollars[sic] worth of their shares while the company has been addressing privacy issues."

143.    The article pointed out that Defendant "Yuan . . . made $10.5 million in sales on Jan[uary] 14, another $12.5 million on Feb[ruary] 12, and $15.5 million on March 16," while "Chief Marketing Officer Janine Pelosi has made close to $14 million in trades since February."

144.    On the same day, another AG investigation was announced by the Connecticut AG William Tong concerning the Data and Security Exposure. The Connecticut AG provided a statement to *Politico*, stating that "[w]e are alarmed by the Zoom-bombing incidents and are seeking more information from the company about its privacy and security measures in coordination with other state attorneys general."

145.    Also on April 3, 2020, an interdisciplinary laboratory known as Citizen Lab, published a report "examin[ing] the encryption that protects meetings in the popular Zoom teleconference app." According to the research report, Citizen Lab found that Zoom has "rolled [concocted] their own" encryption scheme, "which has significant weaknesses," and "identif[ied] potential areas of concern in Zoom's infrastructure, including observing the transmission of meeting encryption keys through China."

146.    After market hours on the same day, the Company confirmed that, during its process of attempting to accommodate more users amidst COVID-19, it had "mistakenly" allowed two of its Chinese data centers to accept calls as a backup in the event of network congestion. Defendant Yuan, specifically explained that, "[d]uring normal operations, Zoom clients attempt to connect to a series of primary datacenters in or near a user's region, and if those multiple connection attempts fail due to network congestion or other issues, clients will reach out to two secondary datacenters off of a list of several secondary datacenters as a potential backup bridge to the Zoom platform."

147.    On April 4, 2020, *The Wall Street Journal* reported that, Defendant Yuan, had stated during an interview regarding Zoom's increasing privacy issues that "[i]f we mess up again, it's done," and that "I really messed up as CEO" and "[t]his kind of thing shouldn't have happened."

148.    Negative reports concerning the Company continued to ensue. The next trading day, on April 6, 2020, the New York City Department of Education announced that it was banning the use of Zoom in city classrooms. The city's mayor, Bill de Blasio further revealed that there had "been an effort by the Department of Education to work with that company to ensure the privacy of our students to make sure their information could not be accessed wrongly," but "[t]he chancellor and the team at the Department of Education do not believe the company has cooperated." The Department of Education instead suggested schools utilize Google or Microsoft Teams for remote learning operations in schools across the state during the COVID-19 pandemic.

149.    The same day, an article reported on *Yahoo! Finance* disclosed that a link had been posted on a popular forum on the dark web that included 352 compromised Zoom accounts for hackers to target, including a major U.S. healthcare provider. According to the article, a spokesperson for cybersecurity firm Sixgill stated that, "[i]n comments on this post, several actors thanked him for the post, and one revealed intentions to troll the meetings." Sixgill further stated that the "links included email addresses, passwords, meeting IDs, host keys and names, and the type of Zoom account." Sixgill maintained that the compromised accounts included "a major U.S. healthcare provider, seven more to various educational institutions, and one to a small business"; that "[t]he accounts were listed for anyone to download, with the intent to troll and disrupt rather than profit"; and that, "given that many are using Zoom for business purposes, confidential information could be compromised."

150. On the news of the aforementioned, the Company's stock price fell $5.26 per share, or 4.10%, from closing at $128.20 per share, to close at $122.94 per share, the following trading day, on April 6, 2020.

## DAMAGES TO ZOOM

151. As a direct and proximate result of the Individual Defendants' misconduct, Zoom has lost and will continue to lose and expend many millions of dollars.

152. These losses include, but are not limited to, any losses tied to businesses and/or institutions that banned its employees from using Zoom products or applications in response to the Data and Security Exposure.

153. Such expenditures include, but are not limited to, fees associated with the EPIC complaint, AG investigations into the Company, the Consumer Action filed against the Company, the Securities Class Action filed against the Company and the Company's CEO and CFO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

154. Additionally, these expenditures include, but are not limited to, lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

155. As a direct and proximate result of the Individual Defendants' conduct, Zoom has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

156.    Plaintiff brings this action derivatively and for the benefit of Zoom to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Zoom, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof.

157.    Zoom is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

158.    Plaintiff is, and has been at all relevant times, a shareholder of Zoom. Plaintiff will adequately and fairly represent the interests of Zoom in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

159.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

160.    A pre-suit demand on the Board of Zoom is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Yuan, Chadwick, Eschenbach, Gassner, Hammonds, Scheinman, Subotovsky, Swanson (the "Director-Defendants"), and non-party Lieut. Gen. H.R. McMaster (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

161.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to engage in or allow the Data and Security Exposure and to make and/or cause the Company to make false and misleading statements

and omissions of material facts, while five of them engaged in insider sales based on material non-public information, netting proceeds of approximately $167.3 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

162.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the foregoing schemes. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

163.    Additional reasons that demand on Defendant Yuan is futile follow. Defendant Yuan is the founder of Zoom and has served as the Company's CEO and President since June 2011. Thus, as the Company admits, he is a non-independent director. Defendant Yuan's beneficial ownership of Class B common stock provides him with a combined voting power of 34.4%, rendering him a controlling shareholder. The Company provides Defendant Yuan with his principal occupation, and he receives handsome compensation as described above. Defendant Yuan was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the conference calls and the 1Q20 10-Q, 2Q20 10-Q, 3Q20 10-Q, and 2020 10-K, referenced herein, which he signed and/or signed SOX certifications for. As the Company's highest officer, controlling shareholder, and as a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Data and Security Exposure  and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously

disregarded his duties to protect corporate assets. His insider sales, which yielded over $59.4 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Yuan is a defendant in the Securities Class Action. For these reasons, Defendant Yuan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164.    Additional reasons that demand on Defendant Chadwick is futile follow. Defendant Chadwick has served as a Company director since September 2017. He also serves as the Chair of the Company's Audit Committee. Defendant Chadwick receives compensation, as described above for his services. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Data and Security Exposure and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded over $11.7 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Chadwick signed, and thus personally made the false and misleading statements in the 2020 10-K. For these reasons, Defendant Chadwick breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

165.    Additional reasons that demand on Defendant Eschenbach is futile follow. Defendant Eschenbach has served as a Company director since November 2016. He also serves as a member of the Company's Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Data and Security Exposure and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously

disregarded his duties to protect corporate assets. His insider sales, which yielded over $43 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Eschenbach signed, and thus personally made the false and misleading statements in the 2020 10-K. For these reasons, Defendant Eschenbach breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166.    Additional reasons that demand on Defendant Gassner is futile follow. Defendant Gassner has served as a Company director since October 2015. Defendant Gassner receives compensation, as described above, for his services. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Data and Security Exposure and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Gassner signed, and thus personally made the false and misleading statements in the 2020 10-K. For these reasons, Defendant Gassner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

167.    Additional reasons that demand on Defendant Hammonds is futile follow. Defendant Hammonds has served as a Company director since September 2018. She also serves as a member of the Company's Nominating and Corporate Governance Committee. Defendant Hammonds receives compensation, as described above, for her services. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Data and Security Exposure  and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes,

and consciously disregarded her duties to protect corporate assets. Her insider sales, which yielded over $5 million in proceeds, demonstrate her motive in facilitating and participating in the fraud. Furthermore, Defendant Hammonds signed, and thus personally made the false and misleading statements in the 2020 10-K. For these reasons, Defendant Hammonds breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

168.    Additional reasons that demand on Defendant Scheinman is futile follow. Defendant Scheinman has served as a Company director since January 2013. He also serves as the Company's Lead Independent Director, Chair of the Compensation Committee, and as a member of the Audit Committee. Defendant Scheinman receives compensation, as described above, for his services. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Data and Security Exposure and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Scheinman signed, and thus personally made the false and misleading statements in the 2020 10-K. For these reasons, Defendant Scheinman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

169.    Additional reasons that demand on Defendant Subotovsky is futile follow. Defendant Subotovsky has served as a Company director since December 2014. He also serves as Chair of the Nominating and Corporate Governance Committee, and as a member of the Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Data and Security Exposure and to make false

and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded over $48 million in proceeds, demonstrate his motive in facilitating and participating in the fraud.   Furthermore, Defendant Subotovsky signed, and thus personally made the false and misleading statements in the 2020 10-K. For these reasons, Defendant Subotovsky breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170.    Additional reasons that demand on Defendant Swanson is futile follow. Defendant Swanson has served as a Company director since August 2013. He also serves as a member of the Company's Compensation Committee and Nominating and Corporate Governance Committee. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Data and Security Exposure and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Swanson signed, and thus personally made the false and misleading statements in the 2020 10-K. For these reasons, Defendant Swanson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

171.    Additional reasons that demand on the Board is futile follow.

172.    The Director-Defendants have longstanding business and personal relationships with each other and the Company that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendant Gassner is the CEO of Veeva Systems Inc. ("Veeva"), a cloud computing company that has been party to a service

agreement with Zoom since September 2016, at least. According to the 2020 Proxy Statement, Zoom recognized $1.3 million in revenue from Veeva during the fiscal year ended January 31, 2020. The Company is also party to an investors' rights agreement with entities affiliated with Emergence Capital Partners ("Emergence") and entities affiliated with Sequoia Capital Operations, LLC ("Sequoia"). Defendant Subotovsky is a member of Emergence Equity Partners III, L.P., and shares voting and investment controls with respect to the Zoom shares held by the Emergence entities, including their 13.6% combined voting power and significant Class B common stock ownership. Defendant Eschenbach is a general partner of Sequoia. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

173.    Demand in this case is excused because the Director-Defendants are beholden to and controlled by Defendant Yuan, who controls the Company by virtue of his share ownership, which provided him with approximately 34.4% of total shareholder voting power as of March 31, 2020.  These shareholdings provide Defendant Yuan with significant control over the continued employment of the Director-Defendants.  In light of Defendant Yuan's control, Defendants Gassner, Subotovsky, and Eschenbach, by virtue of their beneficial entity relationships with the Company, are especially not disinterested.  Thus, the Director-Defendants are unable to evaluate a demand with disinterest or independence as a result of Defendant Yuan's control over them.

174.    Defendants Chadwick, Eschenbach, and Scheinman (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the quality and integrity of the Company's financial statements,

the Company's compliance with laws and regulations, and the Company's system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

175.     In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Data and Security Exposure or the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

176.     Zoom has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Zoom any part of the damages Zoom suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

177.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

178.    The acts complained of herein constitute violations of fiduciary duties owed by Zoom's officers and directors, and these acts are incapable of ratification.

179.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Zoom. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Zoom, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

180.    If there is no directors' and officers' liability insurance, then the Directors will not cause Zoom to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

181.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

182.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

183.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Zoom's business and affairs.

184.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

185.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Zoom.

186.    In breach of their fiduciary duties owed to Zoom, the Individual Defendants willfully or recklessly caused the Company to engage in and allow the Data and Security Exposure, and made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Zoom's data privacy and security controls were insufficient, as evinced by the Data and Security Exposure ; (2) despite the Company's own claims, Zoom's video communications software was not equipped with end-to-end encryption; (3) consequently, Zoom users faced certain risks, including a heightened risk that their personal information would be improperly retrieved by unapproved parties, such as Facebook; (4)

revelation of the Data and Security Exposure  would foreseeably decrease personal and professional usage of Zoom's video communication services; and (5) the Company failed to maintain internal controls. As a result of the foregoing, Zoom's public statements were materially false and misleading at all relevant times.

187.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, while six of the Individual Defendants made lucrative insider sales, netting proceeds of over $172.9 million, which renders them personally liable to the Company for breaching their fiduciary duties.

188.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

189.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Zoom's securities.

190.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls,

even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Zoom's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

191.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

192.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Zoom has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

193.    Plaintiff on behalf of Zoom has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

194.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

195.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Zoom.

196.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Zoom that was tied to the performance or artificially inflated valuation of Zoom, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

197.    Plaintiff, as a shareholder and a representative of Zoom, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including

any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

198.    Plaintiff on behalf of Zoom has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

199.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

200.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Zoom, for which they are legally responsible.

201.    As a direct and proximate result of the Individual Defendants' abuse of control, Zoom has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

202.    Plaintiff on behalf of Zoom has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

203.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

204.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Zoom in a manner consistent with the operations of a publicly-held corporation.

205.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Zoom has sustained and will continue to sustain significant damages.

206.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

207.    Plaintiff on behalf of Zoom has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

208.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

209.    The Individual Defendants caused the Company to pay themselves excessive salaries and fees, to the detriment of the shareholders and the Company.

210.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Zoom to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

211.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

212.    Plaintiff on behalf of Zoom has no adequate remedy at law.

## SIXTH CLAIM

### Against Defendants Yuan and Steckelberg for Contribution
### Under Sections 10(b), 20(a), and 21D of the Exchange Act

213.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

214.    Zoom, and Defendants Yuan and Steckelberg are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of

Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Yuan's and Steckelberg's willful and/or reckless violations of their obligations as offices and/or directors of Zoom.

215.    Defendants Yuan and Steckelberg, because of their positions of control and authority as CEO and CFO of Zoom, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Zoom, including the wrongful acts complained of herein and in the Securities Class Action.

216.    Accordingly, Defendants Yuan and Steckelberg are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

217.    As such, Zoom is entitled to receive all appropriate contribution or indemnification from Defendants Yuan and Steckelberg.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Zoom, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Zoom;

(c)    Determining and awarding to Zoom the damages sustained by it as a result

of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

        (d)     Directing Zoom and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Zoom and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

        1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

        2. a provision to permit the shareholders of Zoom to nominate at least five candidates for election to the Board; and

        3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

        (e)     Awarding Zoom restitution from Individual Defendants, and each of them;

        (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

        (g)     Granting such other and further relief as the Court may deem just and proper.

Dated: June 11, 2020

Of Counsel:

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

*Attorneys for Plaintiff*