**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE ZOOM VIDEO COMMUNICATIONS, INC. STOCKHOLDER DERIVATIVE LITIGATION | Consol. C.A. No.: 1:20-cv-00797-GBW <br><br> **REDACTED** <br><br> DEMAND FOR JURY TRIAL |

**VERIFIED STOCKHOLDER DERIVATIVE AMENDED OPERATIVE**
**CONSOLIDATED COMPLAINT FOR BREACH OF FIDUCIARY DUTY**
**AND UNJUST ENRICHMENT**

Plaintiff, by her attorneys, submits this Verified Stockholder Derivative Amended Operative Consolidated Complaint for Breach of Fiduciary Duty and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of documents produced in response to plaintiff's inspection demand, public filings with the U.S. Securities and Exchange Commission ("SEC"), and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Zoom Video Communications, Inc. ("Zoom" or the "Company") against certain of its officers and directors for breach of fiduciary duty, unjust enrichment, and violations of law between September 25, 2019, and the present (the "Relevant Period"). These wrongs resulted in significant monetary damages to Zoom's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed Zoom to at least millions of dollars in potential liability for violations of state and federal law and the costs associated with defending itself. Finally, these actions have caused the Company to pay $85 million to settle a class action brought by consumers and $150 million to settle a class action brought by investors.

2.      Zoom is a teleconferencing communications technology company that was founded in April 2011 by Cisco Systems, Inc.'s ("Cisco") former Vice President of Engineering, defendant Eric S. Yuan ("Yuan"). Zoom provides a video-first communications platform to virtually connect people across devices and locations through "frictionless video, phone, chat and content sharing."

The Company's communication services and features include offerings such as Zoom Meetings, Zoom Phone, Zoom Chat, Zoom Rooms, and Zoom Video Webinars.

3.  Prior to the Relevant Period, in March of 2019, the Company began the process of going public via an initial public offering ("IPO"). In connection with the IPO, the Company filed a registration statement and prospectus with the SEC that touted the Company's "unique technology and infrastructure" as having "best-in-class reliability, scalability and performance." The Individual Defendants (as defined herein) drew interest in Zoom's IPO by highlighting the platform's purported features and capabilities, including: (i) Zoom's broad interoperability with a range of diverse devices, operating systems, and third-party applications; (ii) the ability to embed the Zoom platform into other developers' offerings via open application program interfaces ("APIs") and cross-platform software development kits ("SDKs"); (iii) the Zoom platform's reliability and ease of use; and (iv) the platform's use of secure Advanced Encryption Standard ("AES") 256-bit end-to-end encryption.

4.  The Zoom platform's reliability, security, and privacy features were a major selling point in persuading the investing public that Zoom had superior technology in the video-based tele-communications space. Beginning before the IPO, the Company would publish security white papers (the "Security Guide") prominently on its website that touted the platform's security. The Security Guide purported to "provide information on the security features and functions that [were] available with Zoom" and claimed that Zoom users could secure a meeting with end-to-end AES 256-bit encryption.

5.  Zoom's IPO closed on April 23, 2019, with the Company selling over 9.91 million shares to the investing public at $36 per share.

6.     Following the IPO, the Individual Defendants created a narrative which touted certain features of the Zoom platform and the Company's commitment to privacy and security. Unfortunately, as would slowly come to light, Zoom's representations about its privacy and security practices were a far cry from the truth.  In reality, Zoom never offered end-to-end or AES 256-bit encryption.  Rather, Zoom was much more vulnerable to privacy and security breaches given that defendants made the deliberate decision to bypass security features in certain operating systems in order to maintain the platform's "ease of use."  The decision to bypass this security feature enabled malicious actors to invade a Zoom user's privacy by accessing their webcams without their knowledge or consent.  Additionally, Zoom misrepresented to its users how it handled user data and failed to disclose that Zoom was sharing its customer's personal information with third parties, such as Facebook, Inc. ("Facebook").  Zoom further failed to disclose that the Company's software had a feature for paid users that automatically and surreptitiously sent its users' names and e-mail addresses to a third-party company system that was used to match them with their LinkedIn profiles without their consent or notification.  This was a major invasion of privacy that revealed Zoom's users' personal information, even when they were under the impression that they would remain anonymous.

7.     The truth about Zoom's substandard privacy and security practices slowly began to emerge on July 8, 2019, when a security researcher by the name of Jonathan Leitschuh published an article that revealed Zoom decided to bypass security features on certain operating systems and cause a major vulnerability in doing so.  The article explained that this vulnerability "allows any malicious website to enable your camera without your permission."  Given the severity of the vulnerability, the article highlighted that "[t]he flaw potentially exposes up to 750,000 companies around the world that use Zoom to conduct day-to-day business."

8.      In the wake of this disclosure, Zoom's market capitalization dropped more than 1.22%, or $1.12 per share, on July 8, 2019, to close at $90.76 per share compared to the previous trading day's closing of $91.88 per share, erasing $36 million in market capitalization in a single day.

9.      Nonetheless, the Individual Defendants continued to make false and misleading statements about Zoom's privacy and security practices, which artificially inflated the Company's stock price during the beginning of the COVID-19 global pandemic.  The whole truth emerged between March 26, 2020 and April 7, 2020, when a series of articles exposed the fact that Zoom had been lying about its privacy and security practices.

10.     This series of disclosures caused the Company's stock price to precipitously decline.  In total, Zoom's stock price fell from $150.88 per share at the close of trading on March 30, 2020, to a low of $113.75 per share at closing on April 7, 2020, a $4.7 billion loss in market capitalization.

11.     Analysts were quick to respond to this negative news.  On April 8, 2020, Argus Research Company ("Argus Research") and Oppenheimer & Co. Inc. ("Oppenheimer") published reports voicing concerns over Zoom's security issues and pending investigations against the Company.  In light of the recent disclosures, Oppenheimer reported they would "remain on the sidelines" given (among other things) Zoom's "Growing pains", Zoom's premium valuation of 27.7x CY21 EV/sales, the U.S. Federal Trade Commission ("FTC") investigation and other pending actions against the Company.

12.     In similar fashion, news outlets were quick to circulate and report on the Company's vulnerabilities and related failures to identify and mitigate privacy issues plaguing Zoom's platform and videoconferencing.

13.     On April 10, 2020, as reported by VOA News, the Department of Defense issued a new guidance on using Zoom's platform following the FBI's warning about its security issues. The report noted that "[t]he security concern is much greater than 'Zoom bombing' attack[]" ... and maintained that "[e]xperts say the teleconferencing app may introduce security risks not only to government employees during Zoom sessions but also to data that reside on government computers."

14.     On April 17, 2020, a global online publication, DW, reported on Zoom's public apology and purported measures to address the recently exposed security vulnerabilities.  The article noted that the Company's action came on the heels of "multiple countries and organizations [] banning its use."

15.     On April 20, 2020, the New York Times published a report on Zoom's security flaws and how the Company was slow to correct or respond to evidence of bugs in the Company's services.

16.     Defendants, however, did not fare nearly as poorly as the Company.  Certain of the Individual Defendants (defined *infra*) have unlawfully reaped over $87 million in illegal insider trading proceeds of the Company's stock between October 18, 2019 and March 19, 2020 (the "Sales Period").

17.     Significantly, between August 28, 2019, and April 5, 2020, the current members of the Company's Board of Directors (the "Board") discussed and received pertinent information about the underlying misconduct, even as the truth started to emerge.  Nonetheless, they knowingly failed to undertake meaningful efforts to mitigate, oversee and respond to the issues until it was far too late.  The Company and scores of its consumers have been severely damaged by such bad faith conduct.

18.    As a direct result of this unlawful course of conduct, Zoom has been exposed to numerous government and regulatory investigations by the Federal Bureau of Investigation ("FBI"), U.S. Department of Justice ("DOJ"), SEC, and several state attorneys general.

19.    Additionally, these actions subjected the Company to a consolidated consumer class action in the U.S. District Court for the Northern District of California (the "Consumer Class Action").  Plaintiffs in the Consumer Class Action asserted claims against the Company for: (i) invasion of privacy in violation of California common law and the California Constitution, Article I, §1; (ii) negligence; (iii) breach of implied contract; (iv) breach of implied covenant of good faith and fair dealing; (v) unjust enrichment/quasi-contract; (vi) violation of the California Unfair Competition Laws ("UCL"), Cal. Bus. Prof. Code §17200, *et seq.*; (vii) violation of the California Consumer Legal Remedies Act ("CLRA"), Cal Code. Civ. Code §1750, *et seq.*; (viii) violation of the Comprehensive Data Access and Fraud Act ("CDAFA"), Cal. Penal Code §502; and (ix) deceit by concealment under Cal. Civ. Code §1710(3).

20.    On March 11, 2021, U.S. District Judge for the Northern District of California, Lucy H. Koh, entered an order granting in part and denying in part Zoom's motion to dismiss the complaint in the Consumer Class Action.  Specifically, Honorable District Judge Koh, denied the Company's motion to dismiss with respect to claims based on breach of implied contract, breach of the implied covenant of good faith and fair dealing, violations of the UCL under the "unlawful" and "unfair" prongs, unjust enrichment/quasi contract, and all "Zoombombing" claims to the extent they were not barred by section 230(c)(1) of the Communications Decency Act, 47 U.S.C. §230.  All other claims were dismissed with leave to amend.

21.    On May 12, 2021, plaintiffs in the Consumer Class Action filed their Second Amended Consolidated Class Action Complaint.  Shortly thereafter, the Company entered into a

stipulation of settlement and ultimately agreed to pay $85 million to settle the Consumer Class Action.

22.     Additionally, this unlawful course of conduct has caused the Company to be subject to litigation brought by the FTC for unfair and deceptive business practices in violation of section 5 of the FTC Act.  The FTC charged Zoom with, among other matters: (i) falsely or misleadingly representing that it employed AES 256-bit end-to-end encryption; and (ii) deceptively deploying a web server (that remained on users' computers even after they had uninstalled the Zoom app) that circumvented Safari's privacy and security safeguards without providing notice to or obtaining consent from its users.  On November 9, 2020, Zoom entered a proposed consent agreement with the FTC requiring the Company to implement robust information security programs to settle charges that Zoom engaged in deceptive and unfair practices that undermined the security of its users.

23.     Moreover, Zoom is also the subject of a federal securities class action lawsuit filed in the U.S. District Court for the Northern District of California on behalf of investors who purchased Zoom's shares (the "Securities Class Action").  The Securities Class Action asserts claims against Zoom and certain of the Individual Defendants in connection with the Company's improper statements and fraudulent scheme to deceive the investing public, including causes of action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, promulgated thereunder.  In February 2022, the Securities Class Action survived in part a motion to dismiss the consolidated complaint in that action based on the false representation that Zoom offered "robust security capabilities, including end-to-end encryption."

24.     As of April 30, 2023, the Company had accrued a total of $60 million in costs connected to the Securities Class Action.  On July 17, 2023, the parties in the Securities Class

Action entered a stipulation of settlement whereby Zoom has agreed to pay $150 million to settle the claims therein.

## JURISDICTION AND VENUE

25.     Jurisdiction is conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

26.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

27.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Zoom is incorporated in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Zoom, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District. In addition, the Company has consented in writing to this venue and jurisdiction.

## THE PARTIES

**Plaintiff**

28.     Plaintiff Suzanne Flannery was a stockholder of Zoom at the time of the wrongdoing complained of, since the beginning of the Relevant Period, has continuously been a stockholder since that time, and is a current Zoom stockholder. Plaintiff is a citizen of Arkansas.

**Nominal Defendant**

29.    Nominal defendant Zoom is a Delaware corporation with principal executive offices located at 55 Almaden Boulevard, 6th Floor, San Jose, California.  Accordingly, Zoom is a citizen of Delaware and California.  Zoom is a video-first communications platform that offers frictionless and secure video, phone, chat, and content sharing.  The Company's main product is Zoom Meetings, which consists of hosts who organize video meetings and individual attendees who participate in those meetings.  Zoom customers range from individuals to Fortune 50 organizations.  As of January 31, 2021, Zoom had approximately 4,422 employees.

**Defendants**

30.    Defendant Yuan is Zoom's Chief Executive Officer ("CEO"), President, Chairman of the Board, and a director and has been since June 2011.  Defendant Yuan founded Zoom in April 2011.  Defendant Yuan is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  While in possession of material, nonpublic information concerning Zoom's true business health, defendant Yuan sold 420,858 shares of his stock for $38,544,800.74 in proceeds.  Zoom paid defendant Yuan the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------------|--------------|----------------------------------------|----------------------|-------|
| 2023 | $402,962 | $74,311,158 | - | - | $1,245,563 | $75,959,683 |
| 2022 | $301,731 | - | - | $13,224 | $800,134 | $1,115,089 |
| 2021 | $300,000 | - | - | $42,000 | $607,748 | $949,748 |
| 2020 | $300,000 | - | - | $20,826 | - | $320,826 |
| 2019 | $300,000 | - | $4,374,307 | - | - | $4,674,307 |

Defendant Yuan is a citizen of California.

31.    Defendant Kelly Steckelberg ("Steckelberg") is Zoom's Chief Financial Officer and has been since November 2017.  Defendant Steckelberg is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act. While in possession of material, nonpublic information concerning Zoom's true business health, defendant Steckelberg sold 66,402 shares of her stock for $5,624,172.32 in proceeds.  Zoom paid defendant Steckelberg the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|--------------|----------------------------------------|-------|
| 2023 | $426,196 | $36,322,225 | | $36,748,421 |
| 2022 | $377,164 | | $16,530 | $393,694 |
| 2021 | $375,000 | $94,424 | $52,500 | $521,924 |
| 2020 | $356,250 | - | $52,283 | $408,533 |

Defendant Steckelberg is a citizen of California.

32.    Defendant Dan Scheinman ("Scheinman") is Zoom's Lead Independent Director and has been since April 2019 and a director and has been since January 2013.  Defendant Scheinman is also a member of Zoom's Audit Committee and has been since April 2019.  Zoom paid defendant Scheinman the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|-------------|-------------------|--------------|---------------|-------|
| 2023 | $97,500 | $141,808 | - | $239,308 |
| 2022 | $97,500 | - | - | $97,500 |
| 2021 | $75,000 | - | - | $75,000 |
| 2020 | $50,625 | - | - | $50,625 |
| 2019 | - | - | $903,950 | $903,950 |

Defendant Scheinman is a citizen of California.

33.    Defendant Carl M. Eschenbach ("Eschenbach") was a Zoom director from November 2016 to January 2023.  Defendant Eschenbach was a member of Zoom's Audit Committee from April 2019 to January 2023.  While in possession of material, nonpublic information concerning Zoom's true business health, defendant Eschenbach sold 130,385 shares

of his stock for $14,718,641.11 in proceeds. Zoom paid defendant Eschenbach the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $54,375 | $274,667 | $329,042 |
| 2022 | $57,500 | - | $57,500 |
| 2021 | $14,375 | - | $14,375 |

Defendant Eschenbach is a citizen of California.

34.    Defendant Jonathan Chadwick ("Chadwick") has served as a Zoom director since September 2017. Defendant Chadwick was a member of Zoom's Audit Committee from April 2019 to January 2023. While in possession of material, nonpublic information concerning Zoom's true business health, defendant Chadwick sold 110,000 shares of his stock for $11,674,322.83 in proceeds. Zoom paid defendant Chadwick the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $70,510 | - | $70,510 |
| 2022 | $70,000 | $454,139 | $524,139 |
| 2021 | $55,000 | - | $55,000 |
| 2020 | $37,500 | - | $37,500 |

Defendant Chadwick is a citizen of California.

35.    Defendant Bart Swanson ("Swanson") was a Zoom director from August 2013 to February 2022. Zoom paid defendant Swanson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Total |
|---|---|---|
| 2022 | $60,000 | $60,000 |
| 2021 | $15,000 | $15,000 |

Defendant Swanson is a citizen of New York.

36.    Defendant Santiago Subotovsky ("Subotovsky") is a Zoom director and has been since December 2014. While in possession of material, nonpublic information concerning Zoom's

true business health, defendant Subotovsky sold 146,336 shares of his stock for $16,800,119.30 in

proceeds.  Zoom paid defendant Subotovsky the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $65,000 | $274,667 | $339,667 |
| 2022 | $65,000 | - | $65,000 |
| 2021 | $16,250 | - | $16,250 |

Defendant Subotovsky is a citizen of California.

37.    Defendant Peter Gassner ("Gassner") is a Zoom director and has been since

October 2015.  Zoom paid defendant Gassner the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $45,000 | - | $45,000 |
| 2022 | $45,000 | - | $45,000 |
| 2021 | $33,750 | $684,368 | $718,118 |
| 2020 | $22,500 | $96,681 | $119,181 |

Defendant Gassner is a citizen of California.

38.    The defendants identified in ¶¶30-31 are referred to herein as the "Officer

Defendants."  The defendants identified in ¶¶30, 32-37 are referred to herein as the "Director

Defendants."  The defendants identified in ¶¶32-34 are referred to herein as the "Audit Committee

Defendants."  The defendants identified in ¶¶30-31, 33-34, 36 are referred to herein as the "Insider

Selling Defendants."  Collectively, the defendants identified in ¶¶30-37 are referred to herein as

the "Individual Defendants."

**Relevant Non-Parties**

39.    Kimberly L. Hammonds ("Hammonds") served as a Zoom director from September

2018 until her passing on July 28, 2023.  While in possession of material, nonpublic information

concerning Zoom's true business health, Hammonds sold 69,922 shares of her stock for

$5,079,238.73 in proceeds. Zoom paid non-party Hammonds the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2023 | $28,726 | | $28,723 |
| 2022 | $63,656 | | $63,656 |
| 2021 | $37,625 | - | $37,625 |
| 2020 | $25,125 | - | $25,125 |
| 2019 | - | $1,362,390 | $1,362,390 |

Hammonds was a citizen of Florida.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

40.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Zoom and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Zoom in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Zoom and not in furtherance of their personal interest or benefit.

41.    To discharge their duties, the officers and directors of Zoom were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Zoom were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Zoom's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the

highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Zoom conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(d)    maintain and implement an adequate functioning system of internal legal, financial, and management controls, such that Zoom's operations would comply with all applicable laws and Zoom's financial statements and regulatory filings filed with the SEC and disseminated to the public would be accurate.

**Breaches of Duties**

42.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Zoom, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

43.    The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, Zoom to make improper statements about the Company's privacy and security practices, engage in unfair and deceptive trade practices in violation of federal law, and caused Zoom to incur substantial damage.

44.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Zoom, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other

Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Zoom has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

45.      In addition to these duties, under the Audit Committee Charter in effect during relevant times, the Audit Committee Defendants, defendants Chadwick, Eschenbach, and Scheinman, owed specific duties to Zoom to assist the Board in monitoring and overseeing: (i) the Company's accounting and financial reporting processes and internal controls as well as the audit and integrity of the Company's financial statements; (ii) the Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements); (iii) major risk exposures including the Company's guidelines and policies with respect to risk assessment and risk management pertaining to financial, accounting, legal, compliance, investment, and tax matters.

46.      In overseeing the integrity of the Company's financial statements and disclosures, defendants Chadwick, Eschenbach, and Scheinman, as members of the Audit Committee, were tasked with the following relevant functions:

5. **Review Financial Statements**.  The Audit Committee shall review and discuss the following with management and the independent auditor, as applicable:

- the scope and timing of the annual audit of the Company's financial statements;

- the Company's annual audited and quarterly financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations";

- the results of the independent audit and the quarterly reviews, and the independent auditor's opinion on the annual financial statements;

- the reports and certifications regarding internal control over financial reporting

and disclosure controls and procedures;

- analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements;

47.    The Audit Committee was also required to oversee and review Zoom's earnings press releases and disclosure controls and procedures.  In this regard, the Audit Committee Charter imposed the following obligations on defendants Chadwick, Eschenbach, and Scheinman:

8.  **Earnings Press Releases and Earnings Guidance**.  The Audit Committee shall review earnings press releases, as well as financial information and earnings guidance provided to the public, analysts and ratings agencies.

*        *        *

10. **Disclosure Controls and Procedures**.  The Audit Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures.

48.    Moreover, the Audit Committee's responsibilities also included overseeing the Company's legal and regulatory compliance.  In this regard, the Audit Committee Charter imposed the following obligations on defendants Chadwick, Eschenbach, and Scheinman:

12. **Legal and Regulatory Compliance**.  The Audit Committee shall review and discuss with management and the independent auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Business Conduct and Ethics, compliance with the Foreign Corrupt Practices Act and foreign anticorruption laws, and compliance with export control regulations and (ii) reports regarding compliance with applicable laws, regulations and internal compliance programs, in each case to the extent pertaining to financial, accounting and/or tax matters. The Audit Committee shall discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.  The Audit Committee shall discuss with the Company's general counsel legal matters that may have a material impact on the financial statements or the Company's compliance procedures that pertain to financial, accounting, investment or tax matters of the Company.

49.    Finally, the Audit Committee Charter also required the Audit Committee to monitor

and oversee the Company's major risk exposure pertaining to legal and compliance matters. In this regard, the Audit Committee Charter imposed the following obligations on defendants Chadwick, Eschenbach, and Scheinman:

> 14. **Risks**. The Audit Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management pertaining to financial, accounting, legal, compliance, investment and tax matters. In addition, the Audit Committee will review the Company's risk management framework and programs, overall risk profile and risk exposures with the Board.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Zoom, regarding the Individual Defendants' management of Zoom's operations and true privacy and security practices; (ii) facilitate certain of the Individual Defendants' illicit sales of over $87 million of their personally held shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Zoom and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

52.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and unjust enrichment; and to conceal adverse information concerning Zoom's deeply flawed privacy and security practices and illegal and deceptive trade practices.

53.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**FACTUAL BACKGROUND**

55.     Zoom is a teleconferencing communications technology company that was founded in April 2011 by Cisco's former Vice President of Engineering, defendant Yuan.  Zoom provides a video-first communications platform that virtually connects people across devices and locations through "frictionless video, phone, chat and content sharing."  Zoom provides a range of communication services and features including Zoom Meetings, Zoom Phone, Zoom Chat, Zoom Rooms, and Zoom Video Webinars.

- 18 -

56.     The cornerstone of Zoom's platform is Zoom Meetings, a software-based teleconferencing application that allows users to host virtual meetings and invite one or more participants.  The Zoom Meetings platform is designed to provide high-definition video, voice, chat, and content sharing across mobile devices, desktops, laptops, telephones, and conference room systems.  Zoom Meetings is touted as "a flexible tool for on-the-go-employees who rely on their mobile device or tablet," that integrates third-party tools and applications such as Google, Dropbox, LinkedIn, Microsoft, Salesforce, and Slack.

57.     Although Zoom offers users a free version of Zoom Meetings, the Company primarily generates revenue from the sale of its Pro, Business, and Enterprise subscription plans which provide additional features and functionality.  These subscription plans provide paid users with different participant and time limitations, additional administrative controls, and reporting features.

58.     Over the years, the use of Zoom's platform grew substantially.  For example, Zoom Meetings went from 200 million annual meeting minutes by the end of 2013 to over five billion monthly meeting minutes by the beginning of 2019.  Relatedly, Zoom's annual revenue also experienced substantial growth.  For the fiscal years ended January 31, 2018, and 2019, Zoom's annual revenue grew 149% and 118%, respectively.

59.     Given Zoom's increasing popularity, the Company's fiduciaries sought to capitalize on Zoom's growth prospects by taking the Company public via an IPO.  On March 22, 2019, Zoom began the process of going public and filed a registration statement on Form S-1 with the SEC.  After several amendments, the Form S-1 was declared effective on April 17, 2019 (the "Registration Statement").  The Registration Statement was signed by defendants Yuan, Steckelberg, Chadwick, Eschenbach, Gassner, Scheinman, Subotovsky, and Swanson and non-

party Hammonds.  The following day, Zoom filed its prospectus with the SEC pursuant to SEC Rule 424B4 (the "Prospectus" and together with the Registration Statement, the "Offering Documents").  The Offering Documents purported to disclose the necessary information about the Company so that investors could decide whether to participate in the IPO.  However, the Offering Documents contained a series of false and misleading statements and the Company's shares were cast out to unsuspecting investors.

## ZOOM CREATED A FALSE AND MISLEADING NARRATIVE SURROUNDING ITS SECURITY FEATURES AND PRIVACY PRACTICES PRIOR TO ITS IPO

60.    Zoom's Offering Documents boasted that Zoom's "unique technology and infrastructure enable best-in-class reliability, scalability and performance."  Further, the Offering Documents touted that the Company "offer[s] ***robust security capabilities, including end-to-end encryption***, secure login, administrative controls and role-based access controls."

61.    The Offering Documents also highlighted the Zoom platform's interoperability between a "range of diverse devices, operating systems and third-party applications."  In addition, the Offering Documents stated "we provide, develop and create applications for our platform partners that integrate our platform with our partners' various offerings[,]" and touted the platform's integration with third-party applications and a "variety of other productivity, collaboration, data management and security vendors."

62.    Further, the Offering Documents touted the platform's reliability and ease of use and stated, "[w]e believe that rich and reliable communications lead to interactions that build greater empathy and trust.  We strive to live up to the trust our customers place in us by delivering a communications solution that 'just works.'"

63.     Finally, the Offering Documents contained generalized boiler-plate "risk factors" regarding the Company's purported efforts to comply with privacy, data protection, and information security laws.  In particular the Offering Documents stated:

> We receive, store, process and use personal information and other user content. There are numerous federal, state, local and international laws and regulations regarding privacy, data protection, information security and the storing, sharing, use, processing, transfer, disclosure and protection of personal information and other content, the scope of which is changing, subject to differing interpretations and may be inconsistent among countries, or conflict with other rules. We are also subject to the terms of our privacy policies and obligations to third parties related to privacy, data protection and information security. ***We strive to comply with applicable laws, regulations, policies and other legal obligations relating to privacy, data protection and information security to the extent possible.***

64.     Unbeknownst to investors, the aforementioned statements in the Offering Documents were false and misleading.  Contrary to the Offering Documents assertions, the Zoom platform did not offer robust security capabilities.  Instead, the Zoom platform offered stark security vulnerabilities.  The Zoom platform was nowhere nearly as secure or reliable as the Offering Documents represented.  Moreover, the Company was certainly not committed to complying with applicable laws or regulations related to privacy, data protection, or information security.

65.     As it would later be revealed, Zoom never offered end-to-end encryption. Nonetheless, the Individual Defendants made end-to-end encryption a major selling point of the Zoom platform's purported security.  In fact, the Offering Documents were not the only place where Zoom falsely claimed it offered end-to-end encryption.  Such claims were also included in the Company's Security Guide which was featured prominently on the Company's website on the date of the IPO.  The Security Guide falsely touted that end-to-end encryption was a part of the Company's currently available security capabilities and stated the following:

- "***The following in-meeting security capabilities are available*** to the meeting host";

- "*Secure a meeting with end-to-end encryption (E2E)*";
- "*We offer robust security capabilities, including end-to-end encryption*";
- "*End-to-end encryption [is available] for all meetings*"; and
- Zoom users could "*Secure a meeting with end-to-end encryption (E2E)*" and "*Enable end-to-end encrypted meetings*" using "*Advanced Encryption Standard (AES) 256-bit algorithm.*"

66.    Further, it would later be revealed that Zoom secretly installed a web server on Zoom's users' Macintosh ("Mac") computers that the Company had "consciously" engineered to bypass security settings on the Mac-native internet browser Safari.  The web server that Zoom covertly installed on Mac users' computers permitted the computer's camera to be turned on remotely without the users' consent and remained on users' Mac computers even after users deleted the Zoom app.  Notably, ███████████████████████████████████████

███████████████████████████████████████████████ ZOOM-FLANNERY-00031.[1]

███████████████████████████████████████████████████

███████████████████████████ *Id.* █████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████

67.    Additionally, the Company was not committed to complying with applicable laws and regulations.  For instance, Zoom flouted the FTC's restriction on unfair and deceptive trade practices by misrepresenting how it handled its users' data.  While Zoom's Privacy Policy disclosed that the Company may collect users' personal data "when [users] use Facebook to log-in to our Products or to create an account for our Products," it failed to disclose that Zoom was

---

[1] All references to "ZOOM-FLANNERY-_____" are from the documents produced in response to plaintiff's inspection demand.

surreptitiously sending users' data to Facebook—including from users who did not have a Facebook account—without users' consent or notification. Notably, Facebook required that developers who use its SDK, such as Zoom, be transparent with users about the data their applications, or apps, send to Facebook.

68.    Moreover, Zoom's software automatically and surreptitiously sent its users' names and e-mail addresses to a company system that was used to match them with their LinkedIn profiles without their consent or notification. Thus, Zoom users who subscribed to the LinkedIn Sales Navigator feature were able to view links to the publicly available LinkedIn profiles of other meeting participants without their consent or notification. This functionality even worked to display the LinkedIn profiles of users who adopted pseudonyms in Zoom Meetings in order to remain anonymous. As a result, Zoom Meetings would identify certain users' real names and biographical information as reflected on LinkedIn, even if those users wished to keep their actual identity private, and had taken steps to ensure that they would remain anonymous by adopting a pseudonym while using Zoom Meetings.

69.    Due to the foregoing, the statements in the Offering Documents concerning the availability of end-to-end encryption, the manner in which Zoom interacted with various operating systems and third-party applications, the reliability of its platform, its accessibility, and its capacity to foster trust with users and customers, Zoom's efforts to comply with laws, policies, and regulations pertaining to privacy, data protection, and information security, and the generalized, boiler-plate risk provisions that failed to account for known privacy and security risks, were all materially false and misleading.

**THE COMPANY'S FIDUCIARIES LEARN OF ZOOM'S SUBSTANTIAL FLAWS BUT**
**CONTINUE TO MISLEAD THE PUBLIC**

70.     Following the IPO, the Individual Defendants caused the Company to issue further

false and misleading statements.  On June 7, 2019, Zoom filed its Quarterly Report on Form 10-Q

for the first fiscal quarter ended April 30, 2019 with the SEC (the "Q1 2020 Form 10-Q").  The

Q1 2020 Form 10-Q was signed by defendants Yuan and Steckelberg and contained certifications

pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of

2002 ("SOX") attesting to the accuracy of the statements contained therein.

71.     Despite the Audit Committee's obligation to review and approve the Company's

financial statements, they allowed the Company to file the Q1 2020 Form 10-Q containing a series

of false and misleading statements.  Notably, the Q1 2020 Form 10-Q substantively reiterated the

false and misleading statements included in the Company's Offering Documents.  The Q1 2020

Form 10-Q also failed to disclose that: (i) the Company's data privacy and security controls were

inadequate; (ii) the Zoom platform was not actually equipped with AES 256-bit or end-to-end

encryption, despite previous assertions to the contrary; (iii) Zoom did not accurately disclose how

it handled users' data; (iv) consequently, Zoom users faced heightened risks that their personal

information would be improperly retrieved by unauthorized parties; (v) Zoom was not compliant

with regulatory requirements related to privacy, data protection, or information security; and

(vi) the Company failed to maintain adequate internal controls.  As a result, Zoom's public

statements were materially false and misleading at all relevant times.

72.     Then on July 8, 2019, the truth about Zoom's security vulnerabilities slowly began

to emerge when Jonathan Leitschuh ("Leitschuh"), a software engineer and security researcher,

published an article titled, "Zoom Zero Day: 4+ Million Webcams & Maybe an RCE? Just Get

Them to Visit Your Website!"  The article revealed that "[a] vulnerability in the Mac Zoom Client

allows any malicious website to enable your camera without your permission." Given the severity of the vulnerability, the article highlighted that "[t]he flaw potentially exposes up to 750,000 companies around the world that use Zoom to conduct day-to-day business."

73.    On this news, Zoom's market capitalization fell 1.22%, or $1.12 per share, on July 8, 2019, to close at $90.76 per share compared to the previous trading day's closing of $91.88 per share, erasing $36 million in market capitalization in a single day.

74.    Then on July 11, 2019, the Electronic Privacy Information Center ("EPIC") filed a complaint against Zoom with the FTC. EPIC's complaint was based in part on Leitschuh's findings detailed in his article and also detailed the possibility of malicious actors remotely accessing Zoom users' webcams and potentially subjecting them to remote surveillance and vulnerable denial of service attacks. EPIC's complaint alleged that Zoom intentionally designed its videoconferencing services to bypass browser security settings, thereby "pla[cing] at risk the privacy and security of the users of its services." Additionally, the complaint stated that "Zoom did not act until the risks were made public, several months after the matter was brought to the company's attention."

75.    EPIC's complaint also noted that the Company admitted its purpose for covertly installing the web server on Mac operating system devices was to prevent Zoom users who were using the Safari web browser from having to click more than once to join a Zoom meeting. EPIC's complaint stated the following:

> When a Mac-user installs the Zoom client, Zoom also installs a localhost web server on the device without the user's knowledge. The localhost web server allows users to join Zoom meetings without manually launching the Zoom client, but also allows others to join users to Zoom meetings without their knowledge or consent.
>
> ***Zoom developed this technique to bypass a security feature in Safari 12, which required users to affirmatively choose to join a Zoom meeting.*** Zoom contends that the installation of the Zoom local web server "is a legitimate solution to a poor

- 25 -

user experience problem, enabling our users to have faster, one-click-to-join meetings."

\*   \*   \*

Zoom's Chief Information Security Officer Richard Farley acknowledges this design choice – "*[w]e consciously enabled the ability to have meeting joins initiated from within an iframe on a webpage*" – but claims that it is "not a security concern."

76. On this news, Zoom's market capitalization fell more than 1.42%, or $1.32 per share, on July 11, 2019, to close at $91.40 per share compared to the previous trading day's closing of $92.72 per share, erasing more than $42 million in market capitalization in a single day.

77. Despite these revelations, the Company's stock continued to trade at artificially inflated prices due to defendants' additional false and misleading statements.

78. ██████████████████████████████████████████

███████████████████████████████████████████████

ZOOM-FLANNERY-00001. ████████████████████████████

███████████████████████████████████████████████

██ ███ ███ ███ ███ ██ ██ ███  ZOOM-FLANNERY-00002; ZOOM-FLANNERY-00485. ████████████████████████

████ ████ ████ ███ ██ ████ ████ ██ ███ ███  ZOOM-FLANNERY-00003; ZOOM-FLANNERY-00485. ████████████████████████

█████████████

79. ██████████████████████████████████████

███████████████████████████████████████████████

███████████  ZOOM-FLANNERY-00007. ████████████████████

███████████  (ZOOM-FLANNERY-00031), ████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████

80.    ████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

*Id.*

81.    ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████    ZOOM-FLANNERY-00027.  Despite knowing this, defendants

Chadwick, Gassner, Scheinman, Subotovsky, Swanson, Yuan, and Eschenbach ████████████

██████████████████████████████████████████████████



*Id.*

82.



ZOOM-FLANNERY-00028.

83.    On September 5, 2019, Zoom held an earnings conference call for analysts and investors concerning the Company's financial results for the second fiscal quarter ended July 31, 2019.  On the call, defendant Yuan touted the fact that the Company's technology, ease-of-use, and security were the "secret sauce" in winning their customer's trust.  In particular, defendant Yuan stated, "I think ***the combination of technology, ease-of-use, security will win the customer trust***, right.  If you look at all other solutions out there today, all of [their] architecture is very old, right?  Not a design for modern video cloud – video first architecture.  That's why we're ahead of any of our competitors for several years."  These statements by defendant Yuan were materially false and misleading given the fact that he knew Zoom faced major security issues.  In fact, Zoom regularly ignored major security vulnerabilities so as to not compromise the platform's "ease of use."  Contrary to defendant Yuan's assertions, the Company's own poor technology and security decisions were ultimately the cause for the Company's loss of consumer trust.

84.    On September 10, 2019, Argus Research published an analyst report that described the reputational damage the Company suffered as a result of its prioritization of ease of use over user privacy and security in connection with Zoom's installation of a local web server on Mac clients.  The analyst report further highlighted the significance of the Company's failure to timely address its major security vulnerability and stated the following:

> Zoom got a PR black eye on July 8 when security researcher Jonathan Leitschuh publicly disclosed a security vulnerability related to the local web server installed on users' Apple computers with the Zoom application.  The flaw would enable a third party to automatically turn on a user's web camera as well as enable denial of service attacks on the user's computer.  While the DNS flaw was fixed in May, the web camera issue was not adequately addressed until after Mr. Leitschuh went public, after the expiration of the customary 90-day waiting period from when Mr. Leitschuh first reported the flaw privately to the company.

> We can see how the company's ethic around creating an easy and seamless user experience may have led to decisions to automate certain processes to save users redundant click throughs.  However, issues around the tech industry's responsibility for user privacy and data security have intensified severely in recent years after Facebook's Cambridge Analytica scandal, the continuing string of large data breaches, and increased regulatory scrutiny of industry business practices.  While Zoom did quickly fix the flaw after public disclosure, the company's stumble arose from not taking a flaw that could compromise user privacy seriously enough to fix it earlier.

85.    On September 13, 2019, Zoom filed its Quarterly Report on Form 10-Q for the second fiscal quarter ended July 31, 2019 with the SEC (the "Q2 2020 Form 10-Q").  The Q2 2020 Form 10-Q was signed by defendants Yuan and Steckelberg and contained SOX certifications signed by defendants Yuan and Steckelberg attesting to the accuracy of the statements contained therein.

86.    Despite  defendants  Scheinman,  Eschenbach,  Chadwick,  and  Steckelberg's ████████████████████████████████████████████ ███████████████████████████—they allowed the Company to file the Q2 2020 Form 10-Q containing a series of false and misleading statements.  The Q2 2020 Form 10-Q substantively

reiterated the false and misleading statements included in the Company's Offering Documents and Q1 2020 Form 10-Q.

87.    Although the risk factors section of the Q2 2020 Form 10-Q passively mentioned the July 2019 Leitschuh article, the Q2 2020 Form 10-Q failed to disclose that the Company knew of the privacy and security vulnerability for months, yet failed to address the issue until after the article was published.  In particular, the risk factors misleadingly stated:

> We have not always been able in the past and may be unable in the future to anticipate or prevent techniques used to obtain unauthorized access or to compromise our systems because they change frequently and are generally not detected until after an incident has occurred. ***For example, in July 2019, a security researcher published a blog highlighting concerns with the Zoom Meeting platform, including certain video-on features***. In July 2018, we were made aware of a vulnerability in the Zoom Meeting client for Windows that could result in potential exposure of a Zoom user's password. Additionally, in 2018, a cybersecurity company discovered a vulnerability in our software that could be exploited by hackers to exert certain meeting controls. ***While we were able to release updates to the software addressing these vulnerabilities and we are not aware of any customers being affected or meetings compromised by these vulnerabilities, in most cases customers are responsible for installing this update to the software and their software is subject to these vulnerabilities until they do so***. Additionally, we cannot be certain that we will be able to address any vulnerabilities in our software that we may become aware of in the future.

88.    Despite all of the Individual Defendants' █████████████████████ ████████ they allowed the Company to make misleading risk factor statements.  In reality, the Company was not proactive about addressing this major flaw.  Instead, the Company only addressed the privacy and security vulnerability until after a security researcher forced its hand.

89.    Additionally, the Q2 2020 Form 10-Q failed to disclose that: (i) the Company's data privacy and security controls were inadequate; (ii) the Zoom platform was not actually equipped with AES 256-bit end-to-end encryption, despite previous assertions to the contrary; (iii) Zoom did not accurately disclose how it handled users' data; (iv) consequently, Zoom users faced heightened risks that their personal information would be improperly retrieved by

unauthorized parties; (v) Zoom was not compliant with regulatory requirements related to privacy, data protection, or information security; (vi) the Company did not have an adequate security program in place; and (vii) the Company failed to maintain adequate internal controls. As a result, Zoom's public statements were materially false and misleading at all relevant times.

90.    Despite defendants Scheinman, Eschenbach, Chadwick, and Steckelberg's ██████████████████████████████████████████████████████ the Q2 2020 Form 10-Q further failed to disclose the complaint EPIC filed with the FTC regarding certain aspects of Zoom's misleading privacy and security practices. Instead, the Q2 2020 Form 10-Q merely stated "[w]e are not presently a party to any litigation the outcome of which, we believe, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, cash flows or financial condition."

### THE COMPANY'S FIDUCIARIES CONTINUE DISSEMINATING FALSE AND MISLEADING STATEMENTS THROUGHOUT THE RELEVANT PERIOD

91.    Despite the defendants' knowledge that: (i) the Company's data privacy and security controls were inadequate; (ii) the Zoom platform was not actually equipped with AES 256-bit or end-to-end encryption as Zoom and defendant Yuan had claimed; (iii) Zoom did not accurately disclose how it handled users' data; (iv) Zoom users faced heightened risks that their personal information would be improperly retrieved by unauthorized parties; (v) Zoom was not compliant with regulatory requirements related to privacy, data protection, or information security; and (vi) the Company failed to maintain adequate internal controls, the defendants continued to disseminate false and misleading statements and failed to remediate Zoom's known issues throughout the Relevant Period.

92.    For example, at the October 15, 2019 Zoomtopia conference, an analyst asked defendant Yuan to talk about the Company's security features; defendant Yuan highlighted the

Company's "security white paper," touted the Company's security capabilities, and claimed that

Zoom's customers do not have a lot of questions about security and data privacy once they review

the Security Guide published on the Company's website:

> [Analyst:] So as you move upstream, regardless of all the features that customers love, talk a little bit about how customers are demanding additional security features....

> [Defendant Yuan:] Yes, yes. That's a good question.... I came from WebEx, right? When we build WebEx, we never realized we needed to add those security features. We distribute all the features. They come -- whenever we receive a report about any [embedded] issues, we try to fix those security problems. I learned a hard lesson. That's why Zoom on day 1, security is already built in from each layer, right, with a security interface, with security interface. I think if you look at our product today, from a security feature perspective, I think we pretty much already offer a lot of security features....

> Another thing more of the customer data privacy is very important, and customers use our cloud, recording the meetings, maybe they pay for with a credit card, we're going to make sure, show customer that those layers, what we can do to have a customer privacy. But most of the time, other ***customer looking at our security white paper, they do not have a lot of questions about our security features***, just, I mean, data privacy and a compliance, yes, on that front.

93.    Notably, the then current version of Zoom's Security Guide that defendant Yuan

was referencing at the October 15, 2019 Zoomtopia conference continued to falsely claim that

Zoom Meetings enabled end-to-end encryption.  Additionally, the Security Guide continued to

misleadingly misrepresent that "Zoom places security as the highest priority in the operations of

its suite of products and services."

94.    ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ ZOOM-FLANNERY-00048. ████████████████

████████████████████████████████████████████████████████████

█████████████ ZOOM-FLANNERY-00049; ZOOM-FLANNERY-00540. ████████

████████████████████████████████████████████████████████████



ZOOM-FLANNERY-00050.

95.    On December 9, 2019, Zoom filed the Q3 2020 Form 10-Q with the SEC.  The Q3 2020 Form 10-Q was signed by defendants Yuan and Steckelberg and contained SOX certifications signed by defendants Yuan and Steckelberg attesting to the accuracy of the statements contained therein.

96.    Despite defendants Scheinman, Eschenbach, Chadwick, and Steckelberg's

—they allowed the Company to file the Q3 2020 Form 10-Q containing a series of false and misleading statements.  Like the Q2 2020 Form 10-Q, the Q3 2020 Form 10-Q also passively mentioned the July 2019 Leitschuh article, yet failed to disclose that the Company knew of the privacy and security vulnerability for months but failed to address the issue until after the article was published. In particular, the risk factors section of the Q3 2020 Form 10-Q misleadingly stated:

> We have not always been able in the past and may be unable in the future to anticipate or prevent techniques used to obtain unauthorized access or to compromise our systems because they change frequently and are generally not detected until after an incident has occurred. ***For example, in July 2019, a security researcher published a blog highlighting concerns with the Zoom Meeting platform, including certain video-on features***. In July 2018, we were made aware of a vulnerability in the Zoom Meeting client for Windows that could result in potential exposure of a Zoom user's password. Additionally, in 2018, a cybersecurity company discovered a vulnerability in our software that could be exploited by hackers to exert certain meeting controls. ***While we were able to***

*release updates to the software addressing these vulnerabilities and we are not aware of any customers being affected or meetings compromised by these vulnerabilities, in most cases customers are responsible for installing this update to the software and their software is subject to these vulnerabilities until they do so*. Additionally, we cannot be certain that we will be able to address any vulnerabilities in our software that we may become aware of in the future.

(Emphasis added).

97.     In reality, the Company was not proactive about addressing this major flaw. Instead, the Company only addressed the privacy and security vulnerability until after a security researcher forced its hand.

98.     Additionally, the Q3 2020 Form 10-Q failed to disclose that: (i) the Company's data privacy and security controls were inadequate; (ii) the Zoom platform was not actually equipped with AES 256-bit end-to-end encryption, despite previous assertions to the contrary; (iii) Zoom did not accurately disclose how it handled users' data; (iv) consequently, Zoom users faced heightened risks that their personal information would be improperly retrieved by unauthorized parties; (v) Zoom was not compliant with regulatory requirements related to privacy, data protection, or information security; (vi) the Company did not have an adequate security program in place; and (vii) the Company failed to maintain adequate internal controls. As a result, Zoom's public statements were materially false and misleading at all relevant times.

99.     Finally, despite defendants Scheinman, Eschenbach, Chadwick, and Steckelberg's ██████████████████████████████████████████████ the Q3 2020 Form 10-Q failed to disclose the complaint EPIC filed with the FTC regarding certain aspects of Zoom's misleading privacy and security practices. Instead, the Q3 2020 Form 10-Q merely stated "[w]e are not presently a party to any litigation the outcome of which, we believe, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, cash flows or financial condition."

100.    Then, in early 2020, a novel strand of the coronavirus known as COVID-19 spread rampantly across the world causing a global pandemic.  The COVID-19 pandemic caused a radical shift in social practices as people around the world were advised to social distance in order to contain the spread of the virus.  Additionally, entire countries implemented travel restrictions and state and local governments issued stay-at-home directives.  As the world began to adjust to COVID-19 mandates, individuals, business, and institutions increasingly relied on virtual communications platforms to connect and provide services.  Zoom's purported security, privacy, and reliability were seen as a superior means to virtually facilitate communications and Zoom's user base grew astronomically as a result.  Additionally, the COVID-19 pandemic resulted in widespread uncertainty over the future of the global economy which caused the stock price of many public companies to crater.  However, Zoom's unique market position and growth prospects in the midst of the pandemic caused the Company's stock price to skyrocket.

101.    Unfortunately, investors were deceived about Zoom's privacy and security practices and Zoom's stock price remained artificially inflated.  Despite the fact that the explosive growth in Zoom's user base exacerbated the Company's existing privacy and security flaws, the Individual Defendants continued to mislead the public by issuing additional false and misleading statements.

102.    On March 20, 2020, less than a week before the truth began to fully emerge, Zoom filed its Annual Report on Form 10-K for the fourth and fiscal year ended January 31, 2020 with the SEC (the "2020 Form 10-K").  The 2020 Form 10-K was signed by defendants Yuan, Steckelberg, Chadwick, Eschenbach, Gassner, Scheinman, Subotovsky, Swanson, and non-party Hammonds and contained SOX certifications signed by defendants Yuan and Steckelberg attesting to the accuracy of the statements contained therein.

103.    Despite the Audit Committee's obligation to review and approve the Company's financial statements, they allowed the Company to file the 2020 Form 10-K containing a series of false and misleading statements.  Like the Company's Offering Documents and previous SEC filings on Form 10-Q, the 2020 Form 10-K contained the substantively same materially false and misleading statements mentioned above.

104.    For instance, like the Offering Documents, the 2020 Form 10-K continued to boast that Zoom's "unique technology and infrastructure enable best-in-class reliability, scalability and performance" and highlighted the Zoom platform's interoperability between a "range of diverse devices, operating systems and third-party applications."  In addition, the 2020 Form 10-K stated "we provide, develop and create applications for our platform partners that integrate our platform with our partners' various offerings[,]" and touted the platform's integration with third-party applications and a "variety of other productivity, collaboration, data management and security vendors."

105.    Further, the 2020 Form 10-K touted the platform's reliability and ease of use and stated, "[w]e believe that rich and reliable communications lead to interactions that build greater empathy and trust.  We strive to live up to the trust our customers place in us by delivering a communications solution that 'just works.'"

106.    Finally, the 2020 Form 10-K contained generalized boiler-plate "risk factors" regarding the Company's purported efforts to comply with privacy, data protection, and information security laws.  In particular the 2020 Form 10-K stated:

> We receive, store, process and use personal information and other user content. There are numerous federal, state, local and international laws and regulations regarding privacy, data protection, information security and the storing, sharing, use, processing, transfer, disclosure and protection of personal information and other content, the scope of which is changing, subject to differing interpretations and may be inconsistent among countries, or conflict with other rules. We are also

subject to the terms of our privacy policies and obligations to third parties related to privacy, data protection and information security.

***We strive to comply with applicable laws, regulations, policies and other legal obligations relating to privacy, data protection and information security to the extent possible.***

(Emphasis added).

107.    Further, the 2020 Form 10-K only passively mentioned the July 2019 Leitschuh article, yet failed to disclose that the Company knew of the privacy and security vulnerability for months but failed to address the issue until after the article was published.  In particular, the risk factors section of the 2020 Form 10-K misleadingly stated:

> We have not always been able in the past and may be unable in the future to anticipate or prevent techniques used to obtain unauthorized access or to compromise our systems because they change frequently and are generally not detected until after an incident has occurred. ***For example, in July 2019, a security researcher published a blog highlighting concerns with the Zoom Meeting platform, including certain video-on features***. In July 2018, we were made aware of a vulnerability in the Zoom Meeting client for Windows that could result in potential exposure of a Zoom user's password. Additionally, in 2018, a cybersecurity company discovered a vulnerability in our software that could be exploited by hackers to exert certain meeting controls. ***While we were able to release updates to the software addressing these vulnerabilities and we are not aware of any customers being affected or meetings compromised by these vulnerabilities, in most cases customers are responsible for installing this update to the software and their software is subject to these vulnerabilities until they do so***. Additionally, we cannot be certain that we will be able to address any vulnerabilities in our software that we may become aware of in the future.

(Emphasis added.)

108.    Interestingly, the 2020 Form 10-K omitted any mention of Zoom's "robust security capabilities," or the availability of "end-to-end encryption."  However, the 2020 Form 10-K did not address Zoom's stark security vulnerabilities or that Zoom did not, in fact, offer end-to-end encryption.  Instead, consumers and investors were still led to believe that Zoom offered end-to-end encryption in light of the fact that the then current version of Zoom's Security Guide still continued to falsely claim Zoom offered end-to-end encryption.

109.    The 2020 Form 10-K tellingly failed to disclose that: (i) the Company's data privacy and security controls were inadequate; (ii) the Zoom platform was not actually equipped with AES 256-bit or end-to-end encryption, despite previous assertions to the contrary; (iii) Zoom did not accurately disclose how it handled users' data; (iv) consequently, Zoom users faced heightened risks that their personal information would be improperly retrieved by unauthorized parties; (v) Zoom was not compliant with regulatory requirements related to privacy, data protection, or information security; (vi) the Company did not have an adequate security program in place; and (vii) the Company failed to maintain adequate internal controls.  As a result, Zoom's public statements were materially false and misleading at all relevant times.

110.    Despite defendants Scheinman, Eschenbach, Chadwick, and Steckelberg's ██████████████████████████████████████████████████, the 2020 Form 10-K failed to disclose the complaint EPIC filed with the FTC regarding certain aspects of Zoom's misleading privacy and security practices.  Instead, the 2020 Form 10-K merely stated "[w]e are not presently a party to any litigation the outcome of which, we believe, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, cash flows or financial condition."

## THE TRUTH BEGINS TO EMERGE

111.    The truth behind the Company's deceptive privacy and security practices began to emerge on March 26, 2020, when the website Motherboard published an article titled, "Zoom iOS App Sends Data to Facebook Even if You Don't Have a Facebook Account: Zoom's Privacy Policy Isn't Explicit About the Data Transfer to Facebook at All."  The article revealed that the Company was sending data to Facebook, including from users without Facebooks accounts, and noted there was "nothing in the privacy policy that addresses that," by using the Zoom platform,

users may unknowingly be providing data to Facebook.  Further, the article noted that Facebook's

own terms of use required Zoom to "provide[] robust and sufficiently prominent notice to users

regarding the Customer Data collection, sharing and usage[.]"  In particular, the article stated:

> As people work and socialize from home, video conferencing software Zoom has exploded in popularity.  ***What the company and its privacy policy don't make clear is that the iOS version of the Zoom app is sending some analytics data to Facebook, even if Zoom users don't have a Facebook account,*** according to a Motherboard analysis of the app.
>
> This sort of data transfer is not uncommon, especially for Facebook; plenty of apps use Facebook's software development kits (SDK) as a means to implement features into their apps more easily, which also has the effect of sending information to Facebook.  But Zoom users may not be aware it is happening, nor understand that when they use one product, they may be providing data to another service altogether.
>
> "***That's shocking.  There is nothing in the privacy policy that addresses that***," Pat Walshe, an activist from Privacy Matters who has analyzed Zoom's privacy policy, said in a Twitter direct message.
>
> \*       \*       \*
>
> Zoom is not forthcoming with the data collection or the transfer of it to Facebook.  ***Zoom's policy says the company may collect user's "Facebook profile information*** (when you use Facebook to log-in to our Products or to create an account for our Products)," ***but doesn't explicitly mention anything about sending data to Facebook on Zoom users who don't have a Facebook account at all.***
>
> Facebook told Motherboard it requires developers to be transparent with users about the data their apps send to Facebook.  ***Facebook's terms say "If you use our pixels or SDKs, you further represent and warrant that you have provided robust and sufficiently prominent notice to users regarding the Customer Data collection, sharing and usage," and specifically for apps, "that third parties, including Facebook, may collect or receive information from your app and other apps and use that information to provide measurement services and targeted ads."***

112.    Then on March 27, 2020, defendant Yuan wrote a blog post published on Zoom's

website addressing the Motherboard article.  In his blog post, defendant Yuan admitted that the

Company collected "unnecessary" user information by using Facebook's SDK:

Zoom takes its users' privacy extremely seriously. We would like to share a change that we have made regarding the use of Facebook's SDK.

We originally implemented the "Login with Facebook" feature using the Facebook SDK for iOS (Software Development Kit) in order to provide our users with another convenient way to access our platform. However, we were made aware on Wednesday, March 25, 2020, that the Facebook SDK was collecting device information unnecessary for us to provide our services. The information collected by the Facebook SDK did not include information and activities related to meetings such as attendees, names, notes, etc., but rather included information about devices such as the mobile OS type and version, the device time zone, device OS, device model and carrier, screen size, processor cores, and disk space.

Our customers' privacy is incredibly important to us, and therefore we decided to remove the Facebook SDK in our iOS client and have reconfigured the feature so that users will still be able to log in with Facebook via their browser.

113. Then, on March 29, 2020, Zoom finally updated its Privacy Policy. The Privacy Policy included a letter from Zoom's Chief Legal Officer, Aparna Bawa, that reiterated the importance of users' privacy and stated, "[p]rivacy is an extremely important topic, and we want you to know that at Zoom, we take it very seriously. … We are committed to protecting the privacy and security of your personal data."

114. The following day, the *New York Times* published an article titled, "New York Attorney General Looks into Zoom's Privacy Practices: as the Videoconferencing Platform's Popularity Has Surged, Zoom Has Scrambled to Address a Series of Data Privacy and Security Problems." The article reported that Zoom was being investigated by the New York Attorney General for its security and privacy practices, including the Company's sharing of data with Facebook and the security vulnerability that allowed malicious actors to enable a users' webcams without their consent. Additionally, the article reported that the New York Attorney General sought information regarding "the categories of data that Zoom collects, as well as the purposes and entities to whom Zoom provides consumer data," and on "changes the company put in place

after a security researcher, Jonathan Leitschuh, exposed a flaw allowing hackers to take over Zoom webcams."

115.    On this news, Zoom's market capitalization dropped more than 3.68%, or $5.58 per share, on March 31, 2020, to close at $146.12 per share compared to the March 27, 2020 closing of $151.70 per share, erasing $711.2 million in market capitalization in a single trading day.

116.    Also on March 31, 2020, computer security engineer Micah Lee and journalist Yael Grauer published an article on the *Intercept* titled, "Zoom Meetings Aren't End-to-End Encrypted, Despite Misleading Marketing: The Video Conferencing Service Can Access Conversations on Its Platform." Notably, the article disclosed that Individual Defendants' claims regarding Zoom's use of end-to-end encryption were false. In fact, the Zoom platform did not actually provide end-to-end encryption. Instead, the Company used a weaker form of encryption called "transport encryption," which provided not just the users but also Zoom itself the decryption key. Indeed, the article noted that the Company admitted that: "Currently, it is not possible to enable E2E [end-to-end] encryption for Zoom video meetings," despite having repeatedly represented that it was not only possible but a present option for users. The article called out the Company's misleading end-to-end encryption representations, stating:

> Zoom, the video conferencing service whose use has spiked amid the Covid-19 pandemic, ***claims to implement end-to-end encryption, widely understood as the most private form of internet communication, protecting conversations from all outside parties. In fact, Zoom is using its own definition of the term, one that lets Zoom itself access unencrypted video and audio from meetings.***

> Still, Zoom offers reliability, ease of use, and at least one very important security assurance: As long as you make sure everyone in a Zoom meeting connects using "computer audio" instead of calling in on a phone, the meeting is secured with end-to-end encryption, at least according to Zoom's website, its security white paper, and the user interface within the app. But ***despite this misleading marketing, the service actually does not support end-to-end encryption for video and audio content, at least as the term is commonly understood.*** Instead it offers what is usually called transport encryption, explained further below.

In Zoom's white paper, there is a list of "pre-meeting security capabilities" that are available to the meeting host that starts with "Enable an end-to-end (E2E) encrypted meeting." Later in the white paper, it lists "Secure a meeting with E2E encryption" as an "in-meeting security capability" that's available to meeting hosts. When a host starts a meeting with the "Require Encryption for 3rd Party Endpoints" setting enabled, participants see a green padlock that says, "Zoom is using an end to end encrypted connection" when they mouse over it.

But when reached for comment about whether video meetings are actually end-to-end encrypted, a Zoom spokesperson wrote, "***Currently, it is not possible to enable E2E encryption for Zoom video meetings***. Zoom video meetings use a combination of TCP and UDP. TCP connections are made using TLS and UDP connections are encrypted with AES using a key negotiated over a TLS connection."

117.    Additionally, the *Intercept* article quoted the FTC's former Chief Technologist, Ashkan Soltani, who stated that if Zoom claimed to provide end-to-end encryption (which it did), those representations could be a deceptive trade practice that harms consumers and competitors who do not misrepresent their products' capabilities. In particular, the article stated:

Independent technologist Ashkan Soltani, who formerly served as the FTC's chief technologist, said it's unclear to him whether Zoom is actually implementing end-to-end encryption; he was unaware that it claimed to do so prior to speaking with The Intercept. But he said that if a reasonable consumer makes a decision to use Zoom with the understanding that it has end-to-end encryption for video chat when, in fact, it did not, and if Zoom's representation is deceptive, it could be a deceptive trade practice.

This kind of marketing could impact not just consumers, but also other businesses.

"***If Zoom claimed they have end-to-end encryption, but didn't actually invest the resources to implement it***, and Google Hangouts didn't make that claim and you chose Zoom, not only are you being harmed as consumer, but in fact, Hangouts is being harmed because ***Zoom is making claims about its product that are not true***," he said. "So it's actually benefiting from false claims, and people are essentially receiving more market share because of those false claims."

118.    After the markets closed on April 1, 2020, defendant Yuan published a blog to Zoom's website titled "A Message to Our Users." In his blog, defendant Yuan admitted that Zoom had "fallen short" of meeting the Company's and its users' "privacy and security expectations."

Also, the blog mentioned that Zoom removed the software that shared Zoom user data with Facebook and "clarif[ied] the facts" about the ability to encrypt transmissions over Zoom's platform. Defendant Yuan's blog referred to and linked a post made on the same day by Zoom's Chief Product Officer titled, "The Facts Around Zoom and Encryption for Meetings/Webinars." Notably, the post admitted that Zoom Meetings were not capable of using end-to-end encryption, stating:

> In light of recent interest in our encryption practices, ***we want to start by apologizing for the confusion we have caused by incorrectly suggesting that Zoom meetings were capable of using end-to-end encryption***. Zoom has always strived to use encryption to protect content in as many scenarios as possible, and in that spirit, we used the term end-to-end encryption. While we never intended to deceive any of our customers, ***we recognize that there is a discrepancy between the commonly accepted definition of end-to-end encryption and how we were using i***t. This blog is intended to rectify that discrepancy and clarify exactly how we encrypt the content that moves across our network.

119. On this news, Zoom's market capitalization plunged more than 9.2%, or $13.88 per share, on April 1, 2020, to close at $137 per share compared to the March 30, 2020 closing of $150.88 per share, erasing over $1.7 billion in market capitalization in two trading days.

120. In total, the revelations that occurred from March 27, 2020 to April 2, 2020, cause the Company's stock price to fall precipitously. In total, Zoom's stock price fell from $151.70 per share at the close of trading on March 27, 2020 to a low of $121.93 per share at the closing on April 2, 2020. In other words, the Company lost nearly $3.8 billion in market capitalization in just four trading days.

121. After the market closed on April 2, 2020, the *New York Times* published an article titled, "A Feature on Zoom Secretly Displayed Data from People's LinkedIn Profiles: After an Inquiry from Times Reporters, Zoom Said It Would Disable a Data-Mining Feature that Could Be Used to Snoop on Participants During Meetings Without Their Knowledge." The article detailed

several privacy and security concerns related to the fact that Zoom permitted certain users to access other users' LinkedIn profile information without their knowledge.  In particular, the *New York Times* article stated:

> [W]hat many people may not know is that, until Thursday, a data-mining feature on Zoom allowed some participants to surreptitiously have access to LinkedIn profile data about other users – without Zoom asking for their permission during the meeting or even notifying them that someone else was snooping on them.
>
> The undisclosed data mining adds to growing concerns about Zoom's business practices at a moment when public schools, health providers, employers, fitness trainers, prime ministers and queer dance parties are embracing the platform.
>
> An analysis by The New York Times found that when people signed in to a meeting, Zoom's software automatically sent their names and email addresses to a company system it used to match them with their LinkedIn profiles.
>
> *              *              *
>
> The discoveries about Zoom's data-mining feature echo what users have learned about the surveillance practices of other popular tech platforms over the last few years.  The video-meeting platform that has offered a welcome window on American resiliency during the coronavirus – providing a virtual peek into colleagues' living rooms, classmates' kitchens and friends' birthday celebrations – can reveal more about its users than they may realize.
>
> "People don't know this is happening, and that's just completely unfair and deceptive," Josh Golin, the executive director of the Campaign for a Commercial-Free Childhood, a nonprofit group in Boston, said of the data-mining feature.

122.    Further, the *New York Times* article mentioned that reporters reached out to the Company with their findings and Zoom decided to disable the data-mining feature in response. The article also mentioned defendant Yuan's related blog post where he wrote that the Company had removed the data-mining feature "after identifying unnecessary data disclosure" and that Zoom would freeze all new features for the next ninety days to concentrate on data security and privacy issues.

123.    Tellingly, the Company's decision to remove the LinkedIn data-mining feature demonstrates the Company's consistent practice of allowing privacy and security flaws to go

unabated until their deceptive practices and misleading statements are revealed to the public. In addition, these actions show that Zoom was never serious about privacy or security, contrary to the Company's previous assertions. Finally, defendant Yuan's statements in his blog post were yet another deceptive tactic to make it seem as if Zoom promptly addressed privacy issues as soon as the Company learns of its flaws. However, defendant Yuan's statements are directly contradicted by the fact that the main purpose of the LinkedIn profile matching feature was to exploit user data to gain insights on sales prospects. In fact, Zoom's own marketing materials dating back to 2018 promoted the LinkedIn profile-matching feature's ability to "[i]nstantly gain insights about your meeting participants." The *New York Times* article further noted that "neither Zoom's privacy policy nor its terms of service specifically disclosed that Zoom could covertly display meeting participants' LinkedIn data to other users," stating, in particular:

> *In 2018, Zoom introduced the LinkedIn profile-matching feature to help sales representatives better profile and target sales prospects attending Zoom meetings.*
>
> *"Instantly gain insights about your meeting participants,"* a Zoom video promoting the service said. *"Once signed in, you'll be able to match participants to their LinkedIn profile information and view their recent activity."*
>
> But *neither Zoom's privacy policy nor its terms of service specifically disclosed that Zoom could covertly display meeting participants' LinkedIn data to other users* — or that it might communicate the names and email addresses of participants in private Zoom meetings to LinkedIn. *In fact, user instructions on Zoom suggested just the opposite: that meeting attendees may control who sees their real names.*
>
> "Enter the meeting ID number and your display name," one section on Zoom's Help Center said. "If you're signed in, change your name if you don't want your default name to appear."
>
> Similarly, *Zoom's privacy policy says that "some data will be disclosed to other participants" when a person uses Zoom*. For instance, it says, "if you send a chat or share content, that can be viewed by others in the chat or the meeting." *But it did not mention that Zoom could show some users' LinkedIn data to other users or disclose data about users' participation in private Zoom meetings to LinkedIn.*

(Emphasis added).

124.    Then on April 3, 2020, Citizen Lab, an interdisciplinary laboratory at the Munk School of Global Affairs, University of Toronto, issued a report titled, "Move Fast and Roll Your Own Crypto: A Quick Look at the Confidentiality of Zoom Meetings."  The Citizen Lab report confirmed that Zoom did not actually use "end-to-end encryption" contrary to its previous assertions but instead "the Zoom app uses non-industry-standard cryptographic techniques with identifiable weaknesses."  The report also mentioned that the Company falsely claimed that it uses AES 256-bit encryption, however, the Company only used the less secure AES 128-bit encryption. In addition, the report noted that the Zoom servers responsible for generating the AES 128-bit keys were sometimes located in China even where all participants in a Zoom meeting are outside of China.  As a result, the report highlighted concerns that Zoom may be subject to pressure from Chinese authorities.

125.    That same day, defendant Yuan published a blog post in response to Citizen Lab's report where he acknowledged that the Company needed to improve with respect to encryption. In particular, defendant Yuan stated, "[w]e recognize that we can do better with our encryption design."

126.    Then, on April 4, 2020, the *Wall Street Journal* published an article titled, "Zoom CEO: 'I Really Messed Up' on Security as Coronavirus Drove Video Tool's Appeal: Eric Yuan Says He Is Scrambling to Restore Reputation of Platform that Has Drawn Soaring Usage, Privacy Concerns During Pandemic."  The article was based on the *Wall Street Journal's* interview with defendant Yuan where he stated that he was now promising a future option for end-to-end encryption.  Additionally, the article noted that large companies such as Tesla, Inc. had stopped using the Zoom platform as a result of the Company's privacy and security failures:

- 47 -

"'If we mess up again, it's done,' I thought a lot last night," he told The Wall Street Journal in an interview Friday, after what he said was a sleepless night.

Among the privacy features Mr. Yuan now promises is an option for end-to-end encryption to safeguard conversations, he told the Journal. Zoom had previously advertised such a feature, but security experts discovered the underlying technology provided a lesser level of data protection. The full-encryption feature won't be ready for a few months, Mr. Yuan said.

The backlash against Zoom hasn't come just from security professions. Some corporate users have dropped the platform, including Elon Musk's Tesla Inc. and Space Exploration Technologies Corp., Mr. Yuan said.

"I really messed up as CEO, and we need to win their trust back. This kind of thing shouldn't have happened," he said.

127. ███████████████████████████████████████ defendants Chadwick, Gassner, Scheinman, Subotovsky, Swanson, Yuan, and Eschenbach. ████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████ ZOOM-FLANNERY-00053-54. ███████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████ *Id.*

128. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

ZOOM-FLANNERY-00053-55.

129. ███████████████████ defendants and others serving on the Company's Board, utterly failed to undertake their oversight responsibilities seriously. Instead, they sat, passive in the face of numerous red flags alerting them that the Company's current security and

privacy practices were utterly deficient and needed immediate and significant correction and attention. Defendants waited until the Company's deficiencies were put on display by outside reports and complaints of repeated failures. The persistent vulnerabilities in Zoom's platform exposed the Company and its consumers to much damage and distress that could have and should have been avoided. Instead of proactively and diligently overseeing key aspects of the Company's operations, defendants stalled until they no longer could. Worse still, defendant Yuan and other Zoom insiders proceeded to dump significant numbers of shares onto the market, seeking to profit as long as they could.

130. ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

ZOOM-FLANNERY-00032. Although concerns were steadily exposed to the public, defendants heedlessly touted Zoom's safety and security in a manner designed to assure investors without sincerely addressing core issues, as defendant Yuan, himself effectively admitted in April 2020.

131. Then, Zoom's stock price continued to fall as result of On April 6, 2020, *Fortune* published an article titled, "Zoom stock down after schools and businesses banned the meeting app over 'Zoom bombing' security issues." The *Fortune* article reported that Zoom's stock price had declined by 14.5% as a result of additional security concerns leading to numerous organizations banning or discouraging the use of Zoom's platform:

> Zoom stock dropped as much as 14.5% this morning, after concerns over the security of the company's video-chat and meeting software led to several major organizations banning or discouraging its use. The reversal follows a huge surge in usage during a worldwide lockdown to combat the coronavirus pandemic.
>
> Recent days have highlighted a number of deeper concerns with the underlying security of Zoom software and the company's practices. Zoom is facing lawsuits

in New York and California for sharing user data with Facebook, a practice Zoom has since halted.

On Friday, it was revealed that some Zoom calls were routed through data centers in China, potentially making them easier to compromise. Recent reports also found that while Zoom claimed it used "end to end encryption" to protect calls, that claim was misleading.

132.    On this news, Zoom's stock price continued its precipitous decline in response to the multiple articles and reports revealing Zoom's numerous privacy and security issues. In total, Zoom's stock price fell from $150.88 per share at the close of trading on March 30, 2020, to a low of $113.75 per share at closing on April 7, 2020. In other words, the Company lost over $4.7 billion in market capitalization in just six trading days as the truth was revealed.

## <u>REASONS THE STATEMENTS WERE IMPROPER</u>

133.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)    that the Company was experiencing known but undisclosed privacy and security vulnerabilities;

(b)    the Company's data privacy and security controls were inadequate;

(c)    the Zoom platform was not actually equipped with AES 256-bit end-to-end encryption, despite previous assertions to the contrary;

(d)    the Company did not accurately disclose how it handled users' data;

(e)    Zoom's users faced heightened risks that their personal information would be improperly retrieved by unauthorized parties;

(f)    the Company was not compliant with regulatory requirements related to privacy, data protection, or information security;

(g)    the Company did not maintain an adequate security program, despite previous representations related to Zoom's purportedly robust security capabilities;

(h)    the Company failed to maintain adequate internal controls; and

(i)    as a result of the foregoing, the Individual Defendants' representations concerning the Company's privacy and security practices were materially false and misleading at all relevant times and Zoom's public statements were materially false and misleading at all relevant times.

### THE AFTERMATH FOLLOWING THE REVELATION OF THE INDIVIDUAL DEFENDANTS' DECEPTIVE TRADE PRACTICES AND FALSE AND MISLEADING STATEMENTS

134.    After the truth fully emerged, the Company attempted to scrub all references to "end-to-end" encryption contained in blog posts published on the Company's website. For instance, Zoom removed references to end-to-end encryption in at least eight blog posts dated: January 24, 2017; April 20, 2017; April 24, 2017; July 20, 2017; January 4, 2018; February 27, 2019; July 12, 2019; and March 30, 2020.

135.    Likewise, on April 8, 2020, the Individual Defendants modified the Security Guide published on the Company's website to remove all references to end-to-end encryption.

136.    Nonetheless, the Company continued to face backlash from the public for its numerous scandals related to its deceptive privacy and security practices. Various school systems such as the New York City Department of Education and the Clark County School District of Nevada banned the use of Zoom for remote learning due to privacy and security concerns.

137.    Also on April 8, 2020, Argus Research published a report summarizing the issues present at Zoom, including the local web server allowing for unauthorized, remote access to Mac computers' cameras, Zoom's "fail[ure] to alert users that" their data was being shared with Facebook, and that they touted end-to-end encryption despite not supporting end-to-end

encryption, which Argus Research characterized as "one more black eye for Zoom."  The report

noted that the foregoing had subjected Zoom to twenty-seven state attorneys general

investigations.  Moreover, the report stated:

> Another issue pointed to by the press is the company's touted "end-to-end
> encryption" of its meetings software. This issue may be somewhat semantic, but it
> also points to a certain sloppiness by management. End-to-end encryption as
> generally used in the technology industry means that data is encrypted at the point
> of origin and then unencrypted at the endpoint such that no other parties have access
> to the data other than the sender and recipient, including the communication service
> itself. End-to-end encryption has become more common for messaging services,
> with the most prominent example being Facebook's WhatsApp Messenger. While
> Zoom said its meetings were end-to-end encrypted, its service actually has only
> standard encryption, which prevents outside parties from accessing the meeting but
> still gives Zoom itself access, which may actually be required for the software to
> function. So, one more black eye for Zoom. On April 1, the company clarified the
> type of encryption it uses. Mr. Yuan has also promised to implement real end-to-
> end encryption within a few months.

*          *          *

> We can see how the company's interest in creating an easy user experience may
> have led it to automate certain processes to save users redundant click-throughs.
> However, concerns about tech companies' responsibility for user privacy and data
> security have intensified in the wake of the Facebook Cambridge Analytica scandal,
> the continuing string of large data breaches, and increased regulatory scrutiny of
> industry business practices. While Zoom quickly fixed the flaw after public
> disclosure, the company stumbled by not taking the threat to user privacy seriously
> enough and by failing to address the problem earlier.

138.    That same day, April 8, 2020, Oppenheimer published their own analyst report

detailing the effect that the privacy- and security-related problems had on Zoom:

> Zoom's recent explosive user expansion has brought new attention and high-profile
> criticism of its security/privacy vulnerabilities, which we believe leaves it
> susceptible to some brand erosion and enterprise churn.... Given Zoom's premium
> valuation (27.7x CY21 EV/sales), we remain on the sidelines, especially
> considering the new set of complexities Zoom's navigating.

> KEY POINTS

> - **Growing pains.** Zoom's seen explosive adoption from December to March,
>   with free/paid users exponentially rising from 10M to 200M DAUs ["Daily

Active Users"]. This is indicative of Zoom's rising WFH value proposition and simple UI/user onboarding, yet it's also exposed security/privacy vulnerabilities including unobtrusive data sharing/mining, sub-standard end-to-end encryption, malicious actors accessing webcams, and exposed meeting records, which leave it vulnerable to brand erosion.

\*    \*    \*

- **Under investigation?** Multiple class-action lawsuits have been filed in response to Zoom's security/privacy vulnerabilities and inquiries/concerns from public officials (US Senators Blumenthal, Klobuchar, Bennet, NY Attorney General James, etc.) could lead to an FTC investigation. Zoom's technical response is a positive step and it's engaging directly with officials, yet legal/investigation uncertainties could still divert management bandwidth and hurt the brand.

139. Then, on April 10, 2020, as reported by VOA News, the Department of Defense issued a new guidance on using Zoom's platform following the FBI's warning about its security issues. The report noted that "[t]he security concern is much greater than 'Zoom bombing' attack[]" ... and maintained that "[e]xperts say the teleconferencing app may introduce security risks not only to government employees during Zoom sessions but also to data that reside on government computers."

140. On April 17, 2020, a global online publication, DW, reported on Zoom's public apology and purported measures to address the recently exposed security vulnerabilities. The article noted that the Company's action came on the heels of "multiple countries and organizations [] banning its use."

The Indian government on Thursday declared that Zoom was "not a safe platform," banning it for government use in a new advisory. Taiwan and Germany have also taken similar steps to discourage its use.

In the United States, prosecutors are investigating Zoom's security practices, while the FBI has issued a warning about hijacked sessions. Google has banned the use of the platform's desktop versions from company laptops.

141.    On April 20, 2020, the New York Times published a report on Zoom's security flaws and how the Company was slow to correct or respond to evidence of bugs in the Company's services.  According to the article, the Company's security flaws were identified because its partners and other concerned users did the leg work to test the platform's vulnerabilities.  According to the report, as early as 2018, "a senior research engineer at Tenable, a security vulnerability assessment company, uncovered a serious flaw in Zoom that would have allowed an attacker to remotely disrupt a meeting — without even being on the call.  Among other things, Mr. Wells reported that an attacker could take over a Zoom user's screen controls, enter keystrokes and covertly install malware on their computer."

142.    Instead of acting to correct the underlying security flaws, the Company operated for years and failed to respond with serious actin until independent researchers discovered and publicized Zoom's security issues.

143.    On April 28, 2020, Forbes reported on critical security issues at the Company, detailing how hackers were able to steal 500,000 passwords from Zoom users at the start of the month.  The article quoted a professor of cybersecurity from the University of Manchester, who stated that "using key account credentials to access other accounts is, unfortunately, encouraged for convenience over safety.  But means a hacker can grab one and access many."

144.    On April 29, 2020, Zacks Equity Research issued an analyst report that covered the repercussions the Company faced as a result of its privacy and security flaws, including the entire country of Singapore banning the use of the Zoom platform.  In particular, the report stated:

> Zoom Video is facing significant backlash from customers due to security issues. Daimler AG, Ericsson, NXP Semiconductors, Bank of America and Tesla are among a host of companies banning or warning employees against using the app due to security concerns.  It was also temporarily banned by the New York City Department of Education and Singapore.  Moreover, India deemed Zoom Video as an unsafe platform.  These allegations revealed a significant chink in Zoom's armor

and could prompt customers to shift to more secure platforms like Teams and Webex that are now free to use.

Zoom Video is also struggling with privacy issues. The "zoombombing", which occurs when uninvited individuals disrupt a teleconferencing session, is a major privacy risk. Moreover, the company's iOS app is accused of sending user data to Facebook, which ultimately resulted in a class action lawsuit. The company allegedly overstated its ability to protect users on the platform. It failed to inform users that their communications weren't safeguarded by end-to-end encryption.

145.    On May 7, 2020, New York Attorney General Letitia James announced an agreement with Zoom to "implement and maintain a comprehensive data security program to protect all users" and to "enhance its encryption protocols by encrypting users' information, both in transit and as stored online on their cloud servers." Attorney General James also mentioned some of the recent privacy and security scandals involving Zoom including the fact that: (i) Zoom failed to use AES 256-bit and end-to-end encryption as it had publicly represented; (ii) Zoom shared user information with Facebook unbeknownst to its users; (iii) certain Zoom users could directly access LinkedIn profiles for other users even where the users were under the impression that they would remain anonymous; and (iv) that Zoom leaked personal information of some users to others where those users had signed up for Zoom using the same uncommon e-mail address domain.

146.    Then on November 9, 2020, the FTC announced that it had entered into a proposed consent agreement with Zoom that would require the Company to implement a robust information security program to settle charges that Zoom engaged in deceptive and unfair practices.

147.    The crux of the FTC's allegations surrounded the Company's false and misleading statements regarding its use of end-to-end encryption, and the covert installation of a web server on Mac operating system users' devices that was designed to circumvent browser privacy and security safeguards. According to the FTC's complaint accompanying the consent agreement:

Zoom has made numerous, prominent representations touting the strength of the privacy and security measures it employs to protect users' personal information. For example, Zoom has claimed on its website, in Security Guides, and in its privacy policy, that it takes "security seriously," that it "places privacy and security as the highest priority," and that it "is committed to protecting your privacy."

The privacy and security of video communications, including the level of encryption used to secure those communications, is important to users and their decisions about which videoconferencing platform to use, the price to pay for such services, and/or how they use those services. In numerous blog posts, Zoom has pointed to its security as a reason for potential customers to use Zoom's videoconferencing services. In a January 2017 blog post, "Zoom: The Fastest Growing App on Okta," Zoom specifically cited, based on customer feedback, its security feature of "end-to-end AES 256 bit encryption" as important to businesses and one of the reasons for Zoom's growth.

In fact, Zoom did not provide end-to-end encryption for any Zoom Meeting that was conducted outside of Zoom's "Connecter" product (which are hosted on a customer's own servers), because Zoom's servers – including some located in China – maintain the cryptographic keys that would allow Zoom to access the content of its customers' Zoom Meetings.

*     *     *

In July 2018, Zoom updated its App for Mac computers by deploying a web server onto users' computers – without adequate notice or consent – in order to circumvent a security and privacy safeguard in Apple's safari browse. Specifically, Apple had updated its safari browser to help defend its users from malicious actors and popular malware by requiring interaction with a dialogue box when a website or link attempts to launch an outside App.

To avoid this dialogue box, Zoom issued a manual update in July 2018 for its Zoom App for Mac desktop computers that secretly deployed a web server, called the "ZoomOpener," as a means to bypass the new privacy and security safeguard.

Zoom's deployment of the ZoomOpener web server – without adequate notice or consent – to circumvent a browser privacy and security safeguard, while also exposing users to additional security vulnerabilities […], reflects Zoom's poor privacy and security practices […] Zoom's security policies and practices have been inconsistently applied across its systems, and it has lacked an effective training program on secure software development principles.

148.    Also on November 9, 2020, the FTC issued a press release summarizing the

allegations and settlement it had entered into with Zoom. The FTC's press release stated that

"Zoom's misleading claims gave users a false sense of security" and admonished the Company for misleading its users.  In particular, the press release stated:

> **Zoom's misleading claims gave users a false sense of security**, according to the FTC's complaint, especially for those who used the company's platform to discuss sensitive topics such as health and financial information.  In numerous blog posts, Zoom specifically touted its level of encryption as a reason for customers and potential customers to use Zoom's videoconferencing services.
>
> "During the pandemic, practically everyone – families, schools, social groups, businesses – is using videoconferencing to communicate, making the security of these platforms more critical than ever," said Andrew Smith, Director of the FTC's Bureau of Consumer Protection.  **"Zoom's security practices didn't line up with its promises, and this action will help to make sure that Zoom meetings and data about Zoom users are protected."**

149.    Notably, two FTC Commissioners—Rohit Chopra and Rebecca Kelly Slaughter—dissented and argued that the terms of the settlement did not go far enough in punishing Zoom given the severity of the Company's wrongdoing.  Commissioner Chopra's dissenting statement argued that the Company used deceptive practices to take advantage of the COVID-19 pandemic and create a windfall for the Company's fiduciaries.  Commissioner Chopra's dissenting statement further asserted:

> Zoom (NASDAQ: ZM) did not invent web-based video conferencing. Indeed, there are many other players in the market. But Zoom succeeded in becoming the "default" for many businesses, both large and small, capturing a significant market share despite a crowded field. However, **the allegations in the FTC's complaint raise questions whether Zoom's success – and the tens of billions of dollars of wealth created for its shareholders and executives in a short period of time – was advanced through fair play. In my view, the evidence suggests that deception helped to create this windfall.**
>
> *                *                *
>
> **Zoom has "cashed in" on the pandemic.** While Zoom doesn't publicly share its total number of users, the company has confirmed that it has nearly four times the number of customers with 10 or more employees than they had at this time a year ago. Their stock value has soared. **Zoom's CEO, Eric Yuan, has increased his net worth by almost $16 billion since March, and is now one of the wealthiest individuals in America.**

Zoom can now use this new market penetration to increase monetization for users who currently do not pay any fees. With the pandemic-driven expansion, Zoom has announced that they're going to make a platform pivot and begin to offer an app marketplace and a paid events platform. Zoom disclosed to its investors how a shift to a "platform and sales model allow[s] us to turn a single non-paying user into a full enterprise deployment."

Zoom stands ready to emerge as a tech titan. But we should all be questioning whether Zoom and other tech titans expanded their empires through deception. ***Zoom could have taken the time to ensure that its security was up to the right standards. But, in my view, Zoom saw the opportunity for massive growth by quickly leaping into the consumer market, allowing it to rapidly emerge as the new way to virtually celebrate birthdays and weddings and further solidify itself into our lives. But had Zoom followed the law, it might all be different.***

150.    Similarly, Commissioner Slaughter joined Commissioner Chopra's criticisms of Zoom's wrongdoing and likewise criticized the FTC's settlement for failing to adequately address Zoom's pervasive practice of engaging in unfair and deceptive practices.  Further, Commissioner Slaughter's dissenting statement also highlighted a clear distinction between data security and privacy concerns and claimed that Zoom should be accountable for violating consumer privacy, too.  As a result, Commissioner Slaughter pointed out that the settlement did not even mention consumer privacy and cited the majority's failure to understand that "the reason customers care about security measures ... is that they value their privacy."

151.    The two FTC Commissioners' dissenting statements show that regulators are placing an increasing focus on penalizing companies that have committed serious violation of consumer privacy and data security.  In addition, the dissenting statements highlight the continued risk of Zoom continuing its illegal practices.  Notably, the Individual Defendants' misconduct has put a target on the Company's back and exposed it to further regulatory actions.

152.    Then on December 18, 2020, Zoom disclosed that the DOJ and U.S. Attorney's Office for the Eastern District of New York had issued grand jury subpoenas seeking information

regarding, among other matters, the development and implementation of Zoom's privacy policies. Similarly, Zoom disclosed that the U.S. Attorney's Office for the Northern District of California and the SEC had issued subpoenas seeking information, among other matters, on "various security and privacy matters, including Zoom's encryption, and Zoom's statements[.]"

153. Additionally, these actions have subjected the Company to the consolidated Consumer Class Action filed in the U.S. District Court for the Northern District of California. Plaintiffs in the Consumer Class Action allege that Zoom made harmful misrepresentations and failed to secure its platform, leading to egregious invasions of consumers' privacy. More specifically, plaintiffs in the Consumer Class Action allege that: (i) Zoom shared consumers' personally identifiable information with third parties such as Facebook, Google, and LinkedIn without their permission; (ii) Zoom misstated the security capabilities and offerings of its services where Zoom failed to provide end-to-end encryption; and (iii) Zoom failed to prevent and warn users about security breaches known as "Zoombombing"—whereby malicious actors would join Zoom Meetings without authorization and display pornography, scream racial epithets, or engage in similarly despicable conduct. As a result, plaintiffs in the Consumer Class Action asserted claims against the Company for: (i) invasion of privacy in violation of California common law and the California Constitution, Article I, §1; (ii) negligence; (iii) breach of implied contract; (iv) breach of implied covenant of good faith and fair dealing; (v) unjust enrichment/quasi-contract; (vi) violation of California's Unfair Competition Laws; (vii) violation of the CLRA; (viii) violation of the CDAFA; and (ix) deceit by concealment under Cal. Civ. Code §1710(3).

154. On March 11, 2021, U.S. District Judge for the Northern District of California, Lucy H. Koh, entered an order granting in part and denying in part Zoom's motion to dismiss. Specifically, Judge Koh, denied the Company's motion to dismiss with respect to claims based on

breach of implied contract, breach of the implied covenant of good faith and fair dealing, violations of the UCL under the "unlawful" and "unfair" prongs, unjust enrichment/quasi contract, and all "Zoombombing" claims to the extent they were not barred by section 230(c)(1) of the Communications Decency Act, 47 U.S.C. §230. All other claims were dismissed with leave to amend.

155.    On May 12, 2021, plaintiffs in the Consumer Class Action filed their Second Amended Consolidated Class Action Complaint. Shortly thereafter, the Company forwent filing a responsive pleading and entered into a stipulation of settlement, agreeing to pay $85 million to settle the Consumer Class Action.

156.    According to the Company's May 25, 2023 Form 10-Q filing, several objections were made to the $85 million settlement throughout 2022, each of which were resolved. While the terms of the $85 million settlement did not have Zoom admit to any liability, the settlement required the Company to make over a dozen changes to its business practices that are designed to "improve meeting security, bolster privacy disclosures and safeguard consumer data." Zoom agreed to, in relevant part:

> [P]rovide in-meeting notifications to make it easier for users to understand who can see, save, and share Zoom users' information and content by alerting users when a meeting host or another participant uses a third-party application during a meeting…. Separately, Zoom will ensure that its privacy statement discloses the ability of Zoom users to share other user's data with third parties via integrations third party software, or otherwise to record meetings, and/or to transcribe meetings…. The Settlement also requires Zoom to (i) not reintegrate the Facebook SDK for iOS into Zoom meetings for a year and will request that Facebook delete any U.S. user data obtained from the SDK … ; (ii) develop and maintain for at least three years, documented protocols and procedures for admitting third-party applications for dissemination to users through Zoom's "Marketplace" … ; (iii) develop and maintain a user-support ticket system for internal tracking of, and communication with users about reports of meeting disruptions … ; (iv) develop and maintain a documented process for communication with law enforcement about meeting disruptions involving illegal content, including dedicated personnel to report serial meeting disrupters to law enforcement … ; (v) develop and maintain

security features such as waiting rooms for attendees, the suspend meeting activities button, and blocking of users from specific countries for a minimum of three years…. The Settlement also requires Zoom to better educate users about the security features available to protect meeting security and privacy, through dedicated space on the Zoom website and banner-type notifications.

157.    As a result of this settlement, Zoom has had to expend not only $85 million in settling the litigation but has further had to expend on defending the litigation prior to settlement and will have to continue to expend on implementing the above-described changes that were agreed upon in the settlement.

158.    Moreover, as a direct result of this unlawful course of conduct, Zoom is now the subject of the Securities Class Action lawsuit filed in the U.S. District Court for the Northern District of California on behalf of investors who purchased Zoom's shares.  The Securities Class Action asserts claims against Zoom and certain of the Individual Defendants in connection with the Company's improper statements and fraudulent scheme to deceive the investing public, including causes of action under section 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, promulgated thereunder.

159.    On February 16, 2022, a U.S. District Judge for the Northern District of California, James Donato, granted in part, and denied in part, Zoom's motion to dismiss the consolidated complaint of the Securities Class Action.  Specifically, Honorable District Judge Donato denied the Company's motion to dismiss with respect to the plaintiff's section 10(b)/Rule 10b-5 claim against Zoom and defendant Yuan for the statement made by Zoom and defendant Yuan: "***Security and disaster recovery. We offer robust security capabilities, including end-to-end encryption***, *secure login, administrative controls and role-based access controls*" (partial emphasis added). All other claims were dismissed with leave to amend.

160.    The Company filed a motion for reconsideration of the court's ruling on the motion to dismiss on March 14, 2022, which was subsequently denied on March 8, 2023.  A scheduling

order was entered by the court on April 6, 2023, setting the trial for May 20, 2024. The parties to the Securities Class Action engaged in mediation on May 23, 2022, and expect to continue ADR and settlement efforts. The Company stated in their May 25, 2023 Form 10-Q filing ("May 2023 10-Q") that they have engaged in discussions with the lead plaintiff's counsel regarding the "potential settlement of this matter" and that such discussions are "ongoing."

161.    The Company's May 2023 10-Q, estimated the legal charges to be incurred, stating in relevant part:

> We previously accrued an estimated legal settlement charge of $7.5 million during fiscal year 2023, and based on recent discussions, we have recorded an additional estimated charge of $52.5 million as a general and administrative expense in our condensed consolidated statement of operations for the three months ended April 30, 2023. **We believe, based on the recent settlement discussions, that the maximum loss at this time in excess of the amounts accrued is approximately $90 million**. We expect some or all of this amount would be paid by our D&O insurance.

162.    With the maximum estimated charge of $90 million combined with the Company's existing settlement charges in connection with the Consumer Class Action, the Company was expected to suffer losses of around $175 million in defending and settling legal actions, occurring solely as a result of the defendants' breach of fiduciary duties. Indeed, as of April 30, 2023, the Company reported that it had accrued $60 million in expenses related to the Securities Class Action.

163.    On July 21, 2023, the Company issued a current report on Form 8-K disclosing that it had agreed to settle the claims in the Securities Class Action for $150 million on July 17, 2023.

164.    In addition, an amended criminal complaint filed by the United States Attorney's Office of the Eastern District of New York against a Company employee in *United States of America v. Jin, et al*., No. 1:20-mj-01103-RER (E.D.N.Y.) ("Criminal Complaint") in April 2023 identifies further instances of security and privacy breaches within Zoom that the defendants did

not monitor, correct, or inform the investing public about. In particular, the complaint charges a former China-based Zoom employee ("Julien Jin"), among other co-conspirators based in China, including several Chinese government officials, with (i) conspiracy to commit Interstate Harassment in or about and between 2017 and 2020; and (ii) unlawful conspiracy to transfer means of identification in or about and between January 2019 and June 2020.

165.    The Criminal Complaint alleges, among other things, that Julien Jin and co-conspirators in China and in the United States:

> **[U]sed [Zoom]'s systems in the United States to censor the political and religious speech of individuals located in the United States and around the world pursuant to the directives of the [Chinese] government**.
>
> *                *                *
>
> JULIEN JIN and certain other [Zoom] employees repeatedly sought to terminate video chat meetings organized by a prominent, U.S.-based critic of the [Chinese Communist Party] and the [Chinese] government, beginning in or about 2017 and continuing into June 2020.
>
> *                *                *
>
> JULIEN JIN, HUANG and other co-conspirators acted to disrupt meetings held on the [Zoom] platform during which participants intended to discuss topics considered politically sensitive by the [Chinese] government, by **infiltrating the meetings to gather evidence about purported misconduct occurring in those meetings or by gathering intelligence about the planned agenda of the meetings before the meetings even occurred.**
>
> *                *                *
>
> JULIEN JIN, working with certain other [Zoom] employees, successfully deplatformed users outside of [China] for conduct occurring outside of [China], including users based in the United States or using [Zoom] servers contained in the United States, thus **subjecting these users to the extraterritorial application of the [Chinese] government's censorship regime**.

(Emphasis added.)

166.    By way of background, in September 2019, Chinese authorities blocked Zoom as it had not done enough to suppress anti-government speech.  Following this, in October 2019, defendant Yuan travelled to China to resolve the blockage alongside Julien Jin.  In doing so, defendant Yuan agreed to comply with the Chinese government's demands to suppress speech on Zoom and follow the "rectification report" which, among other things, indicated an intention to proactively monitor users'—based in and outside of China, including in the United States— communications for (i) content that would include the expression of political and religious views unacceptable to the Chinese government; (ii) commemorations to the Tiananmen Square massacre; (iii) the Hong Kong riots; (iv) Falun Gong; (v) the Dalai Lama in Tibet; and (vi) content that spread "rumors" to smear Chinese leaders.  Criminal Complaint, ¶55.

167.    In detailing these severe security and data privacy breaches, the Criminal Complaint further suggests that executives at Zoom, including defendant Yuan knew, to some degree, of Julien Jin and the Chinese government's conspiracy and impact on Zoom users outside of China, with defendant Yuan travelling to Beijing in October 2019 to unblock Zoom in China, wanting to review the rectification plan, and the Company's Chief Legal Officer ("CLO") agreeing to follow Chinese law on May 22, 2020.  Criminal Complaint, ¶88.  Moreover, in their Form 10-K for fiscal year ended January 31, 2023 filed with SEC on March 3, 2023, Zoom stated that *"the Chinese government has at times turned off our service in China without warning and requested that we take certain steps prior to restoring our service, such as designating an in-house contact for law enforcement requests and **transferring China-based user data housed in the United States to a data center in China**."*  (Emphasis added).

168.    Yet, despite possessing actual knowledge of these severe security and privacy breaches carried out by Chinese Zoom employees under the direction of the Chinese government

from 2017 through 2020, Zoom executives—in particular, defendant Yuan—continued to knowingly and intentionally make false and misleading statements about Zoom's ineffective and improper security and privacy measures and practices, causing an artificially inflated stock price and subsequent damage to the Company.

169.    Finally, on February 7, 2023, Zoom announced via a Form 8-K filing with the SEC that it was entering a restructuring plan in order to reduce operating costs and continue the Company's "ongoing commitment to profitable growth."  In connection with that plan, the Company's workforce will be reduced by approximately 15%, and an estimated $50 million to $68 million of charges will be incurred by the Company which primarily relate to "employee transition, severance payments, employee benefits, and stock-based compensation," with the Company offering departing workers: (i) up to 16 weeks' salary and healthcare coverage; (ii) payment of their 2023 fiscal year bonuses; (iii) RSU and stock option vesting for six months for US-employees and through August 9, 2023 for non-US employees; (iv) outplacement services that include 1:1 coaching, workshops, networking groups, and more.

170.    In connection with the restructuring plan, the Company has temporarily reduced the base salary of defendant Yuan—the Company's founder and Chief Executive Officer—by 98% to $10,000 for the 2024 fiscal year and forfeited his 2023 fiscal year bonus, with defendant Yuan stating that he "want[s] to show accountability" for the "mistakes and the actions we take today." The Company has also temporarily reduced the base salaries of its executive officers by 20% for the 2024 fiscal year while also forfeiting their 2023 fiscal year bonuses.  Additionally, the Company terminated without cause the Company's President—Greg Tomb—offering severance benefits in the form of "limited equity vesting."

171. Explaining his reasoning for the restructuring plan, defendant Yuan stated in his address to Zoom employees in relevant part:

> We worked tirelessly and made Zoom better for our customers and users. But **we also made mistakes. We didn't take as much time as we should have to thoroughly analyze our teams or assess if we were growing sustainably, toward the highest priorities**.

*     *     *

> As the world transitions to life post-pandemic, we are seeing that people and businesses continue to rely on Zoom. But the uncertainty of the global economy, and its effect on our customers, means we need to take a hard—yet important—look inward to reset ourselves so we can weather the economic environment, deliver for our customers and achieve Zoom's long-term vision.

(Emphasis added).

172. While market conditions provided defendants with a convenient opportunity to mask their economic difficulties as being caused by a post-pandemic change in the market, Zoom's performance and popularity skyrocketed during the pandemic placing the Company in a stronger economic position than its competitors to handle the post-pandemic decline in the market and minimize any need for workforce and salary reductions. Yet, the Company not only reduced the workforce and salaries, but did so significantly when compared to competitors with Alphabet reducing their workforce only by 6% and Meta reducing its workforce by 13%.

173. Defendants' breaches of fiduciary duty ultimately caused significant damage to the Company. This restructuring plan and, more pertinently, the need to terminate 15% of the workforce shows the extent of damage caused to the Company.

## INSIDER SALES BY DEFENDANTS YUAN, SUBOTOVSKY, ESCHENBACH, CHADWICK, AND STECKELBERG

174. Rather than providing the market with correct information, the Insider Selling Defendants, defendants Yuan, Subotovsky, Eschenbach, Chadwick, and Steckelberg, used their knowledge of Zoom's material, nonpublic information to sell their personal holdings while the

Company's stock was artificially inflated. As officers and directors of Zoom, the Insider Selling Defendants were privy to material, nonpublic information about the Company's true privacy and security vulnerabilities.

175. While in possession of this knowledge, defendant Yuan sold 420,858 shares of his personally held Zoom stock for $38,544,800.74 in proceeds. Defendant Yuan's sales were timed to maximize profit from Zoom's then artificially inflated stock price. Defendant Yuan's sales are suspicious given that his stock sales represented over 35% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 0 |
| Shares Sold During the Sales Period ("SP") | 420,858 |
| Shares Disposed (Other) During SP | 750,000 |
| Total Shares Held During SP | 1,750,848 |
| Shares Remaining SP | 0 |
| **Total Proceeds from Sales** | **$38,544,800.74** |
| **% of Total Ownership Sold During SP** | **35.94%** |

176. While in possession of this knowledge, defendant Chadwick sold 110,000 shares of his personally held Zoom stock for proceeds of $11,674,322.83. Defendant Chadwick's sales were timed to maximize profit from Zoom's then artificially inflated stock price. Defendant Chadwick's sales are suspicious given that his stock sales represented 100% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 0 |
| Shares Sold During SP | 110,000 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 110,000 |
| Shares Remaining SP | 0 |
| **Total Proceeds from Sales** | **$11,674,322.83** |
| **% of Total Ownership Sold During SP** | **100.00%** |

177. While in possession of this knowledge, defendant Steckelberg sold 66,402 shares of her personally held Zoom stock for proceeds of $5,624,172.35. Defendant Steckelberg's sales were timed to maximize profit from Zoom's then artificially inflated stock price. Defendant

Steckelberg's sales are suspicious given that her stock sales represented over 27% of her holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 0 |
| Shares Sold During SP | 66,402 |
| Shares Disposed (Other) During SP | 150,000 |
| Total Shares Held During SP | 244,314 |
| Shares Remaining SP | 27,912 |
| Total Proceeds from Sales | $5,624,172.35 |
| % of Total Ownership Sold During SP | 27.18% |

178.    While in possession of this knowledge, defendant Subotovsky sold 146,336 shares of his personally held Zoom stock for proceeds of $16,800,119.90.  Defendant Subotovsky's sales were timed to maximize profit from Zoom's then artificially inflated stock price.

179.    While in possession of this knowledge, defendant Eschenbach sold 130,385 shares of his personally held Zoom stock for proceeds of $14,718,641.11.  Defendant Eschenbach's sales were timed to maximize profit from Zoom's then artificially inflated stock price.  Additionally, defendant Eschenbach was and continues to be a general partner of Sequoia Capital Operations, LLC ("Sequoia Capital").  Defendant Eschenbach permitted or caused Sequoia to sell 828,437 shares of the Company's stock for proceeds of $28,332,545.40.

180.    In sum, defendants Yuan, Subotovsky, Eschenbach, Chadwick, and Steckelberg sold over $87 million worth of stock at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| YUAN, ERIC | 1/14/2020 | 24,243 | $73.20 | $1,774,657.90 |
| | 1/14/2020 | 45,300 | $73.77 | $3,341,753.82 |
| | 1/14/2020 | 600 | $74.77 | $44,863.92 |
| | 1/15/2020 | 3,800 | $73.90 | $280,802.52 |
| | 1/15/2020 | 13,131 | $74.83 | $982,561.22 |
| | 1/15/2020 | 12,234 | $75.95 | $929,220.01 |
| | 1/15/2020 | 36,178 | $76.74 | $2,776,469.76 |
| | 1/15/2020 | 4,800 | $77.41 | $371,565.12 |
| | 2/12/2020 | 9,400 | $87.19 | $819,619.84 |
| | 2/12/2020 | 59,943 | $88.20 | $5,287,188.39 |

| | | | | |
|---|---|---|---|---|
| | 2/12/2020 | 800 | $88.99 | $71,191.20 |
| | 2/13/2020 | 940 | $87.74 | $82,474.00 |
| | 2/13/2020 | 6,760 | $88.58 | $598,796.74 |
| | 2/13/2020 | 9,115 | $89.74 | $817,976.45 |
| | 2/13/2020 | 45,528 | $90.51 | $4,120,575.38 |
| | 2/13/2020 | 7,800 | $91.25 | $711,718.80 |
| | 3/16/2020 | 600 | $105.10 | $63,060.00 |
| | 3/16/2020 | 1,250 | $106.68 | $133,347.50 |
| | 3/16/2020 | 1,000 | $107.54 | $107,538.80 |
| | 3/16/2020 | 1,400 | $108.67 | $152,140.52 |
| | 3/16/2020 | 3,425 | $109.80 | $376,056.44 |
| | 3/16/2020 | 6,410 | $110.68 | $709,469.70 |
| | 3/16/2020 | 15,121 | $111.67 | $1,688,551.49 |
| | 3/16/2020 | 8,854 | $112.59 | $996,886.03 |
| | 3/16/2020 | 3,725 | $113.82 | $423,989.93 |
| | 3/16/2020 | 9,658 | $114.78 | $1,108,569.39 |
| | 3/16/2020 | 5,255 | $115.79 | $608,495.89 |
| | 3/16/2020 | 5,245 | $116.75 | $612,352.70 |
| | 3/16/2020 | 5,000 | $117.74 | $588,723.00 |
| | 3/16/2020 | 3,200 | $118.96 | $380,656.96 |
| | 3/17/2020 | 200 | $102.28 | $20,456.50 |
| | 3/17/2020 | 1,500 | $103.67 | $155,500.05 |
| | 3/17/2020 | 3,600 | $104.87 | $377,521.20 |
| | 3/17/2020 | 6,700 | $105.83 | $709,055.64 |
| | 3/17/2020 | 18,900 | $106.80 | $2,018,533.23 |
| | 3/17/2020 | 13,800 | $107.58 | $1,484,565.36 |
| | 3/17/2020 | 2,850 | $108.80 | $310,074.87 |
| | 3/17/2020 | 7,200 | $109.85 | $790,925.76 |
| | 3/17/2020 | 7,600 | $110.74 | $841,614.12 |
| | 3/17/2020 | 3,693 | $111.61 | $412,173.88 |
| | 3/17/2020 | 3,400 | $112.83 | $383,629.48 |
| | 3/17/2020 | 700 | $113.54 | $79,477.23 |
| | **Total:** | **420,858** | | **$38,544,800.74** |
| | | | | |
| **SUBOTOVSKY** | 3/10/2020 | 67,951 | $108.58 | $7,378,119.58 |
| | 3/10/2020 | 5,217 | $109.35 | $570,478.95 |
| | 3/19/2020 | 16,685 | $119.70 | $1,997,194.50 |
| | 3/19/2020 | 24,011 | $120.66 | $2,897,167.26 |
| | 3/19/2020 | 29,179 | $121.81 | $3,554,293.99 |
| | 3/19/2020 | 3,293 | $122.34 | $402,865.62 |
| | **Total:** | **146,336** | | **$16,800,119.90** |
| | | | | |
| **ESCHENBACH** | 3/6/2020 | 130,385 | $112.89 | $14,718,641.11 |
| | **Total:** | **130,385** | | **$14,718,641.11** |
| | | | | |
| **CHADWICK** | 2/19/2020 | 29,371 | $100.67 | $2,956,904.87 |
| | 2/19/2020 | 20,329 | $101.31 | $2,059,591.98 |
| | 2/19/2020 | 300 | $102.49 | $30,747.99 |

| | 2/20/2020 | 50,000 | $110.19 | $5,509,580.00 |
|---|---|---|---|---|
| | 3/16/2020 | 200 | $103.76 | $20,752.00 |
| | 3/16/2020 | 100 | $105.02 | $10,502.00 |
| | 3/16/2020 | 800 | $107.16 | $85,730.00 |
| | 3/16/2020 | 1,179 | $108.37 | $127,773.54 |
| | 3/16/2020 | 983 | $109.79 | $107,919.15 |
| | 3/16/2020 | 1,400 | $111.04 | $155,458.94 |
| | 3/16/2020 | 2,200 | $112.02 | $246,440.92 |
| | 3/16/2020 | 500 | $112.80 | $56,400.00 |
| | 3/16/2020 | 300 | $114.35 | $34,305.00 |
| | 3/16/2020 | 1,000 | $115.18 | $115,183.00 |
| | 3/16/2020 | 438 | $116.07 | $50,840.46 |
| | 3/16/2020 | 500 | $117.55 | $58,774.00 |
| | 3/16/2020 | 400 | $118.55 | $47,419.00 |
| | **Total:** | **110,000** | | **$11,674,322.83** |
| | | | | |
| **STECKELBERG** | 10/18/2019 | 5,397 | $65.43 | $353,134.88 |
| | 10/18/2019 | 5,670 | $66.09 | $374,734.27 |
| | 11/18/2019 | 3,289 | $69.33 | $228,037.55 |
| | 11/18/2019 | 7,678 | $70.14 | $538,501.90 |
| | 11/18/2019 | 100 | $70.96 | $7,096.00 |
| | 12/18/2019 | 7,472 | $67.63 | $505,309.69 |
| | 12/18/2019 | 3,595 | $66.39 | $238,682.48 |
| | 1/21/2020 | 2,900 | $74.96 | $217,395.60 |
| | 1/21/2020 | 5,200 | $76.25 | $396,476.08 |
| | 1/21/2020 | 2,967 | $76.76 | $227,737.72 |
| | 2/19/2020 | 3,900 | $101.06 | $394,148.43 |
| | 2/19/2020 | 1,000 | $101.93 | $101,928.00 |
| | 2/19/2020 | 2,100 | $103.17 | $216,654.06 |
| | 2/19/2020 | 3,567 | $104.00 | $370,963.36 |
| | 2/19/2020 | 500 | $104.94 | $52,471.00 |
| | 3/19/2020 | 200 | $119.42 | $23,883.00 |
| | 3/19/2020 | 220 | $120.95 | $26,609.99 |
| | 3/19/2020 | 300 | $122.35 | $36,705.00 |
| | 3/19/2020 | 1,401 | $123.90 | $173,581.24 |
| | 3/19/2020 | 2,200 | $124.89 | $274,754.48 |
| | 3/19/2020 | 2,000 | $125.94 | $251,880.60 |
| | 3/19/2020 | 800 | $127.01 | $101,605.04 |
| | 3/19/2020 | 800 | $128.05 | $102,441.04 |
| | 3/19/2020 | 1,100 | $129.04 | $141,940.48 |
| | 3/19/2020 | 605 | $129.88 | $78,574.98 |
| | 3/19/2020 | 1,000 | $130.82 | $130,816.00 |
| | 3/19/2020 | 441 | $131.77 | $58,109.47 |
| | **Total:** | **66,402** | | **$5,624,172.35** |
| | | | | |
| | | | | |
| | **Total:** | **873,981** | | **$87,362,056.93** |

## DAMAGES TO ZOOM

181.    As a result of the Individual Defendants' improprieties, Zoom disseminated improper, public statements concerning the Company's privacy and security practices.  These improper statements have devastated Zoom's credibility as reflected by the Company's $5.8 billion, or 28%, market capitalization loss.

182.    Zoom's severe privacy and security issues have also damaged its reputation within the business community and in the capital markets.  In addition to price, Zoom's current and potential customers consider a company's ability to accurately disclose platform vulnerabilities and how it handles consumer data.  Businesses are less likely to award contracts to companies that are riddled with security flaws that are unable to ensure that its customer's data will remain private.  Zoom's ability to raise equity capital or debt on favorable terms in the future is now impaired.

183.    Further, as a direct and proximate result of the Individual Defendants' actions, Zoom has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying for the $150 million settlement in the Securities Class Action for violations of federal securities laws;

(b)    costs incurred from defending and paying the $85 million settlement in the Consumer Class Action;

(c)    costs incurred from the fees associated with the EPIC Complaint, and the investigations by the DOJ, SEC, FBI, and numerous attorneys general;

(d)    costs incurred from implementing the security measures required under the Company's settlement with the FTC;

(e)     costs incurred from increased insurance premiums for coverage related to cybersecurity incidents; and

(f)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Zoom.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

184.    Plaintiff brings this action derivatively in the right and for the benefit of Zoom to redress injuries suffered, and to be suffered, by Zoom as a direct result of breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Zoom is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

185.    Plaintiff will adequately and fairly represent the interests of Zoom in enforcing and prosecuting its rights.

186.    Plaintiff was a stockholder of Zoom at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Zoom stockholder.

187.    The Board of Zoom at the time the original operative complaint was filed in this action consisted of the following ten individuals: defendants Yuan, Chadwick, Subotovsky, Eschenbach, Swanson, Scheinman, and Gassner and non-parties Hammonds, Janet Napolitano ("Napolitano") and Herbert Raymond McMaster ("McMaster").  Accordingly, plaintiff needs only to allege demand futility as to five of the ten directors who were on the Board at the time this action commenced.  Plaintiff has not made any demand on the present Board to institute this action

because such a demand would be a futile, wasteful, and useless act, for the same reasons set forth below.[2]

**Demand Is Excused Because Defendants Yuan, Chadwick, Subotovsky, Swanson, Eschenbach, Scheinman, and Gassner Face a Substantial Likelihood of Liability for Their Misconduct**

188.    The Company's internal documents demonstrate that defendants Yuan, Chadwick, Subotovsky, Swanson, Eschenbach, Scheinman, and Gassner and non-party Hammonds knew of the Company's widespread privacy and security problems, yet they still failed to remedy, or cause the Company to remedy, the issues until they were made public by third parties.

189.    For example, defendants Chadwick, Gassner, Scheinman, Subotovsky, Swanson, Yuan, Eschenbach ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████    ZOOM-FLANNERY-00027-28; ZOOM-FLANNERY-00031.

190.    ████████████████████████████    defendants Chadwick, Gassner, Scheinman, Subotovsky, and Yuan (among other defendants not on the Board), ████████

████████████████████████████████████████████████

---

[2] The current Board is comprised of the following nine individuals, a majority of whom are named defendants herein: defendants Yuan, Chadwick, Subotovsky, Scheinman, and Gassner and non-parties Bill McDermott, McMaster, Napolitano, and Cindy Hoots.

███████████████████████████████████████████████████

ZOOM-FLANNERY-00012; ZOOM-FLANNERY-00026.

      191.   ███████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████

      192.   ████████████████████████████ in breach of their fiduciary duties, these defendants did not take steps to expedite the implementation of a fully functioning security program and failed to remedy or otherwise to disclose the other aspects of Zoom's data and security exposure, including that the Company misrepresented supporting end-to-end encryption, that the Company was secretly sharing data with Facebook, and that the Company was leaking user LinkedIn data to other users. As trusted Company directors, they conducted little, if any, oversight of the schemes to cause the Company to engage in the misconduct and to make false and misleading statements, and consciously disregarded their duties to monitor such controls over reporting and engagement in the schemes. As a result of the foregoing, they each breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

      193.   Defendants Chadwick and Scheinman, in particular ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ *See* ZOOM-FLANNERY-00003; ZOOM-FLANNERY-00485; ZOOM-FLANNERY-00048; ZOOM-FLANNERY-00050.

194. ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

ZOOM-FLANNERY-00030.

195. ████████████████████████████████████ in breach of their fiduciary

duties, the Board, especially those serving on the Audit Committee, did not take steps to expedite

the implementation of a fully functioning security program and failed to remedy or otherwise to

disclose the as-yet unrevealed aspects of the Company's pressing data and security exposure,

including that the Company misrepresented supporting end-to-end encryption, that the Company

was secretly sharing data with Facebook, and that the Company was leaking user LinkedIn data to

other users.  As a result of the foregoing, these defendants breached their fiduciary duties, face a

substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus

excused.

196.    Despite having knowledge about these issues, defendants Yuan, Chadwick,

Subotovsky, Swanson, Eschenbach, Scheinman, and Gassner breached their fiduciary duties of

loyalty by making improper statements in the Company's press releases, SEC filings, and blog

posts regarding Zoom's commitment to ensuring adequate privacy and security protections.

197. █████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████ *See* ZOOM-FLANNERY-00002; ZOOM-FLANNERY-

00485; ZOOM-FLANNERY-00049; ZOOM-FLANNERY-00540.    The Audit Committee's

Charter provides that it is responsible for compliance with legal and regulatory requirements.

Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's privacy and security controls. Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein. Thus, defendants Chadwick, Eschenbach, and Scheinman face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**Demand Is Excused Because a Majority of the Board Received a Material Personal Benefit from the Alleged Misconduct**

198.    Insider Selling Defendants (defendants Yuan, Subotovsky, Eschenbach, Chadwick, and Steckelberg) sold over $87 million worth of Zoom stock at artificially inflated prices from April 23, 2019 through and inclusive of March 19, 2020 while in possession of material, non-public information about the Company's true privacy and security vulnerabilities, to which they were privy by virtue of their positions as officers and directors of Zoom, providing the Insider Selling Defendants with a material personal benefit from their misconduct.

199.    Specifically, defendant Yuan sold over $38 million worth of Zoom stock, defendant Subotovsky sold over $16 million, defendant Eschenbach sold over $14 million, defendant Chadwick sold over $11 million, defendant Steckelberg sold over $5 million, and non-party Hammonds sold over $5 million.

200.    ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████    *See* ZOOM-FLANNERY-00006; ZOOM-FLANNERY-00007; ZOOM-

FLANNERY-00053.  In particular, the Insider Selling Defendants reiterated in their Q1 2020 Form 10-Q the false statements contained in the Company's Offering Documents: among other things, the Company *"strive[s] to comply with applicable laws, regulations, policies and other legal obligations relating to privacy, data protection and information security to the extent possible."* (Emphasis added).  Further the Insider Selling Defendants failed, despite being in possession of the knowledge, to disclose in their Q2 2020 Form 10-Q the Company's security and privacy vulnerabilities and the fact that the Zoom platform was not equipped with end-to-end 256-bit encryption, despite previous assertions to the contrary.

201.    ██████████████████████████████████████████ ZOOM-FLANNERY-00031. ██████████████████████████████████ the Insider Selling Defendants continued to make misleading statements and sell Zoom stock at an artificially inflated price from October 18, 2019, until March 19, 2020, seven days before the truth about Zoom's privacy and security vulnerabilities was publicly acknowledged by the Company, and eleven days before Zoom's share price inevitably fell as a result.  Conveniently, the sale of Zoom stock by the Insider Selling Defendants fell firmly within the period between the Insider Selling Defendants gaining knowledge of the privacy and security issues and Zoom publicly acknowledging those issues, thus providing a clear instance of the Insider Selling Defendants using material, non-public information and their misrepresentations to gain a material personal benefit.

202.    Evidently, while in the possession of material, non-public information—that is, the Company's true privacy and security vulnerabilities—the Insider Selling Defendants knowingly and intentionally breached their fiduciary duties of loyalty and care to the Company in publishing false and misleading statements in order to provide themselves with the material personal benefit

of the large proceeds from selling Zoom stock at an artificially inflated price.  As a result of this material personal benefit gained from their misconduct, the five Insider Selling Defendants and non-party Hammonds, who was on the Board at the time, have satisfied the first prong of the *Zuckerberg* demand futility test as set out by the Delaware Supreme Court.  Accordingly, with half of the Board of Zoom satisfying this first demand futility prong, demand on the Board is excused as futile.

203.    In addition, any suit by the Director Defendants to remedy these wrongs would expose defendants Yuan and Zoom to liability for violations of the federal securities laws in the pending consolidated Securities Class Action, and would result in civil actions being filed against one or more of the other Individual Defendants.  The Securities Class Action alleges violations of sections 10(b) and 20(a) of the Exchange Act.  If the Board elects for the Company to press forward with its right of action against defendant Yuan in this action, then Zoom's efforts would compromise its defense of the Securities Class Action.  Accordingly, demand on the Board is excused.

**Demand Is Excused Because the Board Lacks Independence**

*Defendant Eschenbach and His Role within Sequoia Capital*

204.    ███████████████████████████████████████████████

████████████████████████    ZOOM-FLANNERY-00107.  █████████████

████████████    As General Partner, defendant Eschenbach struck a number of deals for Sequoia Capital which ultimately produced huge returns for the firm.  In particular, defendant Eschenbach persuaded defendant Yuan to accept $100 million in Series D funding entirely from Sequoia in 2017 leading to Sequoia Capital owning 11.4% of Zoom at the time of Zoom's IPO.

205.    In addition to his role as General Partner at Sequoia Capital, defendant Eschenbach served as a Zoom director from November 2016 and on Zoom's Audit Committee from April 2019

until his resignation on January 11, 2023. As director, defendant Eschenbach maintained a position of control and authority and exercised control over the acts of the Company, including the wrongful acts complained of. Because of his position of control and authority, defendant Eschenbach was privy to all information relating to the Company and, in particular, had knowledge of material, non-public information about the Company. Moreover, as a member of the Audit Committee, defendant Eschenbach knowingly permitted false and misleading statements to be made in the Company's financial and SEC filings at a time when the privacy and security vulnerabilities were known to each of the Individual Defendants, including defendant Eschenbach, causing Zoom's share price to be artificially inflated.

206.    Despite being under a duty of loyalty to the Company, defendant Eschenbach was in a position that allowed him to use his specialized knowledge of the Company for personal benefit. In turn, using his senior position within Sequoia Capital and the knowledge gained in his directorial position within Zoom, defendant Eschenbach caused and/or permitted Sequoia Capital to sell over $28 million worth of Zoom stock on April 23, 2019 and March 6, 2019 while the share price was artificially high and the defendants knew of Zoom's severe privacy and security flaws.

207.    The timing of Sequoia Capital's sale of Zoom stock is suspicious as it falls firmly within the period in which the Individual Defendants—including defendant Eschenbach—knew of the Company's issues and made false statements about the issues, and before the Company publicly acknowledged such issues causing their share price to fall. Thus, it is clear that defendant Eschenbach used his respective positions within Sequoia Capital and Zoom to cause or permit Sequoia Capital to sell Zoom stock at an artificially inflated price which, in turn, would benefit defendant Eschenbach in his role with Sequoia Capital.

*Defendant Subotovsky and His Role within Emergence Capital*

208.    ███████████████████████████████████████████

████████████████████████████████████████████████████ ZOOM-

FLANNERY-00218.    ██████████████    defendant Subotovsky developed a relationship with

defendant Yuan and caused Emergence Capital to become Zoom's first institutional investor and

one of the largest beneficial owners of Zoom's Class B Common Stock.

209.    In addition to his role with Emergence Capital, defendant Subotovsky serves as a

director of Zoom and has since 2014. As director, defendant Subotovsky maintained a position of

control and authority and exercised control over the acts of the Company, including the wrongful

acts complained of. By way of his position of control and authority, defendant Subotovsky was

privy to all information relating to the Company and, in particular, had knowledge of material,

non-public information about the Company. Moreover, along with other certain defendants,

defendant Subotovsky knowingly and intentionally made improper statements in the Company's

press releases, SEC filings, and blog posts regarding Zoom's commitment to ensuring adequate

privacy and security protections, despite knowing of the Company's issues in this respect, causing

Zoom's share price to be artificially inflated.

210.    Despite being under a duty of loyalty to the Company, defendant Subotovsky was

in a position that allowed him to use his specialized knowledge of the Company for personal

benefit. In turn, using his senior position within Emergence Capital and the knowledge gained in

his directorial position within Zoom, defendant Subotovsky caused and/or permitted an investment

fund held by Emergence Capital to sell 73,168 shares of Zoom stock on March 10, 2019 and

Emergence Capital to sell 73,168 shares of Zoom stock on March 19, 2020 while the share price

was artificially high and the defendants knew of Zoom's severe privacy and security flaws.

211.    The timing of Emergence Capital and the investment fund held by Emergence Capital's sale of Zoom stock is suspicious as it falls firmly within the period in which the Individual Defendants—including defendant Subotovsky—knew of the Company's security and privacy issues and made false statements about those issues, and before the Company publicly acknowledged such issues causing their share price to fall. Thus, it is highly unlikely that defendant Subotovsky did not use his respective positions within Emergence Capital and Zoom to cause and/or permit Emergence Capital to sell Zoom stock at an artificially inflated price which, in turn, would benefit defendant Subotovsky in his role with Emergence Capital.

**Certain Other Defendants' Ties to Sequoia Capital and Emergence Capital and Other Pre-Existing Relationships**

212.    Sequoia Capital and Emergence Capital have invested in other companies in which certain other defendants serve as executives or directors. ██████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████    *See*  ZOOM-FLANNERY-00092;  ZOOM-FLANNERY-000135; ZOOM-FLANNERY-000148.

213.    █████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████    ZOOM-FLANNERY-00059-60. █████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████    ZOOM-FLANNERY-00061. ████████████████████

████████████████████████████████████████████████████ *See* ZOOM-
FLANNERY-00092; s*ee also* ZOOM-FLANNERY-00135.

214.    Sequoia Capital and Emergence Capital also have overlapping investments and have participated in several rounds of funding in multiple companies, including Docket, Inc. and Ironclad, Inc.

215.    ██████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████ ZOOM-FLANNERY-00356;
ZOOM-FLANNERY-000358. ██████████████████████████████████
██████████████████████████████████████████████████
████████ ZOOM-FLANNERY-00366-67. ████████████████████████
██████████████████████████

216.    ██████████████████████████████████████████████
████████████████████████████████ ZOOM-FLANNERY-
00148-49.

217.    With each of these longstanding business relationships and overlapping investments, it is highly improbable that Sequoia Capital and Emergence Capital did not improperly gain material, non-public information from any one of the Individual Defendants and, in particular, defendants Eschenbach and Subotovsky, which caused them to conveniently sell their Zoom stock at the artificially inflated price, caused by the Individual Defendants' misconduct.

218.    Additionally, ████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

to NVIDIA Corporation in August 2020.  ZOOM-FLANNERY-00148. ███████████████

███████████████████████████

219.    Defendants Chadwick, Scheinman, and Yuan all worked together at Cisco from May 2007 to June 2010.  Defendant Chadwick served in various executive roles at Cisco from September 1997 to June 2010.  Defendant Scheinman served in various roles at Cisco from January 1997 to April 2011, including Senior Vice President of Corporate Development and Senior Vice President and General Manager of Cisco Media Solutions.  Defendant Yuan served as Cisco's Vice President of Engineering from May 2007 until he left Cisco to start Zoom in June 2011.  Notably, defendants Yuan and Scheinman left Cisco on the same day and defendant Scheinman became Zoom's first investor shortly thereafter.

220.    Accordingly, ████  ██████████  ██████████  ████  ██████████  ████████

████████████████████████████████████████████████████████████

███████████████████████████████████████  Venture capital firms have to compete in order to be allowed to invest in companies before they go public.  ██████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

- 83 -

███████████████████████ Demand is therefore futile as to defendants Yuan, Subotovsky, Eschenbach, Chadwick, Scheinman, and Gassner and non-party Hammonds.

221.    Further, defendant Yuan is the founder of Zoom and has served as the Company's CEO and President since June 2011.  Thus, as the Company admits, he is a non-independent director.  Defendant Yuan's beneficial ownership of Class B common stock provides him with a combined voting power of 34.4%, rendering him a controlling stockholder.  Additionally, defendant Yuan's immediate family member, Bin Yuan, is a trustee and holds voting and investment control over 22,589,226 shares of Class A common stock held in trust for defendant Yuan's children, representing 9.6% of Zoom's Class A common stock.  The principal professional occupation of defendant Yuan is his employment with Zoom, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above.  Accordingly, defendant Yuan lacks independence from defendants Chadwick, Subotovsky, Eschenbach, Swanson, and Scheinman and non-party Hammonds due to his interest in maintaining his executive positions at Zoom.  This lack of independence renders defendant Yuan incapable of impartially considering a demand to commence and vigorously prosecute this action.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

222.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

223.    The Individual Defendants owed and owe Zoom fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Zoom the highest obligation of care and loyalty.

224.     The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

225.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the unfair and deceptive trade practices of such substantial magnitude and duration. The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) Zoom's data privacy and security controls were inadequate; (ii) despite the Company's own claims, the Zoom platform was not actually equipped with end-to-end or AES 256-bit encryption; (iii) Zoom users faced certain risks, including a heightened risk that their personal information would be improperly accessed by unauthorized parties; (iv) revelation of the Company's true privacy and security practices would substantially harm Zoom's reputation and result in a decrease in customers; (v) as a result of the foregoing, Zoom's public statements regarding its privacy and security practices were materially false and misleading at all relevant times.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

226.     The Director Defendants, as directors of the Company, owed Zoom the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning Zoom's unfair and deceptive trade practices.  The Director Defendants knew or were reckless in not knowing that: (i) Zoom's data privacy and security controls were inadequate; (ii) despite the Company's own claims, the Zoom platform was not actually equipped with end-to-end or AES 256-bit encryption; (iii) Zoom users faced certain risks, including a heightened risk that their personal information would be improperly accessed by unauthorized parties; (iv) revelation of the Company's true privacy and security practices would substantially harm Zoom's reputation and result in a decrease in customers; (v) as a result of the foregoing, Zoom's public statements regarding its privacy and security practices were materially false and

misleading at all relevant times. Accordingly, these defendants breached their duty of loyalty to the Company.

227. The Audit Committee Defendants breached their fiduciary duty of loyalty by allowing the Company to make the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review the Company's filings with the SEC, as required by the Audit Committee Charter in effect at the time.

228. Defendants Yuan, Subotovsky, Eschenbach, Chadwick, and Steckelberg breached their duty of loyalty by selling Zoom stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders. The information described above was material, nonpublic information concerning the Company's future business prospects. It was a proprietary asset belonging to the Company, which defendants Yuan, Subotovsky, Eschenbach, Chadwick, and Steckelberg used for their own benefit when they sold Zoom common stock.

229. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Zoom has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

230. Plaintiff, on behalf of Zoom, has no adequate remedy at law.

## <u>COUNT II</u>

### Against the Individual Defendants for Unjust Enrichment

231. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

232.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Zoom.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Zoom.

233.    Defendants Yuan, Subotovsky, Eschenbach, Chadwick, and Steckelberg and others sold Zoom stock while in possession of material, nonpublic information that artificially inflated the price of Zoom stock.  As a result, defendants Yuan, Subotovsky, Eschenbach, Chadwick, and Steckelberg profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

234.    Plaintiff, as a stockholder and representative of Zoom, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

235.    Plaintiff, on behalf of Zoom, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Zoom, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties and unjust enrichment;

B.    Directing Zoom to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Zoom and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or

Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

    1.    a proposal to strengthen the Company's controls over financial reporting;

    2.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

    3.    a provision to permit the stockholders of Zoom to nominate at least three candidates for election to the Board;

    4.    a provision to control insider selling; and

    5.    a proposal to strengthen Zoom's oversight of its disclosure procedures;

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Zoom has an effective remedy;

D.    Awarding to Zoom restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants Yuan, Subotovsky, Eschenbach, Chadwick, and Steckelberg.

E.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 11, 2023

**COOCH AND TAYLOR, P.A.**

/s/*Blake A. Bennett*
Blake A. Bennett (#5133)
The Brandywine Building
1000 N. West Street, Suite 1500
Wilmington, DE 19899
Telephone: (302) 984-3800
Facsimile: (302) 984-3939
E-mail: bbennett@coochtaylor.com

**FARNAN LLP**
Brian E. Farnan (#4089)
Michael J. Farnan (#5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Email: bfarnan@farnanlaw.com
        mfarnan@farnanlaw.com

**BIELLI & KLAUDER, LLC**
Ryan M. Ernst (#4788)
1204 N. King Street
Wilmington, DE 19801
Telephone: (302) 803-4600
E-mail: rernst@bk-legal.com

*Co-Liaison Counsel for Plaintiffs*

**ROBBINS LLP**
Brian J. Robbins
Stephen J. Oddo
Kevin A. Seely
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
         soddo@robbinsllp.com
         kseely@robbinsllp.com

**GAINEY MCKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
E-mail: tjmckenna@gme-law.com
         gegleston@gme-law.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

*Co-Lead Counsel for Plaintiffs*

00657900.DOCX