## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE ZOOM VIDEO COMMUNICATIONS, INC. STOCKHOLDER DERIVATIVE LITIGATION | Consol. C.A. No.: 1:20-cv-00797-GBW **REDACTED** |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE
## AMENDED VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**YOU ARE IN POSSESSION OF A CONFIDENTIAL FILING FROM THE COURT OF CHANCERY OF THE STATE OF DELAWARE.**

If you are not authorized by court order to view or retrieve this document, read no further than this page. You should contact the following person(s):

**GAINEY MCKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
Christopher M. Brain
501 Fifth Avenue, 19th Fl.
New York, NY 10017
Telephone: (212) 983-1300

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427

**ROBBINS LLP**
Brian J. Robbins
Stephen J. Oddo
Kevin A. Seely
Mario D. Valdovinos
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990

*Co-Lead Counsel for Plaintiffs*

**COOCH AND TAYLOR, P.A.**
Blake A. Bennett (#5133)
The Brandywine Building
1000 N. West Street, Suite 1500
Wilmington, DE 19899
Telephone: (302) 984-3800

**FARNAN LLP**
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300

**BIELLI & KLAUDER, LLC**
Ryan M. Ernst (Bar No. 4788)
1204 N. King Street
Wilmington, DE 19801
Telephone: (302) 803-4600

*Co-Liaison Counsel for Plaintiffs*

**A public version of this document will be filed on or before December 29, 2023.**

## TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS ...............................................................1

SUMMARY OF THE ARGUMENT .........................................................................1

STATEMENT OF FACTS .......................................................................................2

    A.    Background of Zoom's Platform Issues, Compliance and Defendants'
Knowledge .............................................................................................2

    B.    Six Insiders Sell over $87 Million of Zoom Stock While Possessing MNPI ..........3

    C.    Zoom's Deceptive Privacy and Security Practices and Misleading
Statements Subject It to Civil Actions and Regulatory Investigations ...................4

ARGUMENT ......................................................................................................4

I.    PLAINTIFF HAS STANDING TO PURSUE CLAIMS IN THE COMPLAINT ..............4

II.    DEMAND IS EXCUSED UNDER RULE 23.1 AND DELAWARE LAW......................6

    A.    A Majority of the Board Faces a Substantial Likelihood Under *Malone* for
Making and Causing the Issuance of Materially False and Misleading
Statements and Omissions ........................................................................6

        1.    Materially False Information and Omissions................................................7

    B.    The Directors Face a Substantial Likelihood of Liability Under *Caremark* ........15

    C.    Demand Is Excused as to Plaintiff's *Brophy* Claim................................19

        1.    Defendants Yuan, Chadwick, Subotovsky and Eschenbach Face a
Substantial Likelihood of Liability for Engaging in Improper Sales.........19

            a.    Yuan, Chadwick, Subotovsky and Eschenbach Possessed
MNPI...............................................................................20

            b.    Yuan, Chadwick, Subotovsky, and Eschenbach Traded on
the Basis of MNPI.........................................................22

        2.    A Majority of the Board Materially Benefitted from Lucrative
Insider Sales Undertaken While Zoom's Stock Price was
Artificially Inflated Due to Defendants' Material
Misrepresentations .....................................................................25

    D.    Demand is Further Excused Because a Majority of the Board Lacks
Independence from Someone Who Faces a Substantial Likelihood of

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Liability from the Claims Asserted or Received a Material Benefit Therefrom ............................................................................................................26

III.   PLAINTIFF'S CLAIMS ARE PLAUSIBLE UNDER 12(B)(6).....................................28

    A.   Plaintiff States a Claim Under *Brophy, Malone* and *Caremark* and States a Claim for Unjust Enrichment ..............................................................................28

CONCLUSION......................................................................................................................30

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

# <u>TABLE OF AUTHORITIES</u>

**CASES**

*Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.*,
   No. CIV.A. 20066-N, 2006 WL 1494360 (Del. Ch. May 24, 2006) ................................13

*Appel v. Berkman*,
   180 A.3d 1055 (Del. 2018) ...........................................................................................9

*Aronson v. Lewis*,
   473 A.2d 805 (Del. 2000) ...........................................................................................27

*Bonner v. Melo*,
   No. 17-CV-04719-WHO, 2018 WL 3537004 (N.D. Cal. Jul. 23, 2018)..........................13

*City of Detroit Police & Fire Ret. Sys. on Behalf of NiSource, Inc. v. Hamrock*,
   No. CV 2021-0370-KSJM, 2022 WL 2387653 (Del. Ch. June 30, 2022).............15, 16, 30

*City of Hialeah Emps. Ret. Sys. v. Begley*,
   No. 2017-0463-JTL, 2018 WL 1912840 (Del. Ch. Apr. 20, 2018) ...................................29

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
   442 F. App'x 672 (3d Cir. 2011)  ...................................................................................25

*Clark v. Davenport, et al.*,
   No. CV 2017-0839-JTL, 2019 WL 3230928 (Del. Ch. July 18, 2019) ........................6, 10

*Constr. Indus. Laborers Pension Fund v. Bingle*,
   No. 2021-0940-SG, 2022 WL 4102492 (Del. Ch. Sep. 6, 2022)......................................16

*Davis v. Baier*,
   No. 3:20-CV-0929, 2023 WL 1073188 (M.D. Tenn. Jan. 27, 2023) ................................20

*Dubroff v. Wren Holdings, LLC*,
   No. CIV.A. 3940-VCN, 2010 WL 3294219 (Del. Ch. Aug. 20, 2010).............................13

*Elburn on behalf of Invs. Bancorp, Inc. v. Albanese, et al.*,
   No. CV 2019-0774-JRS, 2020 WL 1929169 (Del. Ch. Apr. 21, 2020) .........................7, 8

*Fecht v. Price Co.*,
   70 F.3d 1078 (9th Cir. 1995) ........................................................................................23

*Forestal v. Caldwell*,
   No. CV 16-4492-MWF, 2016 WL 9774914 (C.D. Cal. Nov. 14, 2016)...........................13

*Gaffin v. Teledyne, Inc.*,
   611 A.2d 467 (Del. 1992) .............................................................................................7

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

*Goldstein v. Denner*,
 No. CV 2020-1061-JTL, 2022 WL 1797224 (Del. Ch. June 2, 2022) ............................20

*Guth v. Loft, Inc.*,
 5 A.2d 503 (Del. 1939) ....................................................................................................19

*Guttman v. Huang*,
 823 A.2d 492 (Del. Ch. 2003)..........................................................................................24

*IBEW Loc. Union 481 Defined Contribution Plan & Tr. on Behalf of GoDaddy, Inc. v.
 Winborne*,
 301 A.3d 596 (Del. Ch. 2023)..........................................................................................10

*In re Alphabet, Inc. Sec. Litig.*,
 1 F.4th 687 (9th Cir. 2021) ...............................................................................................22

*In re Am. Int'l Grp., Inc.*,
 965 A.2d 763 (Del. Ch. 2009).....................................................................................20, 24

*In re BGC Partners, Inc., Derivative Litig.*,
 2019 WL 4745121 (Del. Ch. Sept. 30, 2019) ................................................................6, 27

*In re Camping World Holdings, Inc. S'holder Deriv. Litig.*,
 No. CV 2019-0179-LWW, 2022 WL 288152 (Del. Ch. Jan. 31, 2022)................7, 10, 21

*In re Caremark International Inc., Derivative Litig.*,
 698 A.2d 959 (Del. Ch. 1996)................................................................................. *passim*

*In re Citigroup Inc. S'holder Derivative Litig.*,
 964 A.2d 106 (Del. Ch. 2009)..........................................................................................10

*In re Clovis Oncology, Inc. Derivative Litig.*,
 No. CV 2017-0222-JRS, 2019 WL 4850188 (Del. Ch. Oct. 1, 2019).................18, 20, 30

*In re Ezcorp Inc. Consulting Agreement Derivative Litig.*,
 No. CV 9962-VCL, 2016 WL 301245 (Del. Ch. Jan. 25, 2016) ......................................27

*In re Facebook, Inc., Initial Pub. Offering Derivative Litig.*,
 797 F.3d 148 (2d Cir. 2015)................................................................................................5

*In re Fitbit, Inc. S'holder Derivative Litig.*,
 2019 WL 190933 (Del.Ch., 2019) ...................................................................................30

*In re Fitbit, Inc. Stockholder Deriv. Litig.*,
 No. CV 2017-0402-JRS, 2018 WL 6587159 (Del. Ch. Dec. 14, 2018) .....................22, 23

*In re Geron Corp. S'holder Deriv. Litig.*,
 No. CV 2020-0684-SG, 2022 WL 1836238 (Del. Ch. Jun. 3, 2022) ...............................10

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

*In re GGP, Inc. S'holder Litig.*,
    282 A.3d 37 (Del. 2022) .........................................................................................7, 12

*In re GoPro, Inc. S'holder Derivative Litig.*,
    No. CV 2018-0784-JRS, 2020 WL 2036602 (Del. Ch. Apr. 28, 2020) ...........................18

*In re HealthSouth Corp. S'holders Litig.*,
    845 A.2d 1096 (Del. Ch. 2003), *aff'd*, 847 A.2d 1121 (Del. 2004)...................................30

*In re IAC/InterActive Corp. Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007)................................................................................25

*In re Infosonics Corp. Derivative Litig.*,
    No. 06CV1336, 2007 WL 2572276 (S.D. Cal. Sept. 4, 2007) ........................................24

*In re infoUSA, Inc. S'holders Litig.*,
    953 A.2d 963 (Del. Ch. 2007)...........................................................................................13

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
    No. 19-MD-2879, 2021 WL 2401641 (D. Md. June 11, 2021)...........................................5

*In re MicroStrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ........................................................................23, 24

*In re Oxford Health Plans, Inc.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ......................................................................................23

*In re Smiledirectclub, Inc. Derivative Litig.*,
    No. CV 2019-0940-MTZ, 2021 WL 2182827 (Del. Ch. May 28, 2021) ...........................5

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006)..............................................................................................22

*In re Trados Inc. S'holder Litig.*,
    73 A.3d 17 (Del. Ch. 2013)...............................................................................................28

*In re TrueCar, Inc. S'holder Derivative Litig.*,
    No. CV 2019-0672-AGB, 2020 WL 5816761 (Del. Ch. Sept. 30, 2020)..........................23

*In re Tyson Foods, Inc. Consol. S'holder Litig.*,
    919 A.2d 563 (Del. Ch. Feb. 6, 2007)..............................................................................13

*In re Walt Disney Co. Derivative Litig.*,
    906 A.2d 27 (Del. Jun. 8, 2006)..................................................................................18, 19

*In re Zimmer Biomet Holdings, Inc. Deriv. Litig.*,
    No. CV 2019-0455-LWW, 2021 WL 3779155 (Del. Ch. Aug. 25, 2021) ..............7, 10, 23

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

*In re Zoom Sec. Litig.*,
  20-cv-02353-JD (N.D. Cal. Dec. 23, 2020) .........................................................................4

*In re Zoom Video Commc'ns, Inc. Privacy Litig.*,
  20-cv-02155-LB (N.D. Cal. July 31, 2021) (Motion ) ........................................................4

*Klaassen v. Allegro Dev. Corp.*,
  No. CA 8626-VCL, 2013 WL 5967028 (Del. Ch. Nov. 7, 2013) ....................................14

*Laborers' Dist. Council Constr. Indus. Pension Fund v. Bensoussan*,
  2016 WL 3407708 (Del. Ch. June 14, 2016), *aff'd*, 155 A.3d 1283 (Del. 2017) ...............5

*Lefkoe v. Jos. A. Bank Clothiers*,
  No. CIV WMN-06-1892, 2007 WL 6890353 (D. Md. Sept. 10, 2007) ...........................25

*Malone v. Brincat*,
  722 A.2d 5 (Del. 1998) ............................................................................................ *passim*

*Marchand v. Barnhill*,
  212 A.3d 805 (Del. 2019) ........................................................................................16, 18

*McPadden v. Sidhu*,
  964 A.2d 1262 (Del. Ch. 2008) .........................................................................................29

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ..........................................................................................24

*Pfeiffer v. Toll*,
  989 A.2d 683 (Del. Ch. 2010) ...........................................................................................21

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Stumpf*,
  No. C 11-2369 SI, 2012 WL 424557 (N.D. Cal. Feb. 9, 2012) ..........................................5

*Plumbers Union Loc. No. 12 Pension Fund v. Ambassador's Grp.*,
  717 F. Supp. 2d 1170 (E.D. Wash. 2010) .........................................................................23

*Rosenblatt v. Getty Oil Co.*,
  493 A.2d 929 (Del. 1985) ..................................................................................................20

*Sandys v. Pincus*,
  152 A.3d 124 (Del. 2016) ......................................................................................25, 27, 28

*Silverberg on Behalf of Dendreon Corp. v. Gold*,
  No. CIV.A. 7646-VCP, 2013 WL 6859282 (Del. Ch. Dec. 31, 2013) ........................20, 24

*Stroud v. Grace*,
  606 A.2d 75 (Del. 1992) ......................................................................................................9

- vi -
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

*Tilden v. Cunningham*,
    No. CV 2017-0837-JRS, 2018 WL 5307706 (Del. Ch. Oct. 26, 2018) ............................21

*Unanue v. Unanue*,
    No. CIV. A. 204-N, 2004 WL 2521292 (Del. Ch. Nov. 3, 2004) ......................................9

*United Food & Com. Workers Union & Participating Food Indus. Employers Tri-State Pension Fund v. Zuckerberg*,
    262 A.3d 1034 (Del. 2021) ..............................................................................6, 19, 25, 28

*Warhanek v. Bidzos*,
    No. CV 12-263-RGA-SRF, 2013 WL 5273112 (D. Del. Sept. 18, 2013) ........................26

*Wilkon on behalf of Orexigen Therapeutics, Inc. v. Narachi*,
    No. CV 12412-VCMR, 2018 WL 1100372 (Del. Ch. Feb. 28, 2018) ..............................13

## STATUTES, RULES & OTHER AUTHORITIES

8 Del. C.
    §102(b)(7) ...........................................................................................................................7
    §220 .....................................................................................................................................1

Federal Rules of Civil Procedure

    Rule 23.1 ..................................................................................................5, 6, 8, 22
    Rule 23.1(b) .............................................................................................................4
    Rule 12 (b)(6).....................................................................................................28, 29

*Zoom Sees More Growth After 'Unprecedented' 2020*, BBC News (Mar. 01, 2021),
    https://www.bbc.com/news/business-56247489 (last accessed Dec. 4, 2024) .................14

*Pentagon Issues New Guidance on Zoom Use*, VOA News (Apr. 10, 2020),
    https://www.voanews.com/a/silicon-valley-technology_pentagon-issues-new-guidance-zoom-use/6187354.html (last accessed Dec. 6, 2023) .......................................................14

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff Suzanne Flannery ("Plaintiff") filed the operative amended complaint in this consolidated stockholder derivative action on behalf of Zoom Video Communications, Inc. ("Zoom" or the "Company") on August 11, 2023, against the Individual Defendants[1] for breach of fiduciary duty and unjust enrichment.  As encouraged by Delaware courts, Plaintiff has used the tools at hand via books and records produced to Plaintiff pursuant to 8 *Del. C.* § 220 ("Section 220") to fortify the allegations in the Complaint.  The Complaint alleges, among other things, that the Individual Defendants: (i) misled investors about Zoom's privacy and security practices; (ii) allowed Zoom to operate without adequate privacy and security controls; and (iii) sold millions of dollars' worth of Zoom stock while in possession of material non-public information ("MNPI"), thereby unjustly enriching themselves.  Defendants moved to dismiss the Complaint on October 18, 2023, pursuant to Rules 12(b)(6) and 23.1 of the Federal Rules of Civil Procedure ("F.R.C.P."). (D.I. 40-45).  Plaintiff hereto opposes Defendants' motion to dismiss ("Motion").

## SUMMARY OF THE ARGUMENT

As set forth below, a pre-suit litigation demand on Zoom's Board of Directors (the "Board") would have been a futile act because the Complaint adequately alleges that a majority of the Board received a material personal benefit, faces a substantial likelihood of liability on the claims asserted herein, or lack independence from someone who received a material personal benefit or faces a substantial likelihood of liability.  Plaintiff has also sufficiently pled claims for breach of fiduciary duty and unjust enrichment.

The Complaint's detailed allegations undermine Defendants' arguments.  First, Plaintiff

---

[1] Capitalized terms not defined in this brief have the same meanings ascribed in the Verified Stockholder Derivative Amended Operative Consolidated Complaint (the "Complaint"). (D.I. 28). Complaint paragraphs are cited as "¶__." Defendants are referred to herein by his/her last name.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

held Zoom stock during the alleged wrongful acts and has standing to challenge the Individual Defendants' conduct that occurred after she acquired Zoom stock.  Further, the Complaint sufficiently asserts that at least half of the Board could not impartially consider a demand.  The Individual Defendants face a substantial likelihood of liability for knowingly disseminating false statements about privacy and security practices; internal documents reveal their awareness of Zoom's cybersecurity flaws.  Plaintiff also highlights insider selling amid false statements, and outlines the Board's oversight failures, including inadequate privacy and security controls and disregard for applicable laws and regulations.  These acts ultimately exposed Zoom to hundreds of millions of dollars in costs arising out of the numerous lawsuits and investigations launched by consumers, investors, and regulators.  Given doubts about the Board's ability to independently and impartially assess Plaintiff's claims on Zoom's behalf, demand on the Board is excused.

## STATEMENT OF FACTS

A.    **Background of Zoom's Platform Issues, Compliance and Defendants' Knowledge**

Before the Relevant Period, in March 2019, the Individual Defendants promoted Zoom's IPO by emphasizing the platform's purported features and capabilities, including: (i) Zoom's "unique technology and infrastructure enable best in-class reliability, scalability and performance;" (ii) the "robust security capabilities, including end-to-end encryption, secure login, administrative controls and role-based access controls;" (iii) that Zoom "strive[s] to comply with applicable laws, regulations, policies and other legal obligations relating to privacy, data protection and information security to the extent possible;" (iv) and that "[e]nd-to-end encryption [is available] for all meetings."  ¶¶60-63, 65.  These features influenced the investing public's perception of Zoom's purportedly superior technology in video-based telecommunications.  ¶¶4, 65. █████████████████████████████████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



¶¶66, 80.

*Id.*

*Id.* The issue was not addressed until a security researcher exposed it. ¶¶66, 88, 97, 142. As a result, Zoom became the subject of a complaint filed by the Electronic Privacy Information Center ("EPIC") with the Federal Trade Commission ("FTC") in July 2019. ¶74.

Additionally, in violation of FTC rules, Zoom's Privacy Policy mentioned collecting data through Facebook log-ins, but failed to disclose the surreptitious sending of user data to Facebook, even for users without Facebook accounts. ¶¶6, 67-68. Zoom also sent users' names and email addresses to a system matching them with LinkedIn profiles without consent. ¶68. This functionality even worked to display users' real names and biographical information, even if those users wished to keep their identities private and adopted pseudonyms during Zoom Meetings. *Id.*

Despite knowing about inadequate data privacy controls, false claims about encryption, inaccurate data handling disclosures, and regulatory non-compliance, Defendants continued disseminating false and misleading statements. ¶¶71, 91, 98, 109. Their deceptive practices were aimed to attract users, artificially inflate the Company's stock price, and take advantage of a meteoric growth opportunity presented by the COVID-19 pandemic. ¶149.

**B.    Six Insiders Sell over $87 Million of Zoom Stock While Possessing MNPI**

Defendants Yuan, Subotovsky, Eschenbach, Chadwick, Steckelberg and non-party Hammonds each possessed MNPI about the sorry state of Zoom's security and privacy practices and the vulnerabilities customers were deliberately exposed to in connection. Still, from October 18, 2019 through March 19, 2020 (the "Sales Period"), they collectively sold over $87 million in

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Zoom stock.  ¶¶198-99.  At the time of these sales, Defendants falsely promoted Zoom's privacy and security despite their knowledge, *inter alia*, that Zoom lacked end-to-end encryption, its data and security controls were deficient, its policies failed to disclose how customer data was handled, and personal customer information was easily accessible to unauthorized parties.  ¶¶89-91.

### C. Zoom's Deceptive Privacy and Security Practices and Misleading Statements Subject It to Civil Actions and Regulatory Investigations

As the truth emerged, Zoom became the subject of a litany of civil lawsuits and regulatory investigations.  As a result, the Company has incurred hundreds of millions of dollars in costs in defending and settling the same, including: (i) at least $210 million in expenses and costs in connection with defending and settling the related Securities Class Action for violations of federal securities laws, captioned *In re Zoom Sec. Litig.*, 20-cv-02353-JD (N.D. Cal. Dec. 23, 2020); (ii) costs incurred from defending and paying the $85 million settlement in the related Consumer Class Action, captioned *In re Zoom Video Commc'ns, Inc. Privacy Litig.*, 20-cv-02155-LB (N.D. Cal. July 31, 2021) (Motion at 16-20); (iii) costs associated with the EPIC Complaint, and investigations by the DOJ, SEC, FBI, and numerous attorneys general; and (iv) costs incurred from implementing the security measures required under the Company's settlement with the FTC and New York Attorney General.  ¶¶18-24, 145-163.

## ARGUMENT

## I. PLAINTIFF HAS STANDING TO PURSUE CLAIMS IN THE COMPLAINT

Pursuant to F.R.C.P. Rule 23.1, a derivative plaintiff must allege that she: (i) "was a shareholder … at the time of the transaction complained of"; and (ii) has owned stock continuously since the date the lawsuit was filed."  *See* F.R.C.P. 23.1(b).  Plaintiff meets these requirements, having been a Zoom shareholder since the beginning of the Relevant Period and continuously

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

maintaining ownership since September 25, 2019.  ¶28.[2]

While Plaintiff alleges, as background, wrongful acts that pre-dated her stock ownership, the substantive allegations of the Complaint relate to misconduct during the Relevant Period,[3] including inadequate privacy controls, regulatory non-compliance, failure to address ongoing privacy and security issues, and improper insider selling.  ¶¶91, 94, 98, 103-110, 174-180, 198-202.[4]  As a result, Defendants' arguments that Plaintiff did not contemporaneously own stock at the time of the alleged wrongful acts—which extend beyond alleged misstatements in the Securities Class Action—is without merit.[5]

---

[2] Indeed, the Complaint makes clear that the claims against Defendants are for conduct that occurred during the Relevant Period, which begins on the date that Plaintiff became a stockholder of Zoom.

[3] *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Stumpf*, No. C 11-2369 SI, 2012 WL 424557, at *4 (N.D. Cal. Feb. 9, 2012) (finding that the plaintiffs satisfied the contemporaneous ownership requirement of F.R.C.P. 23.1, where the complaint alleged, as background, wrongful acts that pre-dated the plaintiffs' stock ownership but the "substantive allegations of the complaint, confirm[ed] that plaintiffs' claims for liability are not based upon allegedly wrongful acts that occurred prior to plaintiffs' stock ownership.").

[4] *Marriott, Facebook* and *In re Smiledirectclub*, cases on which Defendants rely on for the proposition that Plaintiff lacks standing to challenge conduct that pre-dated her stock ownership, are inapposite. *See* Motion at 11-12.  In all three of these cases, the courts found that the plaintiffs could not satisfy Rule 23.1's contemporaneous ownership requirement because they challenged conduct during relevant periods which predated their stock ownership.  *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, No. 19-MD-2879, 2021 WL 2401641,*7 (D. Md. June 11, 2021); *In re Facebook, Inc., Initial Pub. Offering Derivative Litig.*, 797 F.3d 148, 160 (2d Cir. 2015); *In re Smiledirectclub, Inc. Derivative Litig.*, No. CV 2019-0940-MTZ, 2021 WL 2182827, *12 (Del. Ch. May 28, 2021).

[5] Defendants also cite to *Laborers' Dist. Council Constr. Indus. Pension Fund v. Bensoussan*, 2016 WL 3407708, at *2 (Del. Ch. June 14, 2016), *aff'd*, 155 A.3d 1283 (Del. 2017) in support of the proposition that the Relevant Period with respect to the insider sales "is when Defendants entered into the plans, not when their brokers executed the sales" because certain of the Insider Selling Defendants entered into 10b5-1 plans before Plaintiff acquired Zoom stock.  Motion at 12-13.  However, *Benoussan* does not support Defendants' position that insider stock sales must be analyzed at the time 10b5-1 plans were entered into when assessing standing and the court did not hold anything of this sort.  Instead, the court in *Benoussan* dismissed the plaintiff's claims on the basis of issue preclusion, where another court previously rejected the notion that that the director

- 5 -
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## II.     DEMAND IS EXCUSED UNDER RULE 23.1 AND DELAWARE LAW

Under Delaware law, Demand is futile where "the derivative plaintiff has shown some reason to doubt that the board will exercise its discretion impartially and in good faith." *In re BGC Partners, Inc., Derivative Litig.*, 2019 WL 4745121, at \*6 (Del. Ch. Sept. 30, 2019).  Reasonable doubt arises if at least half of the board's members: (i) "received a material personal benefit from the alleged misconduct"; (ii) "face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand"; or (iii) lack independence from someone "who received a material personal benefit […] or would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand." *United Food & Com. Workers Union & Participating Food Indus. Employers Tri-State Pension Fund v. Zuckerberg,* 262 A.3d 1034, 1059 (Del. 2021) (citation omitted).

### A.     A Majority of the Board Faces a Substantial Likelihood Under *Malone* for Making and Causing the Issuance of Materially False and Misleading Statements and Omissions

"[D]irectors who knowingly disseminate false information that results in corporate injury […] violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances." *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998).  "When the directors are not seeking shareholder action, but are deliberately misinforming shareholders about the business of the corporation, either directly or by a public statement, there is a violation of fiduciary duty."  *Id.* at 14; *see also Clark v. Davenport, et al.*, No. CV 2017-0839-JTL, 2019 WL 3230928, at \*26 (Del. Ch. July 18, 2019) (outlining the *Malone* framework).

Because Zoom has an exculpation provision, Plaintiff must also plead either "particularized

---

defendants lacked independence because they shirked their obligation to investigate suspicious stock sales and thus faced a substantial likelihood of liability.  Issue preclusion is not at issue here.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

allegations that support the inference that the disclosure violation was made in bad faith, knowingly or intentionally" or "facts that support a meritorious claim for breach of the duty of loyalty." *In re Camping World Holdings, Inc. S'holder Deriv. Litig.*, No. CV 2019-0179-LWW, 2022 WL 288152, at *12, 19 (Del. Ch. Jan. 31, 2022).[6]  Defendants also argue that Plaintiff must plead reliance, causation, and damage.  Plaintiff disagrees and submits that such a pleading is only required in direct claims, not derivative.[7]  Accordingly, Plaintiff must, and did, plead that the Board knowingly disseminated materially false information; deliberately misinformed shareholders; and breached their duty of loyalty *or* acted in bad faith by their knowing, or intentional misstatements.

### 1.    Materially False Information and Omissions

*False Statements*: Defendants attempt to argue that "Plaintiff fail[s] to allege with particularity which disclosures were misleading, when the Company was obligated to make disclosures, what specifically the Company was obligated to disclose, and how the Company failed to do so."  Motion at 18.  These so-called "newspaper facts" need not be pled as it would be nearly impossible for Plaintiff to plead highly specific facts "about fiduciary wrongdoing when they were not in the boardroom and, unlike fraud, were not the direct targets of the wrongful behavior." *Elburn on behalf of Invs. Bancorp, Inc. v. Albanese, et al.*, No. CV 2019-0774-JRS, 2020 WL 1929169, at *8-9 (Del. Ch. Apr. 21, 2020).  In fact, the Delaware Chancery Court has previously

---

[6] *See also In re Zimmer Biomet Holdings, Inc. Deriv. Litig.*, No. CV 2019-0455-LWW, 2021 WL 3779155, at *5 (Del. Ch. Aug. 25, 2021); *In re GGP, Inc. S'holder Litig.*, 282 A.3d 37, 63 (Del. 2022) ("Critically, Section 102(b)(7) provisions may not exculpate directors for their breaches of the duty of loyalty"); *see also* 8 Del. C. § 102(b)(7).

[7] *Malone's* discussion on reliance expands on the decision in *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 474 (Del. 1992), holding that because individual reliance predominated over the issues, no class may be certified in a common law fraud claim involving stockholders.  As *Gaffin* limits a plaintiff's ability to pursue disclosure claims through a direct claim, it follows that *Malone's* expansion of reliance in non-shareholder action cases also only applies to direct claims. *See Malone*, 722, A.2d at 14.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

held that "the better paradigm in which to assess particularity in the Rule 23.1 context is the one in which courts contextually evaluate allegations of fraudulent omission." *Id.*[8]

However, Plaintiff states with particularity the false statements that were made, which included, *inter alia*: (i) Zoom's "unique technology and infrastructure enable best in-class reliability, scalability and performance;" (ii) the Company "offer[s] robust security capabilities, including end-to-end encryption, secure login, administrative controls and role-based access controls;" (iii) Zoom "strive[s] to comply with applicable laws, regulations, policies and other legal obligations relating to privacy, data protection and information security to the extent possible;" and (iv) "[e]nd-to-end encryption [is available] for all meetings." ¶¶92–106.

Each of these statements were inarguably false and misleading because, as pled: (i) Zoom's data privacy and security controls were inadequate; (ii) despite the Company's own claims, the Zoom platform was not actually equipped with end-to-end or AES 256-bit encryption; (iii) Zoom users faced certain risks, including a heightened risk that their personal information would be improperly accessed by unauthorized parties; (iv) Zoom did not accurately disclose how it handled users' data; (v) Zoom was not compliant with regulatory requirements related to privacy, data protection, or information security; (vi) the Company failed to maintain adequate internal controls; and (viii) Zoom was "experiencing known but undisclosed privacy and security vulnerabilities." ¶¶ 91, 133, 225–26.

*Actionable Omissions*: In addition to the false statements, Plaintiff alleges with particularity the actionable omissions of the Directors.[9]  Under Delaware law, "directors generally

---

[8] The pleading standard under this "paradigm" is more relaxed as omissions "cannot be described in terms of the time, place, and contents of the misrepresentation." *Elburn*, 2020 WL 1929169 at *19 n. 95.

[9] Where, like here, the directors omitted material information and face a substantial likelihood of

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

have a fiduciary duty to disclose all material facts when they seek stockholder action **or communicate with stockholders** […] [t]here need not be an affirmative disclosure requirement under federal law, however, for a fiduciary duty to disclose to arise under Delaware law." *Unanue v. Unanue*, No. CIV. A. 204-N, 2004 WL 2521292, at *8 (Del. Ch. Nov. 3, 2004) (citing *Malone*, 722 A.2d at *9-10) (Emphasis added). Indeed, "the Delaware Supreme Court confirmed that whenever directors communicate publicly or directly with stockholders about the corporation's affairs they must fully and fairly disclose all material facts." *Id*., at *9 (citing *Stroud v. Grace*, 606 A.2d 75 (Del. 1992)). Accordingly, the Directors (referring herein to the Director Defendants) had a clear fiduciary duty to disclose *all* material information in their public filings and statements yet failed to do so. ¶¶6, 71, 87, 89–90, 96, 98–99, 107–10, 133.

Also, the Board frequently omitted material information in tandem with disclosing other information. For example, the Company's public filings touted its end-to-end and AES 256-bit encryption or "passively mentioned the July 2019 Leitschuh article" while simultaneously omitting the serious security vulnerabilities in its system and Defendants' knowledge thereof. *See* ¶¶6, 96. It has "long been understood" under Delaware law that when a board chooses to disclose "a course of events or to discuss a specific subject" "it cannot do so in a materially misleading way, by disclosing only part of the story, and leaving the reader with a distorted impression." *Appel v. Berkman*, 180 A.3d 1055, 1064 (Del. 2018). "Disclosures must provide a balanced, truthful account of all matters they disclose. Partial disclosure, in which some material facts are not disclosed […], is not sufficient to meet a fiduciary's disclosure obligations." *Id.* █████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

liability therefor, the pleading standard is more relaxed, as outlined at n.8, *supra*.

- 9 -

███████████████████████ ¶¶66, 78–82.

**Knowing Dissemination:** Delaware Chancery Court has previously held that directors'

signatures on an SEC filing shows "those directors' participation in the issuance" of the filing and

false and misleading statements. *In re Geron Corp. S'holder Deriv. Litig.*, No. CV 2020-0684-

SG, 2022 WL 1836238, at *10 (Del. Ch. Jun. 3, 2022).[10]

**Deliberately Misinforming Shareholders:** Although this element requires "knowing

misconduct" as opposed to "reckless indifference," *see Clark v. Davenport*, 2019 WL 3230928, at

*9 (Del. Ch. Jul. 18, 2019), the Court may "infer scienter for *Malone* claims where certain types

of factual allegations are made." *See Zimmer Biomet Holdings*, 2021 WL 3779155, at *12 (to infer

scienter, "[a] plaintiff must plead with particularity that directors 'had knowledge that any

disclosures or omissions were false or misleading or … acted in bad faith in not adequately

informing themselves.'" (quoting *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106,

134 (Del. Ch. 2009)).

Here, Defendants argue that Plaintiff did not adequately plead that the Directors knew that

the statements were false and deliberately misinformed shareholders, while picking-and-choosing

---

[10] *IBEW Loc. Union 481 Defined Contribution Plan & Tr. on Behalf of GoDaddy, Inc. v. Winborne*, 301 A.3d 596, 628-629 (Del. Ch. 2023) ("Each of [the directors] signed the 2019 10-K […] [a]t the pleading stage, the plaintiff is entitled to the inference" that the directors had knowledge). Still, Defendants argue that Plaintiff only pleads that the Director Defendants "reviewed and approved" the SEC filings containing the false and misleading statements to satisfy this dissemination element, which is not enough and rely on two cases to support their contention: *In re Zimmer Biomet Holdings*, 2021 WL 3779155, at *14-15, and *In re Camping World Holdings*, 2022 WL 288152, at *5-6. Motion at 15. Unlike *Zimmer* and *Camping World*, the Directors: ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ¶¶45–49, 66, 78, 94. These allegations demonstrate the Directors' "participation in the issuance"–or knowing dissemination– of the false and misleading statements.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

convenient parts of the Complaint to support them.  Motion at 16.  Yet, the Complaint is replete with facts that the Directors ████████████████████████████████████████ ████ (¶66), but still deliberately misinformed shareholders.  In fact, there are two sections of the Complaint (spanning forty paragraphs) dedicated to this exact point, each pleading the Directors' knowledge of Zoom's issues and flaws and their subsequent dissemination of false and misleading information to the public. ¶¶70–110.  Specifically, the Complaint states: (i) ████

████████████████████████████████████████████████████████

████████████████████████████ (ii) ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ (iii) ████████████████████████████████████

██████████ in which Zoom's security flaws, including the "Video On" issue and "Zoom Opener component" which bypassed "Apple's Safari browser security controls," was discussed; and (iv) ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ ¶¶66, 78–82, 94.

Accordingly, Defendants' argument lacks merit.  As averred, Plaintiff pleads: (i) when the Directors learned of Zoom's security flaws, (ii) that the Directors thus knew of Zoom's security issues and vulnerabilities,[11] and (iii) despite this, the Directors continued to publish false and

---

[11] The Complaint also states: "[t]hese statements by Defendant Yuan were materially false and misleading given the fact that he *knew* Zoom faced major security issues"; "[t]he statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants *knew*, consciously disregarded, or were reckless in not knowing"; "Defendants Yuan, Chadwick, Subotovsky, Swanson, Eschenbach, Scheinman, and Gassner […] *knew* of the Company's widespread privacy and security problems"; and ████████████████████████████████████ ████████████████████████████ (Emphasis added) ¶¶81, 133, 201.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

misleading statements regarding Zoom's security and privacy capabilities.  As such, Plaintiff clearly alleges the Directors' knowledge, as well as facts sufficient for the Court to infer scienter.[12]

**Exculpation Provision:** As stated *infra*, the exculpation provision may be overcome by pleading a breach of the duty of loyalty.  *GGP, Inc. S'holder Litig.*, 282 A.3d at 63.  Plaintiff alleges particularized facts throughout the Complaint showcasing the Directors' breaches of the duty of loyalty, sufficient to support a meritorious claim, by "causing [] Zoom to make improper statements about the Company's privacy and security practices, engage in unfair and deceptive trade practices in violation of federal law, and caused Zoom to incur substantial damage"; "making improper statements in the Company's press releases, SEC filings, and blog posts […]"; and by "recklessly permitting the improper activity concerning Zoom's unfair and deceptive trade practices." ¶¶36, 145–47, 160–65.  Despite assertions to the contrary, Plaintiff *did* make allegations to support the inference that the disclosures, or omissions, were made in bad faith, knowingly, or intentionally as set forth herein. *See also* ¶¶45–49, 66, 70–110.

**Reliance, Causation, and Damage:** It is unclear if, under Delaware law, reliance, causation, and damage[13] *must* be pled for a derivative claim.  Notably, the case relied upon by

---

[12] Plaintiff alleges that ███████████████ (¶¶66, 78–82).  The Directors knew that "robust security capabilities," among other things, (¶¶60–62), were key to Zoom's business and success, thus a failure to deliver on these would foreseeably impact Zoom's business and financial performance.

(Emphasis added); ¶¶ 81, 87, 93, 127, 144.

[13] Damage–or corporate injury–is an essential element under *Malone* (*Malone*, 722 A.2d at 9), which has been alleged. ¶¶181–83.  Damage resulting from the corporation's reliance on the false statements is not required to sustain a derivative *Malone* claim; nor is Plaintiff's reliance and

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Defendants is the *only* case in which a Delaware state court has required reliance in a derivative action. *Bonner v. Melo*, No. 17-CV-04719-WHO, 2018 WL 3537004, n.6 (N.D. Cal. Jul. 23, 2018) (refusing to determine whether reliance is required for a derivative *Malone* claim but noting that "one Delaware court has required reliance for derivative claims").[14]  Consistent with this view, courts following *Malone* typically analyze derivative claims without any reference to an element of reliance.  *See In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563 (Del. Ch. Feb. 6, 2007) (making no mention of a reliance requirement); *In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963 (Del. Ch. 2007) (same).  *See also Forestal v. Caldwell*, No. CV 16-4492-MWF (GJSx), 2016 WL 9774914 (C.D. Cal. Nov. 14, 2016) (finding derivative liability without requiring reliance) (applying Delaware law).

In any event, Plaintiff adequately pleads each element of reliance, causation, and damage in the Complaint: following the Directors' misstatements, a huge swathe of private companies, educational institutions, government agencies, and individuals used Zoom because of their enhanced "privacy" and "security" practices.  In early 2020, as "individuals, business, and institutions increasingly relied on virtual communications platforms [...] Zoom's purported security, privacy, and reliability were seen as a superior means to virtually facilitate

---

damage, as Defendants assert.

[14] The decision in *Wilkin on behalf of Orexigen Therapeutics, Inc. v. Narachi*, No. CV 12412-VCMR, 2018 WL 1100372 (Del. Ch. Feb. 28, 2018) also relied on in *A.R DeMarco Enters., Inc. v. Ocean Spray Cranberries, Inc.*, No. CIV.A. 19133-NC, 2002 WL 31820970 (Del. Ch. Dec. 4, 2002); *Dubroff v. Wren Holdings, LLC*, No. CIV.A. 3940-VCN, 2010 WL 3294219 (Del. Ch. Aug. 20, 2010); and *Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.*, No. CIV.A. 20066-N, 2006 WL 1494360 (Del. Ch. May 24, 2006).  However, each of those decisions involved direct actions, not derivative.  This makes sense because a shareholder directly seeking personal damages must show their individual reliance to ensure unharmed plaintiffs do not improperly manufacture a claim against a defendant and reap unjust damages.  Thus, Plaintiff submits that the *Wilkin* court's application of these cases is incorrect, overly expansive, and inconsistent with existing Delaware caselaw.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

communications and Zoom's user base grew astronomically as a result."[15]  ¶100.  Had Zoom not deceptively touted it's "privacy and security practices" (¶101), many of these users would have used a competitor over Zoom.  Zoom also relied on the Directors at all times to act in the best interests of the business.  ¶40; *Klaassen v. Allegro Dev. Corp.*, No. CA 8626-VCL, 2013 WL 5967028, at *11 (Del. Ch. Nov. 7, 2013) ("[t]he board's fiduciary duty of loyalty compels the directors to act in the best interests of the entity.").

Once the truth was revealed, many users stopped using Zoom and switched to competitors. ¶¶126, 131.  For example, "various school systems such as the New York City Department of Education and the Clark County School District of Nevada banned the use of Zoom for remote learning due to privacy and security concerns."  ¶136.  Further, "the Department of Defense issued a new guidance on using Zoom's platform following the FBI's warning about its security issues" (¶139), which included stopping Department of Defense personnel from using Zoom's platform.[16]

As a result, Zoom suffered significant damage.  ¶173. Indeed, the "restructuring plan and […] the need to terminate 15% of the workforce shows the extent of damage caused to the Company."  *Id.*  Moreover, as a result of the Directors' wrongdoing, Zoom has incurred costs of $150 million and $85 million for the settlement of the related Securities Class Action and Consumer Class Action, respectively, as well as having incurred costs on the DOJ, SEC, FBI, and other governmental investigations and implementing the security measures required under the Company's settlement with the FTC.  ¶183.

---

[15] Zoom's sales soared 326% in 2020, reflecting the alleged astronomical growth. *Zoom Sees More Growth After 'Unprecedented' 2020*, BBC News (Mar. 01, 2021), https://www.bbc.com/news/business-56247489 (last accessed Dec. 4, 2024).

[16] Carla Babb, *Pentagon Issues New Guidance on Zoom Use*, VOA News (Apr. 10, 2020), https://www.voanews.com/a/silicon-valley-technology_pentagon-issues-new-guidance-zoom-use/6187354.html (last accessed Dec. 6, 2023).

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

But for Defendants' wrongdoing and publication of false and misleading statements, Zoom's user base would not have grown "astronomically," and the Company would not have suffered significant corporate injury when the truth finally emerged.  Thus, the damage caused to Zoom, and the causal link between the false and misleading statements relied upon and the subsequent damage is sufficiently pled.

**B.    The Directors Face a Substantial Likelihood of Liability Under *Caremark***

To assert a claim under *In re Caremark International Inc., Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996), Plaintiff "must allege particularized facts that establish either (1) 'the directors utterly failed to implement any reporting or information system or controls, *or* (2) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of the risks or problems requiring their attention.'" *City of Detroit Police & Fire Ret. Sys. on Behalf of NiSource, Inc. v. Hamrock*, No. CV 2021-0370-KSJM, 2022 WL 2387653, *12 (Del. Ch. June 30, 2022*).   Contrary to Defendants' assertions, Plaintiff has alleged facts sufficient for both Prong 1 and Prong 2 of *Caremark*.

*Prong 1 – Utter Failure*

When considering a claim under Prong 1—the "Utter Failure Theory"—the Court "must look beyond the mere existence of a system to some indicia of effectiveness when determining whether a board made the required good faith effort.  The court must evaluate, for example, whether the system functions in earnest, as oversight requires more than just 'go[ing] through the motions.'" *City of Detroit Police & Fire Ret. Sys.*, 2022 WL 2387653, at *12 (internal citations omitted).  "[M]erely fulfilling regulatory requirements imposed by governmental authorities [is] not necessarily enough" and "when a company operates in an environment where externally imposed regulations govern its 'mission critical' operations, the board's oversight function must

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

be more rigorously exercised."  *Id.*, at *13 (citing *Marchand v. Barnhill*, 212 A.3d 805, 823 (Del. 2019)).

Despite the existence of the Audit Committee, Plaintiff submits that the members of the Audit Committee (along with the rest of the Board) failed to make the required good faith effort in relation to implementing a fully functioning security program.  As Defendants recognize, the Complaint alleges that: "█████████████████████████████████, did not take steps to expedite the implementation of a fully functioning security program and failed to remedy or otherwise to disclose the as-yet unrevealed aspects of the Company's pressing data and security exposure […]."  ¶195.  Moreover, while the Board *did* receive updates on Zoom's security practices, they still failed to effect any changes or implement a functioning security program until "after a security researcher forced its hand."  ¶¶88, 97.

Data privacy and security are "mission critical" to Zoom's operations, thus the Board's oversight function must be "more rigorously exercised."  *Constr. Indus. Laborers Pension Fund v. Bingle*, No. 2021-0940-SG, 2022 WL 4102492, at *1-2 (Del. Ch. Sep. 6, 2022) ("cybersecurity, for online service providers, is mission critical").  Defendants learned of █████████████ ████████████████ (¶¶66, 78–82), yet in breach of their duty knowingly and intentionally allowed and/or caused the Company to issue statements to the public which falsely touted Zoom's critical cybersecurity features – which did not exist.  ¶¶70–110.  The fact that the Directors did not themselves nor cause the Company to: (i) implement a fully functioning security program; (ii) improve Zoom's cybersecurity controls; or (iii) issue statements containing the true condition of Zoom's cybersecurity practices, until "a security researcher forced its hand"  (¶¶88, 97), despite knowing of the issues for months prior, demonstrates the Directors' complete failure to exercise their duties over Zoom's mission critical security program, thus satisfying Prong 1 of

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

*Caremark*.

> ### Prong 2 – Failure to Monitor

To establish *Caremark* liability under Prong 2, Plaintiff "must plead particularized facts

that that board knew of evidence of corporate misconduct – the proverbial 'red flag' – yet acted in

bad faith by consciously disregarding its duty to address that misconduct." *Genworth Fin. Consol.*

*Derivative Litig.*, No. CV 11901-VCS, 2021 WL 4452338, at *14-15 (Del. Ch. Sep. 29, 2021).

Defendants argue that Plaintiff "never alleges any specific laws that Defendants knowingly

violated." Motion at 26. There is no requirement for Plaintiff to allege specific violations of law,

as Defendants suggest, as *Caremark* is concerned with the Directors' inaction despite knowing of

"corporate misconduct." *Id.* As discussed, the Complaint details the Individual Defendants'

corporate misconduct – that is, knowingly spreading false and misleading information regarding

Zoom's data security and privacy capabilities and failing to implement proper security controls

and remediate known issues. *See, e.g.*, ¶¶70–110. This misconduct subsequently gave rise to,

*inter alia*: (i) "twenty-seven state attorneys general investigations;" (ii) the "DOJ and U.S.

Attorney's Office for the Eastern District of New York […] grand jury subpoenas;" and (iii) the

"U.S. Attorney's Office for the Northern District of California and the SEC […] subpoenas."[17]

¶¶137, 152–53.

"[A]s *Marchand* makes clear, the careful observer is one whose gaze is fixed on the

company's mission critical regulatory issues." *In re Clovis Oncology, Inc. Derivative Litig.*, No.

CV 2017-0222-JRS, 2019 WL 4850188, at *13 (Del. Ch. Oct. 1, 2019) (internal citations omitted).

---

[17] Defendants also point to the fact that the FTC investigation ended in a "no-fault, no-money
Consent Decree" (Motion at 26) but fail to disclose Commissioner Chopra and Slaughter's dissent
which "highlighted the continued risk of Zoom continuing its ***illegal practices***." ¶151 (emphasis
added).

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Accordingly, the Directors knew, and/or recklessly disregarded Zoom's mission critical cybersecurity flaws, turning a blind-eye and acting in bad faith by failing to prevent or remedy the misconduct.  ¶129.  As discussed *infra*, the Directors ████████████████████████████ ██████████████████ ¶¶17, 66, 76–82, 167.  These are the clear "red flags" that Defendants' argue are missing.  *See* Motion at 26.

Defendants argue that ████████████████████████████████ and "quickly," that the Directors did not act in bad faith.  Motion at 27.  What Defendants crucially miss is that the Directors acted months after learning of the respective flaws, and only because they were forced to respond by researchers and news outlets.  ¶¶88, 97, 111, 116–17.  For example, Defendants touted Zoom's "end-to-end encryption" in the Offering Documents in 2019 and through 2020, yet made no clarifications nor improvements until April 2020, despite the Directors learning of, and discussing, the misconduct between August 2019 and March 2020.  ¶¶17, 118; *cf. In re GoPro, Inc. S'holder Derivative Litig*., No. CV 2018-0784-JRS, 2020 WL 2036602 (Del. Ch. Apr. 28, 2020) (finding the Board responding to red flags within 11-days was sufficient, not months).  Instead of taking appropriate action, "Defendant Yuan and other Zoom insiders proceeded to dump significant numbers of shares onto the market, seeking to profit as long as they could" while knowing of the Company's security flaws and publishing false statements, as detailed below.  ¶¶129, 174–180.[18]

As a result of the Individual Defendants' corporate misconduct, the Company suffered damage from, *inter alia*, legal and regulatory actions and the need to implement adequate security measures – as pleaded at length herein and in the Complaint, totaling hundreds of millions of

---

[18]    *See In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. Jun. 8, 2006) ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation").

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

dollars.  *See* ¶183.  Accordingly, Prong 2 is satisfied.

### C.     Demand Is Excused as to Plaintiff's *Brophy* Claim

In *Brophy v. Cities Service Company*, the Delaware Supreme Court held that when "a person 'in a confidential or fiduciary position, in breach of his duty, uses his knowledge to make a profit for himself, he is accountable for such profit.'"  70 A.2d 5, 8 (Del. Ch. 1949).  *Brophy* claims are meant to "extinguish[] all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation."  *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).  Here, demand as to Plaintiff's *Brophy* claim would be futile for two separate reasons: at least half of the Board (i) faces a substantial likelihood of liability because they knowingly traded shares based on MNPI; and/or (ii) received material personal benefits from their insider sales undertaken while Zoom's stock price was artificially inflated to the tune of over $82 million.  *Zuckerberg*, 262 A.3d at 1059. Specifically, during the Sales Period, five out of the ten members of the Board –Yuan, Chadwick, Subotovsky, Eschenbach, and Hammonds – reaped proceeds from insider trading ranging from $5 million to $38 million, each case being multiples greater than their salaries from Zoom at that time. ¶¶30-39; *see Zuckerberg*, 262 A.3d at 1059.[19]

#### 1.     Defendants Yuan, Chadwick, Subotovsky and Eschenbach Face a Substantial Likelihood of Liability for Engaging in Improper Sales

Defendants Yuan, Chadwick, Subotovsky, and Eschenbach face a substantial likelihood of

---

[19] Defendants erroneously assert that demand futility on a *Brophy* claim may only be pled through showing a substantial likelihood of liability by relying on a single case decided 18 years before the Delaware Supreme Court held that the three-prong test under *Zuckerberg* applies "from this point forward."  *Id*.  They cite no authority after *Zuckerberg* that limits the path to pleading demand futility on a *Brophy* claim to a substantial likelihood of liability or otherwise excludes *Brophy* claims from *Zuckerberg*'s three-prong umbrella.  Instead, courts have taken the opposite approach. *See Davis v. Baier*, No. 3:20-CV-0929, 2023 WL 1073148, at *11 (M.D. Tenn. Jan. 27, 2023) (the "material personal benefit" test "acknowledges that conflicts of interest can arise even in the absence of demonstrated individual liability, simply through the economic stake that individuals might have had in the relevant decision.").

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

liability for profiting off sales undertaken with inside information while Zoom's stock was artificially inflated. ¶¶30, 33-34, 36; *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 800 (Del. Ch. 2009) (upholding breach of fiduciary duty for insider sales where "at the time these sales were occurring, AIG was allegedly permeated by the frauds described earlier, all of which, if known, would have made AIG a much less attractive investment.").

To assert an insider trading claim, the Complaint must contain particularized facts that are sufficient to support a reasonable inference that: "(1) the corporate fiduciary possessed material, nonpublic company information; and (2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information [scienter]." *Silverberg on Behalf of Dendreon Corp. v. Gold*, No. CIV.A. 7646-VCP, 2013 WL 6859282, at \*10 (Del. Ch. Dec. 31, 2013). *Brophy* claims "usually rest on circumstantial facts and a successful claim typically includes allegations of unusually large, suspiciously timed trades that allow a reasonable inference of scienter." *Clovis Oncology,* 2019 WL 4850188, at \*15. The Complaint easily establishes this.

### a. Yuan, Chadwick, Subotovsky and Eschenbach Possessed MNPI

Confidential information is material if there is a "substantial likelihood" that it "would have assumed actual significance in the deliberations" of a person deciding whether to trade stock. *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985); *Goldstein v. Denner*, No. CV 2020-1061-JTL, 2022 WL 1797224, at \*8 (Del. Ch. June 2, 2022). Plaintiff is only required to plead facts that reasonably support an inference that the information in question was knowable, and that the officers' or directors' positions lent them the opportunity to know of it. *Pfeiffer v. Toll*, 989 A.2d 683, 694 (Del. Ch. 2010).

Defendants Yuan, Chadwick, Subotovsky, and Eschenbach each knew how important end-

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

to-end encryption was for customers as early as January 2017 and relatedly, how important that was to Zoom's growth.  ¶147.[20]  As outlined in the Complaint, the Board met and discussed material information regarding Zoom's security issues and exposure, including its privacy compliance practices, as early as August 28, 2019, and thereafter. ¶17.[21]

Zoom's touted technology and security were admittedly the "secret sauce" to winning customers' trust—without whom Zoom would not be able to run its business at all.  ¶83.  As the truth emerged and Zoom's stock declined, Zoom experienced a loss of consumer trust, which Yuan professed, himself, in April 2020.  ¶¶83, 126, 132; *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) ("market reaction … support[s] the materiality of the misleading omission"); *In re Fitbit, Inc. Stockholder Deriv. Litig.*, No. CV 2017-0402-JRS, 2018 WL 6587159, at *13 (Del. Ch. Dec. 14, 2018) (similar).

---

[20] For instance, in July 2018, Defendants learned about a vulnerability that could expose users' passwords and the same year, the Company discovered hackers could exploit Zoom's software to take control over meetings.  ¶87.  Zoom's early marketing materials promoted that meeting attendees could obtain personal information about other meeting participants via their LinkedIn accounts without those participants knowing in 2018, though these precise features were not exposed until much later.  ¶¶94, 121, 141. In July 2019, the market learned that Zoom deliberately bypassed security features, which exposed Zoom to disturbing privacy breaches.  ¶¶7, 66.  Yuan, Chadwick, Subotovsky, and Eschenbach were all on the Board at this time and this information in question was undoubtably knowable to them.  ¶¶58-59.

[21] Unlike *Camping World*, where the plaintiffs pled that the directors were "in the dark" about a problematic acquisition due to complex accounting issues, yet knowingly sold shares based on related insider information, here, Plaintiff here alleges that Defendants knew and/or recklessly disregarded pertinent information related to Zoom's privacy and security policies, practices and vulnerabilities, but took no action to mitigate the Company's participation in it or correct false statements made to the investing public.  *Camping World*, 2022 WL 288152, at *1.  Indeed, *Camping World* contrasted cases where, like here, "fiduciaries' knowledge of MNPI about the 'scope and severity' of problems with a medical device could be inferred where they were given internal documents discussing the product's significant design flaws while the company was making bullish public statements about the product." *Id.*, at *11.  *Tilden* is also distinct, as no allegations in the complaint detailed what MNPI defendants possessed that the market did not.  *Tilden v. Cunningham*, No. CV 2017-0837-JRS, 2018 WL 5307706, at *19 (Del. Ch. Oct. 26, 2018).

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

**b.      Yuan, Chadwick, Subotovsky, and Eschenbach Traded on the Basis of MNPI**

Plaintiff is "not required to uncover and plead the 'smoking scienter gun'" to defeat a Rule 23.1 motion, but need only plead "particularized facts [to] support a reasonable inference of knowledge." *Fitbit*, 2018 WL 6587159, at *15.   Trading is suspicious depending on "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved" and whether profits were substantial relative to the seller's ordinary compensation. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006). Here, the timing and amount of these sales readily support an inference of scienter.

Specifically, Yuan profited over $38.5 million by selling shares of Zoom stock priced at $73.20-$113.54 per share between January 14, 2020 and March 17, 2020; Chadwick profited over $11.6 million for stock sales made between February 19, 2020 and March 16, 2020 priced at $100.67-$118.55 per share; Subotovsky profited over $16.8 million for stock sales made on March 10, 2020 and March 19, 2020 priced at $108.58-$122.34 per share; and Eschenbach profited over $14.7 million for stock sales made on March 6, 2020 priced at $112.89 per share. ¶180.[22]  Seven

----

[22] These figures do not include all additional sales made by Defendants Subotovsky's and Eschenbach's affiliated entities.   While Defendants claim otherwise, the fact that Defendants Eschenbach and Subotovsky are indirect holders of stock traded by their venture capital firms does not shield them from liability for utilizing their entities to profit themselves. *See Fitbit,* 2018 WL 6587159, at *14.   Indeed, as reflected in the Form 4s submitted by Defendants with their opening papers, Eschenbach and Subotovsky each disclaimed beneficial ownership of the shares they reported were sold via these entities "except to the extent of his pecuniary interest therein [.]" *See, e.g.*, Motion, Exhibit 21, footnote 8, and Exhibit 22, footnote 2.   In *In re Zimmer*, 2021 WL 3779155, the directors were alleged to have knowingly facilitated the alleged insider trading of a group of investment entities by authorizing a registration statement for the offering of shares by those funds and only one of the directors was alleged to have "personally benefitted" from one of the funds' sales. *Id. Zimmer* also recognized that its situation was not like *Fitbit* (and here) where "a majority of the demand board sold stock either personally or 'through their controlled funds.'" *Id.*, at n246.   Further, unlike *In re TrueCar, Inc. S'holder Derivative Litig.*, No. CV 2019-0672-AGB, 2020 WL 5816761, at *15 (Del. Ch. Sept. 30, 2020), Plaintiff details Defendant

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

days after the Sales Period, on March 26, 2020, the truth about Zoom's privacy and security practices began to emerge and was publicly acknowledged by the Company.  ¶¶9, 111.  As Zoom was exposed into April 2020, its stock price also tellingly fell.  This stock drop occurred a mere 11 days after the Sales Period ended. ¶201. *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (sales made two months before a negative public disclosure were suspicious).

The amount of stock sold in sales further supports an inference of scienter.  *See, e.g., Fecht v. Price Co.*, 70 F.3d 1078, 1084 (9th Cir. 1995); *Plumbers Union Loc. No. 12 Pension Fund v. Ambassador's Grp.*, 717 F. Supp. 2d 1170, 1179 (E.D. Wash. 2010) (approximately $4 million in profit from stock sales indicative of scienter); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (stock sales of $621,000 to $5.4 million suspicious under heightened pleading standard).   During the same fiscal year, these directors received between $0 and $320,826 in compensation. ¶¶30-31, 33-34, 36.  The percentages of stock sold by these Defendants were also significant in relation to the shares most of them held during that period.  ¶¶175-77; *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 646 (E.D. Va. 2000) (courts have acknowledged "manifestly significant percentages" in cases where defendants sold "10.3%, 85.6%, 35.6%, 50%, and 51.8% of their total individual holdings.").[23]  Moreover, when patterns of trading are inconsistent and multiple defendants engage in stock sales, such circumstances can

---

██████████████████████████████████████████████████████████ ¶¶208-17.

[23] Defendants argue that the percentages in the Complaint do not account for Class B Common Stock certain Defendants retained after the Sales Period, which, they contend, cuts against scienter. However, that certain Defendants retained interests in Zoom—especially in light of the onslaught of Covid-19—does not establish that the alleged insider sales were not improper. *MicroStrategy*, 115 F. Supp. 2d at 647 ("the trader may hold on to a portion of his shares to hedge against the unforeseen or to obscure the insider trading from the SEC."). Even so, Defendants fail to establish that, other than Yuan, that the percentage of Defendants' sales were not significant even with accounting for Class B Stock.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

support an inference of scienter.  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008); *Silverberg*, 2013 WL 6859282, at *15 (multiple individuals with inside information were selling at the same time, and defendants "remained silent when the Company chose not to convey that material, nonpublic information to the market, despite having multiple opportunities to do so.").[24]  The fact that some stock sales may have been made pursuant to 10b5-1 plans is also not enough to show that the challenged sales were not made based on insider information; inferences must be drawn in Plaintiff's favor at this stage.  *See In re Infosonics Corp. Derivative Litig.*, No. 06CV1336 BTM(WMc), 2007 WL 2572276, at *9 (S.D. Cal. Sept. 4, 2007) ("whether these trading plans were legitimately adopted or were put in place after learning of material, nonpublic information that could affect the price of stock, cannot be resolved at the pleading stage").[25]  Defendants' reliance on any 10b5-1 trading plans is an affirmative defense that is premature and insufficient to clear them from any ill-motive tied to their trades in light of the allegations pled in the Complaint.  *Lefkoe v. Jos. A. Bank Clothiers*, No. CIV WMN-06-1892, 2007 WL 6890353, at *6, n.11 (D. Md. Sept. 10, 2007) (the "affirmative defense of trading under a

---

[24] According to Defendants, the challenged trades "coincided" with the expiration of the "Lock-Up Period" that Zoom's directors and officers were subject to (restricting them from selling shares for about 6 months post-IPO, which occurred in April 2019) and were not inconsistent with Defendants' trading patterns thereafter.  Yet, as set forth, most of the sales challenged in the Complaint took place mid-January 2020 through March 19, 2020—well after the Lock-Up Period expired.  ¶¶174-180.  Moreover, courts have rejected such a "defense that [directors] could have committed an even larger breach of their fiduciary duties." *Am. Int'l Grp.*, 965 A.2d at 801 ("the small scale of their purchases does not defeat the reasonable inference of scienter").  In *Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003), the complaint failed to plead "particularized facts providing an inference of insider trading," given, for example, that "the timing of the defendants' trades is quite disparate." *Id.* at 503.  Here, the facts support a reasonable inference of scienter.

[25] Unlike *In re IAC/InterActive Corp. Sec. Litig.*, 478 F. Supp. 2d 574, 603-04 (S.D.N.Y. 2007), where the defendant traded shares on the same exact schedule each week for a year, Defendants' colorfully crafted chart (Motion, Exhibit 23), which attempts to show patterns of sales, reveals that the challenged sales were sporadic and concentrated for all selling officers and directors during the Sales Period.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

10b5-1" plan is "typically premature on a motion to dismiss.").[26]

> **2.     A Majority of the Board Materially Benefitted from Lucrative Insider Sales Undertaken While Zoom's Stock Price was Artificially Inflated Due to Defendants' Material Misrepresentations**

Liability aside, directors cannot be presumed capable of acting independently when "the director derives material benefits from her relationship with the company that could weigh on her mind in considering an issue before the board[.]" *Sandys v. Pincus*, 152 A.3d 124, 133 (Del. 2016). This prong of the *Zuckerberg* test is not concerned with a director's liability or lack thereof and is not contingent upon either of the two other prongs. *Zuckerberg*, 262 A.3d 1034, at *16. Rather, it is a standalone factor that, if established, resolves the demand futility analysis.

There is no question that a majority of the Board, five of the ten directors, materially profited from Zoom's artificially inflated stock during the Sales Period. ¶¶198-203. Yuan sold 420,858 shares of his stock for $38,544,800.74 in proceeds. ¶175. Eschenbach sold 130,385 shares of his stock for $14,718,641.11 in proceeds. ¶179. Chadwick sold 110,000 shares of his stock for $11,674,322.83. ¶176. Subotovsky sold 146,336 shares of his stock for $16,800,119.30. ¶178. Hammonds sold 69,922 shares for $5,079,238.73.[27] The Complaint challenges these sales

---

[26] Indeed, the trading plans, as set forth in Defendants' Exhibit 23, were entered into after the Relevant Period began and/or after the market was improperly primed with misrepresentations about the state of Zoom's privacy and security. *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc*., 442 F. App'x 672, 679 (3d Cir. 2011) ("The stock sales at issue at first blush do not appear to meet that test, as most of them were made pursuant to § 10b5–1 plans, under which corporate executives sell predetermined amounts of stock on predetermined dates to avoid liability for insider trading. However, the existence of the § 10b5–1 plans is also not exculpatory because the plans were put into place in 2006, *after* the conspiracy began."). Defendants' references to any price limits are also red herrings, as the challenged sales were made above those amounts.

[27] Defendants are aware of which sales Plaintiff refers to for non-party Hammonds, as before her passing, she was a Defendant and earlier complaints in this action explicitly detailed when her insider sales took place. *See* Motion at 1, ¶56. The Complaint read holistically, as it should be, indicates that the challenged sales occurred during the defined Sales Period. ¶¶201-02.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

and the context in which they took place, *i.e.*, while material information was known to the Individual Defendants, but purposefully shrouded from the public, and while Defendants perpetuated materially false and misleading statements and omissions.  Given that a majority of the Board materially benefitted from the alleged misconduct, demand is excused.  *Warhanek v. Bidzos*, No. CV 12-263-RGA-SRF, 2013 WL 5273112, at *7 (D. Del. Sept. 18, 2013) ("directors 'have a strong financial incentive to maintain the status quo by not authorizing any corrective action that would devalue their current holdings or cause them to disgorge improperly obtained profits.'").[28]

> **D.   Demand is Further Excused Because a Majority of the Board Lacks Independence from Someone Who Faces a Substantial Likelihood of Liability from the Claims Asserted or Received a Material Benefit Therefrom**

Demand is also excused because a majority of the Board was conflicted and lacked independence from someone who received a material benefit or faced substantial likelihood of liability on the claims that are asserted herein.  "At the pleading stage, a lack of independence turns on 'whether the plaintiffs have pled facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party.'"  *Sandys*, 152 A.3d at 128.  Plaintiff need not plead evidence or facts sufficient to create a judicial finding of the lack of independence.  *In re Ezcorp Inc. Consulting Agreement Derivative Litig.*, No. CV 9962-VCL, 2016 WL 301245, at *33 (Del. Ch. Jan. 25, 2016).  Rather, Plaintiff must show "a 'reasonable belief that the board lacks independence.'" *Id.*  Reasonable doubt as to independence may be found

---

[28] Such profits would not have been possible without the underlying misconduct.  As noted by FTC Commissioner Rohit Chopra, questions have been raised about "whether Zoom's success – and the tens of billions of dollars of wealth created for its shareholders and executives in a short period of time – was advanced through fair play . . . the evidence suggests that deception helped to create this windfall . . . [] had Zoom followed the law, it might all be different."  ¶149.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

where a director's decision is based on "extraneous considerations or influences" rather than the "corporate merits of the subject before the board." *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 2000).

Here, the demand futility analysis is strengthened because Yuan is a controlling stockholder. *See In re BGC Partners, Inc.*, No. CV 2018-0722-AGB, 2019 WL 4745121, at *8 (Del. Ch. Sept. 30, 2019) ("the presence and influence of a controller is an important factor that should be considered in the director-based focus of the demand futility inquiry … particularly on the issue of independence"). Defendant Yuan held over 34% of Zoom's voting power. ¶221. As Zoom's founder, Yuan was directly responsible for bringing on Chadwick and Scheinman, his longstanding friends, to the Board. In addition, Yuan's relationship with Eschenbach and Subotovsky, led to their respective venture capital firms' sizable investments in Zoom, and their eventual appointment to the Zoom Board. Defendants do not dispute that Yuan was a controlling stockholder at all relevant times. Accordingly, it is reasonable to infer that defendant Yuan controlled Zoom.

Similarly, defendants Subotovsky, Eschenbach, Chadwick, Gassner, and Scheinman also lack independence. Subtovsky and Eschenbach were at all relevant times general partners at venture capital firms with longstanding business relationships and ties to other members of Zoom's Board. ██████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████ ¶¶214-16. Notably, Emergence Capital was the sole institutional investor in defendant Gassner's company, Veeva Systems, Inc., prior to its IPO. Likewise, ███████████████████████████████████████
████████████████████████████████████████████████████████████████████████

- 27 -

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

██████ ¶213.[29]

Defendant Chadwick's independence is similarly compromised due to the sense of owingness he has to defendant Eschenbach and Sequoia Capital. *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 55 (Del. Ch. 2013) (holding that the director's current and past relationship's with Sequoia Capital "resulted in a sense of 'owingness' that compromised his independence"). It is also unlikely that Yuan would vote to initiate litigation against defendant ████████

███████████████████████████████████████████████

█████████████████████████████ ¶215. Defendants Yuan, Chadwick, Scheinmann, Eschenbach, Subotovsky, and Gassner each face a substantial likelihood under *Malone* and *Caremark* and defendants Yuan, Chadwick, Eschenbach and Subotovsky face a substantial likelihood under *Brophy*, thus demand is futile as to them under the third prong of *Zuckerberg*.

## III.     PLAINTIFF'S CLAIMS ARE PLAUSIBLE UNDER 12(B)(6)

### A.     Plaintiff States a Claim Under *Brophy, Malone* and *Caremark* and States a Claim for Unjust Enrichment

As detailed above, Plaintiffs have sufficiently alleged each of the Director Defendants face a substantial likelihood of liability for breaching their fiduciary duty of loyalty. Having alleged facts sufficient to establish that the Director Defendants face a substantial likelihood of liability under the stricter demand futility pleading standards of Delaware Court of Chancery Rule 23.1, the Complaint satisfies the more lenient standard for stating a claim. *City of Hialeah Emps. Ret.*

---

[29] Sequoia Capital and Emergence Capital also have overlapping investments and have participated in several rounds of funding in multiple companies, one of which is Zoom. ¶¶204, 208, 214. Accordingly, defendants Eschenbach and Subotovsky will not risk their and their firms' reputations and future investment opportunities by voting to initiate litigation against defendants Yuan, Chadwick, and Gassner. *See Sandys*, 152 A.3d at 133-34 (taking into account that private equity firms compete to finance talented entrepreneurs and that a vote to initiate litigation against one could endanger future financing opportunities).

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

*Sys. v. Begley*, No. 2017-0463-JTL, 2018 WL 1912840, at *4 (Del. Ch. Apr. 20, 2018) ("A complaint that pleads a substantial threat of liability for purposes of Rule 23.1 'will also survive a 12(b)(6) motion to dismiss.'" (quoting *McPadden v. Sidhu*, 964 A.2d 1262, 1270 (Del. Ch. 2008)).

For the same reasons that Defendants Yuan, Chadwick, Subotovsky, and Eschenbach face a substantial likelihood of liability for engaging in improper insider sales, the Complaint states plausible claims against them and Defendant Steckelberg (Zoom's CFO), for breach of fiduciary duties under *Brophy*. Steckelberg sold 66,402 shares during the Sales Period for over $5.6 million and was privy to the same MNPI. ¶¶78, 96, 102, 110, 177, 180. As such, it is reasonable to infer she had knowledge of adverse MNPI and was motivated to sell her stock for the same reasons as Yuan, Chadwick, Subotovsky, and Eschenbach. Any argument that Steckelberg traded pursuant to 10b5-1 trading plans likewise fails for the reasons above.

Plaintiff has also established that ████████████████████████████
████████████████████████████████████████████████████████████

¶¶66, 78–82, 94, yet knowingly and intentionally disseminated false and misleading information regarding Zoom's cybersecurity capabilities through the Company's SEC filings, ¶¶70–110, in breach of their duty of loyalty and/or in bad faith which, in turn, led to Zoom suffering hundreds of millions of dollars of corporate injury. ¶183. Accordingly, a *Malone* claim has been sufficiently pled to withstand a 12(b)(6) motion to dismiss.

Plaintiff's *Caremark* claim is also adequately pled, citing the Audit Committee's failure to rigorously oversee Zoom's "mission-critical" cybersecurity practices, and sufficient to sustain a Prong 1 claim. *City of Detroit Police & Fire Ret. Sys.*, 2022 WL 2387653, at *2-3; ¶¶66, 70–110. Additionally, Plaintiff establishes the necessary "red-flags" for a Prong 2 claim, which the Directors ignored. Despite being obligated to focus on the company's mission-critical regulatory

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

issues, *Clovis Oncology*, 2019 WL 4850188, at *12-13, the Individual Defendants turned a blind eye in bad faith, failing to prevent or remedy misconduct for months until "security researcher forced its hand."  ¶¶66, 78–82, 88, 94.

Finally, to plead a claim for unjust enrichment, a plaintiff must show that a defendant "secured a benefit, and that it would be unconscionable to allow them to retain that benefit."  *In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1105 (Del. Ch. 2003), *aff'd*, 847 A.2d 1121 (Del. 2004).  The Complaint alleges that the Insider Selling Defendants received over $87 million in illicit insider trading proceeds, while violating securities laws and breaching their fiduciary duties to Zoom.  The fundamental "public policy underlying a *Brophy* claim is to prevent unjust enrichment based on the misuse of confidential corporate information."  *In re Fitbit, Inc. S'holder Derivative Litig.*, 2019 WL 190933, *4, n.26 (Del.Ch., 2019).  As set forth above with respect to the *Brophy* claim, the unjust enrichment claim is adequately pled.

## CONCLUSION

For all of the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety.

Dated: December 22, 2023

**COOCH AND TAYLOR, P.A.**

/s/ *Blake A. Bennett*
Blake A. Bennett (#5133)
The Brandywine Building
1000 N. West Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 984-3800

**FARNAN LLP**
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

**BIELLI & KLAUDER, LLC**
Ryan M. Ernst (Bar No. 4788)
1204 N. King Street
Wilmington, DE 19801
Telephone: (302) 803-4600

*Co-Liaison Counsel for Plaintiffs*

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
Christopher M. Brain
501 Fifth Avenue, 19th Fl.
New York, NY 10017
Telephone: (212) 983-1300

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427

**ROBBINS LLP**
Brian J. Robbins
Stephen J. Oddo
Kevin A. Seely
Mario D. Valdovinos
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990

*Co-Lead Counsel for Plaintiffs*

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.