IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE ZOOM VIDEO COMMUNICATIONS, INC. STOCKHOLDER DERIVATIVE LITIGATION | C.A. No. 20-797-GBW |

## MEMORANDUM ORDER

Pending before the Court is Plaintiff's unopposed Motion for Final Approval of Derivative Settlement, Award of Attorneys' Fees and Expenses, and Service Award ("Motion for Final Approval") (D.I. 82) and corresponding Memorandum of Points and Authorities (D.I. 83). For the following reasons, the Court GRANTS Plaintiff's Motion for Final Approval (D.I. 82).[1]

## I. BACKGROUND

On June 11, 2020, Mr. Hugues Gervat filed a Shareholder Derivative Complaint ("Complaint") alleging that various directors of Zoom made misrepresentations or caused the making of misrepresentations regarding Zoom's privacy and security practices. D.I. 1 ¶¶ 8-12; see, e.g., D.I. 1 ¶¶ 8-9 ("Throughout the Relevant Period, the Individual Defendants caused the Company to tout . . . the reliability of its technology, infrastructure, encryption and other security controls . . . . In reality, the Company's platform and its primary application were riddled with security deficiencies that exposed its network, including users' webcams, to unauthorized

---

[1] Plaintiff is Suzanne Flannery ("Ms. Flannery" or "Plaintiff"). Nominal Defendant is Zoom Video Communications, Inc. ("Nominal Defendant" or "Zoom" or "Company"). D.I. 28 ¶ 29. The individual defendants ("Individual Defendants") (together with Nominal Defendant, "Defendants") are individual Zoom directors and officers. D.I. 28 ¶¶ 30-37.

intruders. Moreover, the Company was also providing unnecessary personal user data to third parties . . . without the knowledge or authorization of Zoom users. It also became known that Zoom did not in fact offer end-to-end encryption, a system designed to prevent data from being modified or read by outside parties, as it had represented . . . .").

On August 11, 2023, post-consolidation with other actions (D.I. 13), Ms. Flannery filed a Verified Stockholder Derivative Amended Operative Consolidated Complaint for Breach of Fiduciary Duty and Unjust Enrichment ("Amended Complaint"). D.I. 28. Similar allegations were made therein. *See, e.g.*, D.I. 28 ¶ 6 ("Following the IPO, the Individual Defendants created a narrative which touted certain features of the Zoom platform and the Company's commitment to privacy and security. Unfortunately, as would slowly come to light, Zoom's representations about its privacy and security practices were a far cry from the truth."). On January 14, 2025, the parties executed a Stipulation of Settlement ("Settlement") (D.I. 70-1, Ex. 1).

The Stipulation of Settlement provides that Zoom will adopt and implement governance reforms, including: "(i) enhancing the independence and accountability of the Board; (ii) enhancing the Audit Committee's oversight of the Company's financial statements, earnings calls, and disclosure controls, including enhancing management's reporting to the Audit Committee regarding the same; (iii) formalizing the Company's management-level Disclosure Committee and its oversight of the Company's disclosures and the integrity and effectiveness of the Company's disclosure controls; (iv) enhancing the Company's whistleblower controls; (v) establishing and amending a new, board-level Cybersecurity Committee with detailed responsibilities relating to the Company's policies and procedures with respect to its information technology and network systems as well as any data security incidents; and (vi) significantly enhancing Zoom's guidelines relating to stock trading plans under Rule 10b5-1 of the Securities Exchange Act of 1934

('Exchange Act'), for Section 16 officers and directors ('10b5-1 Trading Guidelines')." *See* D.I. 83 at 3-4.

After agreeing to the primary terms in the Stipulation of Settlement, the parties "agreed that Defendants and/or their insurers shall pay Plaintiff's Counsel attorneys' fees and expenses in the total amount of $1,350,000." D.I. 70-1, Ex. 1 at 4-5, 14. The Stipulation of Settlement also provides: "Plaintiff's Counsel may apply to the Court for service awards of up to $5,000 for Plaintiff and former plaintiff [Ms. Sarah] Anderson, only to be paid upon Court approval, and to be paid from the Fee and Expense Amount in recognition of the benefit Plaintiff and former plaintiff Anderson helped create for Zoom." D.I. 70-1, Ex. 1 at 11. The parties, accordingly, request the following for inclusion in the Court's final order: "The Court hereby approves the service awards of $5,000 for each of Plaintiff and former plaintiff Sara Anderson ('Plaintiff Anderson'), which shall be paid from the Fee and Expense Amount in recognition of Plaintiff's and former Plaintiff Anderson's participation and effort in the prosecution of the Derivative Action." D.I. 70-1, Ex. E.

On January 16, 2025, Plaintiff filed an Unopposed Motion for Preliminary Approval of Settlement. D.I. 68. In support, Plaintiff also filed a memorandum in support (D.I. 69), the Stipulation of Settlement (D.I. 70-1, Ex. 1), the proposed Governance Reforms (D.I. 70-1, Ex. A), a proposed Preliminary Approval Order (D.I. 70-1, Ex. B), a proposed Notice of Pendency of the Settlement (long and short forms) (D.I. 70-1, Exs. C, D), and a proposed Order and Final Judgment (D.I. 70-1, Ex. E).

On February 6, 2025, the Court held a preliminary approval hearing and, on April 21, 2025, the Court entered an Amended Revised Preliminary Approval Order. D.I. 78. In the Amended Revised Preliminary Approval Order, the Court *inter alia* (1) preliminarily approved the

Stipulation of Settlement as fair, reasonable and adequate, (2) scheduled a final settlement hearing, (3) approved the form, substance and dissemination of notice of the Stipulation of Settlement, (4) ordered the parties to effect the dissemination of the notice of the Stipulation of Settlement, (5) required Defendants' counsel to file with the Court an appropriate affidavit or declaration confirming compliance with the notice requirements of the preliminary approval order, (6) explained the finality of a potential settlement, including as to the relevant Zoom stockholders, (7) explained the objection procedures for any relevant Zoom stockholders, and (8) ordered Plaintiff to file a motion for final approval at least twenty-eight (28) days prior to the settlement hearing. D.I. 78.

On May 1, 2025, Defendants filed the Declaration of Ryan E. Blair Regarding Publication of Notice and Filing and Publication of Notice of Pendency of Settlement of Derivative Action. D.I. 79. Therein, Mr. Ryan E. Blair confirmed that Defendants satisfied the ordered notice requirements. D.I. 79. On June 24, 2025, Plaintiff filed a Notice of Plaintiff's Motion for Final Approval of Derivative Settlement, Award of Attorneys' Fees and Expenses, and Service Award ("Notice of Motion for Final Approval"). D.I. 82. On July 15, 2025, Plaintiff filed its Notice of Non-Objection in Support of Motion for Final Approval of Derivative Settlement, Award of Attorneys' Fees and Expenses and Service Award by Suzanne Flannery ("Notice of Non-Objection"). D.I. 85. The Notice of Non-Objection states that "the July 8, 2025, deadline to file and serve any objections to the proposed Settlement has passed, and, as of the date of this filing, no objections have been filed, served, or otherwise received by counsel for the Parties." D.I. 85 at 1. Plaintiff is correct that no objections have been filed.

On June 24, 2025, Plaintiff filed the present Motion for Final Approval. D.I. 82. On July 22, 2025, the Court held a hearing on Plaintiff's Motion for Final Approval.

## II.   DISCUSSION

Rule 23.1(c) of the Federal Rules of Civil Procedure provides: "A derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23.1(c). District courts have "wide discretion" in approving shareholder derivative suits. *See Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978).

"The principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *Shlensky*, 574 F.2d at 147. In addition, district courts approving shareholder derivative settlements consider the factors applicable to approval of class action settlements. *See id.* ("[T]he standards annunciated in *Girsh v. Jepson* for class suit settlements have accordingly been applied, although perhaps with somewhat less rigor, in the settlement of shareholders' derivative suits." (citing 521 F.2d 153, 156-57 (3d Cir. 1975))). The "*Girsh*" factors are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the shareholders to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the derivative action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement agreement in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh*, 521 F.2d at 156-57.

As discussed below, each of the *Girsh* factors weigh in favor of (or are neutral to) approving the settlement, including the extent of the benefit to be derived from the proposed settlement by Zoom (which is discussed in the context of *Girsh* factors 8 and 9). Following a discussion of the *Girsh* factors, the Court also holds that Defendants' notice of the proposed

settlement to the Zoom stockholders was sufficient and that the amounts requested for the attorney fees and service awards are fair and reasonable.

A.  **The First *Girsh* Factor Supports Settlement**

The first *Girsh* factor considers the "probable costs, in both time and money, of continued litigation." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 814 (3d Cir. 1995). "By measuring the costs of continuing on the adversarial path, a court can gauge the benefit of settling the claim amicably." *Id.* at 812. "Settlement is favored under this factor if litigation is expected to be complex, expensive and time consuming." *In re Royal Dutch/Shell Transp. Sec. Litig.*, No. 04-cv-374, 2008 WL 9447623, at *17 (D.N.J. Dec. 9, 2008) (internal citations omitted). Derivative actions are, by their very nature, "undeniably complex." *Unite Nat. Retirement Fund v. Watts*, No. 04-cv-3603-DMC, 2005 WL 2877899, at *3 (D.N.J. Oct. 28, 2005). For example, Rule 23.1 imposes a heightened pleading standard and requires Plaintiff to prove that futility was pled with "particularity." *See* Fed. R. Civ. P. 23.1.

Here, Plaintiff states: "Although Plaintiff believes that the claims asserted in the Derivative Action have merit and would have litigated the Derivative Action vigorously, Plaintiff recognizes the significant risk, expense, and length of continued proceedings." D.I. 83 at 9. Plaintiff also states: "Absent Settlement, the Derivative Action could continue for years, as resources and insurance proceeds continue to be depleted." D.I. 83 at 9. For example, Plaintiff asserts: "If litigation were to continue, Plaintiff would need to overcome Defendants' Rule 23.1 motion to dismiss based on demand futility, as well as a Rule 12(b)(6) motion to dismiss." D.I. 83 at 9. "Undoubtedly," according to Plaintiff, "the Settling Parties would face a long road to disposition; the threshold motions to dismiss would have to be adjudicated, discovery would have to be

completed, expert discovery would then commence, and summary judgment motions would be inevitable, consuming more time and resources of the litigants and the Court." D.I. 83 at 9.

At the hearing, Plaintiff issued similar statements. Hr. Tr. 6:12-22 ("Here we had already had Section 220 demands, production of documents, a fully briefed motion to dismiss, several complaints and an amended complaint, and submissions to the mediator, settlement demands and exchanges, etc. But until the motion to dismiss was decided, the case itself would not even advance into discovery, so we still had that hurdle; and had we defeated the motion, then we would have gone into discovery facts, expert discovery, eventually leading to summary judgment; and if we survived that, a trial; and if we won, an inevitable appeal so clearly the future was still complex ahead of us."). Defendants generally agreed. Hr. Tr. 14:17-25 ("We obviously have different views on the litigation risk of this case. We felt very strongly that our motions to dismiss, which we briefed twice, had a strong likelihood of approval of being granted, but at the same time we recognized that there are inherent litigation risks, there are costs associated with litigation; and so while we take a different few of the merits of this case, we recognize that there was a complex and potentially long extensive road ahead.").

For these reasons, the first *Girsh* factor weighs in favor of approving the Settlement.

**B.      The Second *Girsh* Factor Supports Settlement**

"As a general rule, a small number of objectors weighs in favor of approval." *In re Impinj, Inc. Derivative Litig.*, No. 18-cv-1686-RGA, 2021 WL 7209525, at *3 (D. Del. Nov. 22, 2021). Here, no shareholders have objected. *See* D.I. 85 (Notice of Non-Objection); Hr. Tr. 6:23–7:8 ("The reaction of the shareholders to the settlement, as Your Honor noted when you started today, there were no objections. And before Your Honor came out, we have two law clerks observing us, but no one else in the courtroom and there was no one outside in the hall, so clearly there were no

objections. This is a company with something like 72 percent of the company are institutional investors, so they have the wherewithal to mount an objection if they were unhappy with the settlement, and there have been no objections so that's a Girsh factor that favors final approval.").

While the absence of shareholder objections weighs in favor of approving the Settlement, the Court is cautious not to place too much weight on this factor "because the typical investor may not possess the tools with which to value settlement relief comprised entirely of corporate governance reforms." *Impinj*, 2021 WL 7209525, at *3. Thus, the second *Girsh* factor slightly weighs in favor of approving the Stipulation of Settlement.

C.  **The Third *Girsh* Factor Supports Settlement**

The third *Girsh* factor considers "the degree of case development" achieved prior to settlement negotiations and seeks to determine "whether [plaintiff's] counsel had an adequate appreciation of the merits of the case" before the derivative claims were settled. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 813 (3d Cir. 1995). Notably, "[e]ven settlements reached at a very early stage and prior to formal discovery are appropriate where there is no evidence of collusion and the settlement represents substantial concessions by both parties." *Weaver v. Moen*, No. 22-cv-01063-GBW, 2024 U.S. Dist. LEXIS 159346, at *10 (D. Del. Sep. 4, 2024) (quoting *In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 482 (D.N.J. 2012)). "In some cases, informal discovery will be enough for [plaintiff's] counsel to assess the value of the class' claims and negotiate a settlement that provides fair compensation." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 436-37 (3d Cir. 2016), *as amended* May 2, 2016; *see also In re Healthcare Servs. Grp., Inc. Derivative Litig.*, No. 20-cv-03426-WB, 2022 WL 2985634, at *10 (E.D. Pa. July 28, 2022) (holding that "formal proceedings

and discovery are not required for plaintiffs to assess the merits of their claims and their likelihood of success").

Here, Plaintiff observes that "Plaintiff's Counsel conducted a thorough investigation of the facts and legal claims both before and after filing the derivative complaints." D.I. 83 at 10 (citing McKenna Decl. at ¶¶ 9-20). This investigation included: "(i) reviewing documents produced by the Company in response to the 220 Demand, which included key Board-level documents regarding the underlying wrongdoing; (ii) reviewing Zoom's press releases, public statements, SEC filings, and securities analysts reports and advisories; (iii) reviewing related media reports about the Company; (iv) researching applicable law with respect to the claims alleged in the Derivative Action and potential defenses thereto; (v) preparing and filing the complaints; (vi) briefing an opposition to Defendants' motion to dismiss; (vii) conducting damages analyses; (viii) drafting a mediation statement and attending an all-day mediation; and (ix) negotiating the Settlement with Defendants, including researching corporate governance best practices and negotiating the Governance Reforms." D.I. 83 at 10-11 (citing McKenna Decl., ¶¶ 9-20).

Following the investigation, "the Settling Parties reached the Settlement terms through adversarial, arm's-length negotiations by experienced counsel over several months." D.I. 83 at 11; *see* Hr. Tr. 15:21–16:1 ("It [the negotiation] was arm's length, it was facilitated by an experienced mediator, and it was pretty lengthy, as Mr. McKenna outlines. I believe the parties requested leave to explore settlement in April 2024 and it took past the end of the year until there was a final settlement in principle that was reached.").

For the foregoing reasons, the third *Girsh* factor weighs in favor of approving the Settlement.


### D. The Fourth and Fifth *Girsh* Factors Support Settlement; the Sixth *Girsh* Factor is Neutral

The fourth and fifth *Girsh* factors consider the potential risks and rewards of litigating the action "rather than settling it at the current time." *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 814-16 (3d Cir. 1995); *see In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004). "These factors 'balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of immediate settlement.'" *Vinh Du v. Blackford*, No. 17-cv-194, 2018 WL 6604484, at *7 (D. Del. Dec. 17, 2018) (quoting *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions ("Prudential")*, 148 F.3d at 319 (3d Cir. 1998)). Moreover, the fourth and fifth factors "weigh strongly in favor of approval when a plaintiff faces 'significant obstacles' in establishing liability." *Impinj*, 221 WL 7209525, at *4 (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 237-38 (3d Cir. 2001)).

Here, Plaintiff asserts: "Plaintiff believes her claims are meritorious but acknowledges that the Derivative Action may not have withstood Defendants' motions to dismiss, especially given the heightened pleading requirements under Rule 23.1 and the exculpatory provision in the Company's certificate of incorporation which exculpates Zoom's directors from liability to the fullest extent permitted by Delaware law and thus required Plaintiff to allege particularized facts that the directors engaged in fraudulent, illegal or bad faith conduct and acted with scienter." D.I. 83 at 11-12 (cleaned up). Plaintiff also states that the "Complaint contained myriad allegations impugning the ability of a Board-majority to consider a demand" and correctly observes that "successfully alleging that demand is excused is a difficult feat under Delaware law." D.I. 83 at 12 (citing *In re Chemed Corp., S'holder Derivative Litig.*, No. 13-cv-1854-LPS-CJB, 2019 WL 3215852, at *8 (D. Del. Feb. 26, 2019)).


### D. The Fourth and Fifth *Girsh* Factors Support Settlement; the Sixth *Girsh* Factor is Neutral

The fourth and fifth *Girsh* factors consider the potential risks and rewards of litigating the action "rather than settling it at the current time." *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 814-16 (3d Cir. 1995); *see In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004). "These factors 'balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of immediate settlement.'" *Vinh Du v. Blackford*, No. 17-cv-194, 2018 WL 6604484, at *7 (D. Del. Dec. 17, 2018) (quoting *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions ("Prudential")*, 148 F.3d at 319 (3d Cir. 1998)). Moreover, the fourth and fifth factors "weigh strongly in favor of approval when a plaintiff faces 'significant obstacles' in establishing liability." *Impinj*, 221 WL 7209525, at *4 (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 237-38 (3d Cir. 2001)).

Here, Plaintiff asserts: "Plaintiff believes her claims are meritorious but acknowledges that the Derivative Action may not have withstood Defendants' motions to dismiss, especially given the heightened pleading requirements under Rule 23.1 and the exculpatory provision in the Company's certificate of incorporation which exculpates Zoom's directors from liability to the fullest extent permitted by Delaware law and thus required Plaintiff to allege particularized facts that the directors engaged in fraudulent, illegal or bad faith conduct and acted with scienter." D.I. 83 at 11-12 (cleaned up). Plaintiff also states that the "Complaint contained myriad allegations impugning the ability of a Board-majority to consider a demand" and correctly observes that "successfully alleging that demand is excused is a difficult feat under Delaware law." D.I. 83 at 12 (citing *In re Chemed Corp., S'holder Derivative Litig.*, No. 13-cv-1854-LPS-CJB, 2019 WL 3215852, at *8 (D. Del. Feb. 26, 2019)).

> In addition, Plaintiff states:
>
> Even if Plaintiff overcame Defendants' motions to dismiss, significant risks would remain for Plaintiff to improve the result through further litigation, including defeating anticipated motions for summary judgment, proving damages and bad faith on the part of the Individual Defendants, maintaining any favorable judgment through post-trial motions, and surviving any appeals. Even assuming a liability finding, litigation surrounding damages would consume more time and expense, with no guarantee of success. Additionally, further litigation could eliminate insurance coverage, either through depletion or through carriers denying coverage for certain acts. Such results would make collection of real damages from the Individual Defendants the only route to a monetary recovery for Zoom, a difficult and uncertain route at best. In contrast to the obstacles and uncertainties inherent in derivative litigation, the Settlement guarantees immediate, substantial, and lasting benefits that are unquestionably superior to the very real possibility that Plaintiff might recover nothing after years of litigation.

D.I. 83 at 12-13 (citations omitted).

Plaintiff is generally correct and, thus, the Court finds that the fourth and fifth *Girsh* factors weigh in favor of approving the Settlement. The sixth *Girsh* factor, however, "is typically used to evaluate the risk of maintaining class certification in a class action." *Watts*, 2005 WL 2877899, at *4. Because "[a] derivative action does not present the same concern," this factor is neutral. *Id.*

### E.     The Seventh *Girsh* Factor is Neutral

The seventh *Girsh* factor "addresses whether Defendants could withstand a [monetary] judgment for an amount significantly greater than the [proposed] Settlement." *In re Johnson & Johnson*, 900 F. Supp. 2d at 484 (internal quotations omitted). If defendants could not withstand a monetary judgment for a significantly greater amount, for example, such inability would favor settlement. *Id.* "But even assuming there are sufficient funds to pay a greater judgment, the Third Circuit 'has found that a defendant's ability to pay a larger settlement sum is not particularly damaging to the settlement agreement's fairness as long as the other factors favor settlement.'" *Id.* (citation omitted).

11

In a derivative suit like this, this factor "is complicated by the fact that the Individual Defendants are entitled to indemnification from the Company." *Impinj*, 2021 WL 7209525, at *4. Indeed, in such circumstances, further litigation could deplete available insurance coverage, at which point "the Company that is supposed to benefit will be spending its own money in providing discovery, indemnifying the Individual Defendants, and funding their own obligations as a Nominal Defendant [here, Zoom]." *Id.* Also, where a monetary judgment will be paid by an insurance carrier, the Third Circuit has found that a defendant's ability to pay a larger settlement sum is not particularly damaging to the settlement agreement's fairness as long as the other factors favor settlement." *O'Brien v. Brain Research Labs, LLC*, No. 12-cv-204, 2012 WL 3242365, at *19 (D.N.J. Aug. 9, 2012) (citing *Prudential*, 148 F.3d 283, 322 (3d Cir. 1998)).

At the hearing, counsel for Plaintiff stated that Zoom is "a big company and they're doing well now," that Zoom has "put all their troubles behind them" and that "this is the last case that arose out of these data issues and these disclosure issues." Hr. Tr. 9:17-20. Counsel for Plaintiff also stated that Zoom "settled the consumer case" and "the securities class action" and that this case is the "last" one. Hr. Tr. 9:20-23.

Here, while Zoom could likely withstand a larger settlement, such "is not particularly damaging to the settlement agreement's fairness." *See In re Johnson & Johnson*, 900 F. Supp. 2d at 484. Thus, the seventh *Girsh* factor is neutral.

F.  **The Eighth and Ninth *Girsh* Factors Support Settlement**

The final two *Girsh* factors consider whether the settlement represents a "good value for a weak case or a poor value for a strong case." *In re Warfarin*, 391 F.3d at 538. These factors ask "'whether the settlement is reasonable in light of the best possible recovery and the risks the parties

would face if the case went to trial.'" *Pro v. Hertz Equip. Rental Corp.*, No. 06-cv-3830, 2013 WL 3167736, at *5 (D.N.J. June 20, 2013) (quoting *Prudential,* 148 F.3d at 322).

Here, Plaintiff asserts that "the Governance Reforms are tailored to prevent the alleged misconduct from recurring, and confer substantial benefits upon Zoom that are immediate, substantial, and long lasting." D.I. 83 at 13 (citing McKenna Decl., ¶¶ 27-39). Upon review of the Governance Reforms, the Court agrees. As described above, the Governance Reforms include: "(i) enhancing the independence and accountability of the Board; (ii) enhancing the Audit Committee's oversight of the Company's financial statements, earnings calls, and disclosure controls, including enhancing management's reporting to the Audit Committee regarding the same; (iii) formalizing the Company's management-level Disclosure Committee and its oversight of the Company's disclosures and the integrity and effectiveness of the Company's disclosure controls; (iv) enhancing the Company's whistleblower controls; (v) establishing and amending a new, board-level Cybersecurity Committee with detailed responsibilities relating to the Company's policies and procedures with respect to its information technology and network systems as well as any data security incidents; and (vi) significantly enhancing Zoom's guidelines relating to stock trading plans under Rule 10b5-1 of the Securities Exchange Act of 1934 ('Exchange Act'), for Section 16 officers and directors ('10b5-1 Trading Guidelines')." D.I. 83 at 3-4.

These reforms are beneficial, including to the real party in interest (Zoom), to address the problems alleged in the Amended Complaint (e.g., improper or insufficient disclosure regarding privacy and security concerns). The Court's holding is consistent with prior decisions approving proposed settlements requiring corporate reforms. *See, e.g., Weaver,* 2024 U.S. Dist. LEXIS 159346, at *5-6 (approving Rule 23.1 settlement where the terms involved "reforms to improve

13

Tactile's internal controls regarding its compliance, to directly address the alleged lapses in Board and management-level supervision, and to update Tactile's insider trading policy").

For the foregoing reasons, the eighth and ninth *Girsh* factors weigh in favor of approving the Settlement.

### G. The Notice Given to the Stockholders Regarding the Proposed Settlement Was Sufficient

"Nonparty shareholders must be given notice of a proposed settlement of a shareholder's derivative action." *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1317 (3d Cir. 1993). "Notice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders." Fed. R. Civ. P. 23.1. "To satisfy due process, the notice 'must be sufficiently informative and give sufficient opportunity for response.'" *Id.* (quoting *Kyriazi v. W. Elec. Co.*, 647 F.2d 388, 395 (3d Cir. 1981)).

Here, the record reveals that Zoom's stockholders were given sufficient notice and in a manner consistent with previous decisions. *See* D.I. 79; *see also, e.g.*, *Weaver*, 2024 U.S. Dist. LEXIS 159346, at *16 (finding nearly identical notice sufficient). Indeed, the record reveals that: (1) "Defendants caused the Summary Notice to be published once in the Investor's Business Daily national financial newspaper on April 28, 2025," (2) "Zoom filed a copy of the Stipulation and Long-Form Notice with the U.S. Securities and Exchange Commission via Current Report on Form 8-K on April 25, 2025," and (3) "Zoom posted a copy of the Settlement Form 8-K and its attachments on the 'Investor Relations' portion of Zoom's website on April 25, 2025." D.I. 79 at 1.

For the foregoing reasons, the nonparty shareholders were provided with sufficient notice of the proposed settlement.

H.   **The Negotiated Attorneys' Fees and Service Awards Are Fair and Reasonable**

Below, the Court addresses the requested attorneys' fees and service awards in turn.

*First*, "'an award of counsel fees is only justified where the derivative action results in a substantial non-monetary benefit to the corporation.'" *Zucker v. Westinghouse Elec. Corp.*, 265 F.3d 171, 176 (3d Cir. 2001) (quoting *Kaplan v. Rand*, 192 F.3d 60, 69 (2d Cir. 1999)). This Court has previously explained that in "non-fund cases," like this one, "district courts use a lodestar approach to evaluate such an award." *See Weaver*, 2024 U.S. Dist. LEXIS 159346, at *16.

However, the lodestar method is not the only method available to evaluate the attorneys' fees requested. At other times, courts have employed the substantial benefit rule. *See Unite Nat. Ret. Fund v. Watts*, No. CIV.A. 04CV3603DMC, 2005 WL 2877899, at *5 (D.N.J. Oct. 28, 2005) ("Here . . . the recovery is of a non-pecuniary nature and is not easily translated into dollar terms. Nevertheless, attorneys' fees may be awarded even though the benefit conferred is purely non-pecuniary in nature. Instead of using a percentage of recovery method, payment of attorneys' fees is determined pursuant to the substantial benefit rule." (cleaned up)); *Jamaho v. Dema*, No. 4:21-CV-4175, 2023 U.S. Dist. LEXIS 95879, at *13 (S.D. Tex. June 1, 2023) (explain that "to recover attorney fees in a derivative lawsuit" parties and the Court may use "the substantial benefit rule").

In its opening brief in support of its Motion for Approval, Plaintiff invokes the substantial benefit rule. D.I. 83 at 15. "For a benefit to be considered substantial, it must be more than technical in consequence, and must be one that accomplishes a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or would affect the enjoyment or protection of an essential right to the shareholder's interest." *Unite Nat. Ret. Fund*, 2005 WL 2877899, at *5. On the other hand, "[r]ewarding fees for purely speculative benefits could serve to encourage strike suits." *Id.*

15

Here, the benefit conferred is substantial. As described above, the Governance Reforms include: "(i) enhancing the independence and accountability of the Board; (ii) enhancing the Audit Committee's oversight of the Company's financial statements, earnings calls, and disclosure controls, including enhancing management's reporting to the Audit Committee regarding the same; (iii) formalizing the Company's management-level Disclosure Committee and its oversight of the Company's disclosures and the integrity and effectiveness of the Company's disclosure controls; (iv) enhancing the Company's whistleblower controls; (v) establishing and amending a new, board-level Cybersecurity Committee with detailed responsibilities relating to the Company's policies and procedures with respect to its information technology and network systems as well as any data security incidents; and (vi) significantly enhancing Zoom's guidelines relating to stock trading plans under Rule 10b5-1 of the Securities Exchange Act of 1934 ('Exchange Act'), for Section 16 officers and directors ('10b5-1 Trading Guidelines')." D.I. 83 at 3-4.

These reforms will "correct[] or prevent[] an abuse which would be prejudicial to the rights and interests of [Zoom] or would affect the enjoyment or protection of an essential right to the shareholder's interest." *See Unite Nat. Ret. Fund*, 2005 WL 2877899, at *5. Indeed, "Plaintiffs' supporting papers are convincing as to the great benefit conferred upon [Zoom] as a result of the new corporate governance principles provided for in the settlement agreement, and show that the principles will serve to prevent and protect [Zoom] from the reoccurrence of certain alleged wrongdoings." *Id.* Moreover, the fees are consistent with previous fees approved. *See, e.g., In re OSI Sys., Inc. Derivative Litig*, No. CV-14-2910-MWF, 2017 WL 5642304, *4-5 (C.D. Cal. May 2, 2017) (approving $1,600,000 fee award in governance only settlement that required enhanced board independence, strengthened training for officers and directors, enhanced oversight and

consideration of compliance). "Furthermore, it is clear that counsel put forth great effort in its investigation and devoted significant resources and time to achieving such a favorable settlement." *See Unite Nat. Ret. Fund*, 2005 WL 2877899, at *5.

For the foregoing reasons, the Court approves the fee award.

*Second*, Plaintiff "requests approval of nominal service awards of $5,000 to Plaintiff and former plaintiff Sara Anderson, to be paid from the Fee and Expense Amount, in recognition of their roles in creating the substantial benefits for Zoom and its stockholders." D.I. 83 at 19. "[C]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action [or here, a derivative action] litigation." *Weaver*, 2024 WL 4040355, at *6 (quoting *Dewey v. Volkswagen of Am.*, 728 F. Supp. 2d 546, 577 (D.N.J.2010)).

Here, Plaintiff and former plaintiff Sara Anderson "devoted significant time and effort to the Derivative Action." D.I. 83 at 19; *see* D.I. 84-4, Ex. 4 (Declaration of Ms. Flannery) ¶ 3 ("Before I initiated my derivative action on behalf of Zoom, I issued a 220 demand on the Company's board of directors (the "Board"), which demanded the Company's internal books and records regarding the alleged wrongdoing. At all times, I was prepared to devote the time and resources necessary to pursue the derivative claims. Over the past few years, among other things, I reviewed the documents filed on my behalf in the Derivative Action, and both prior to and since the commencement of the Derivative Action, I have regularly consulted with and been updated by my counsel regarding the progress of the case, as well as the Settlement terms and the rationale for Settlement."); D.I. 84-4, Ex. 4 (Declaration of Ms. Anderson) ¶¶ 8-10 ("As this matter progressed, I conferred regularly with Mr. McKenna. In addition to numerous telephone calls with counsel to discuss the Derivative Action, I also exchanged correspondence with counsel about its progress.

Mr. McKenna periodically had questions for me and needed information and documents from me. I readily provided to him whatever I knew or could find that he requested. I also participated in the following activities during the course of the litigation: (i) reviewed public records and other documents; (ii) followed news stories about Zoom and alerted my counsel to any that seemed relevant; (iii) reviewed the Complaint prepared on my behalf and authorized the Derivative Action to be commenced; (iv) regularly communicated with GM&E regarding the status, strategy and progress of the Derivative Action; and (v) communicated with GM&E regarding settlement negotiations and the mediation efforts and approved same.").

Furthermore, the requested service awards are consistent with service awards previously approved. *See Weaver*, 2024 WL 4040355 at *6 (approving service award of $5,000 and explaining that when "the service award is NOT coming out of the common fund[,] courts commonly award incentive funds around $5,000").

Accordingly, to compensate Plaintiff Ms. Flannery and former plaintiff Ms. Anderson for their time and efforts devoted to this matter, the Court approves a $5,000 service award to each.

### III. Conclusion

For the foregoing reasons, the Court GRANTS Plaintiff's unopposed Motion for Final Approval of Derivative Settlement, Award of Attorneys' Fees and Expenses, and Service Award (D.I. 82) and thereby APPROVES the Stipulation of Settlement (D.I. 70-1, Ex. 1), the attorneys' fees, and the service awards.

\* \* \*

Therefore, at Wilmington this 31st day of July, 2025, **IT IS HEREBY ORDERED** that:

1. Plaintiff's unopposed Motion for Final Approval of Derivative Settlement, Award of Attorneys' Fees and Expenses, and Service Award (D.I. 82) is **GRANTED**;

2. The Stipulation of Settlement is **APPROVED**;

3. The agreed-to fee amount of $1,350,000 is **APPROVED**; and

4. The Service Awards to Plaintiff Ms. Flannery and former plaintiff Ms. Anderson, each in the amount of $5,000, are **APPROVED**.

GREGORY B. WILLIAMS
U.S. DISTRICT JUDGE